

# REPORT OF ELLIOT LEITNER

I am an independent insurance consultant. Attached is a copy of my Curriculum Vitae.

In the last four years, I have testified as an expert in American Union Life Insurance Company v Felde, et al, Safeco Life Insurance Company v States, et al; Security Life insurance Company of Denver v Angell, Peterson v Blue Cross of Idaho; Trent v Prudential Insurance Company; Thurman v Provident American Insurance Company; and DeFeo v Federal Kemper Life Insurance Company.

The opinions expressed are based on my experience, knowledge, and training according to industry standards, which includes more than 35 years in the disability insurance business. I do, however, reserve the right to supplement my report, my analysis, and my opinion as additional information, if any, develops and/or is made available for my review and consideration. I have developed my opinions independently and they are expressed with reasonable certainty based on my review of the following documents:

The Northwestern Mutual Life disability policy; The Northwestern Mutual Life disability Claim file; excerpts from the Northwestern Mutual Life Disability Benefits Guidelines; legal pleadings and papers, including the Complaint; the Answer; Interrogatories; Answers to Interrogatories; Requests For Production of Documents; Deposition transcripts of Dr. Richard R. Powell, David Gosse, Suzanne Balistreri, Sharon Hyde, Patricia Sheehan, Eileen Miller Carter, Minnie Armstrong, Richard H. Love, and Bradley R. Newman

I have formed the following opinions based on the information I have received to date:

On July 28, 1994, The Northwestern Mutual Life Insurance Company (NML) insured Cynthia A Diveglia under Policy Number D1070572. The policy provided certain benefits in the event of Mrs. Diveglia total disability. "Total Disability" is defined in the Policy as follows:
"**Total Disability. Until the end of the Initial Period, the Insured is totally disabled when unable to perform the principal duties of the regular occupation. After the Initial Period, the Insured is totally disabled when both unable to perform the principal duties of the regular occupation and not gainfully employed in any occupation.**"

In support of her claim, Mrs. Diveglia periodically submitted "Request For Continuance Of Total Disability Benefits", and, "Attending Physician's Statement", completed by her and her physicians at Sloan Kettering Memorial Hospital, Dr. Seidman, and Dr. Borgen.



Page 2

- NML acted unreasonable when it terminated disability benefits due Mrs Diveglia effective March 17, 2000. The reason provided in Ms. Balistreri's April 14, 2000 letter to Mr. Diveglia did not justify discontinuance of Mrs Diveglia's claim.
- Based on my review of the claim file, Mrs. Diveglia remained totally disabled in March, 2000, in accordance with the "Total Disability" provision of the policy contract.
- At the time of claim, Mrs Diveglia was, and continues to be, unable to perform the principal duties of her specialty occupation; 'trial attorney'.
- Mrs Diveglia furnished NML with satisfactory written proof of loss in full compliance with the policy contract and industry standards.
- Mrs Diveglia continued to be under the care of a licensed physician during her disability.
- NML did not conduct an Independent Medical Examination, or review by an outside medical consultant, prior to discontinuing benefits due Mrs. Diveglia. This is contrary to insurance industry claim practices.
- Based on industry standards, adequate investigation and reasonable inquiry into the possibilities favorable to Mrs. Diveglia's position would have resulted in the claim having been continued subsequent to March 17, 2000.
- At the time Mrs. Diveglia's claim was denied, the NML claim file did not contain any single document confirming that Mrs Diveglia was not totally disabled as defined in the policy contract.

I have not authored any publication in the last ten years.

My fee is $185.00 per hour for review and consultation. For deposition and court, my fee is $200.00 per hour, plus expenses.

_____
ELLIOT LEITNER

1    MR. DIVEGLIA: And I don't exclude that from the
2  listing.
3    THE WITNESS: The other side of it is, and here
4  again I recall where both Dr. Powell and Mr. Gosse agree
5  that there was a high risk associated -- a high risk
6  with respect to the cancer coming on.
7    BY MR. WOLGEMUTH:
8    Q    You agree with me that as of March of 2000
9  Mrs. Diveglia was cancer free?
10    MR. DIVEGLIA: Objection. There's nothing in the
11  record that says that at all.
12    THE WITNESS:
13    A    I didn't notice that, counsel.
14    Q    So you didn't see anything in the medical
15  records that would establish that, at the point the
16  benefits were terminated, she was cancer free?
17    A    I did not see that.
18    Q    All right, so now we have the fact that
19  stress can cause a recurrence; we have the left arm
20  restriction; we've got chest pains, the fact she's on
21  medication; the fact that they suggested a stress test;
22  the fact that she's at high risk of recurrence because
23  of the involvement of the cancer, the stage 2. Anything
24  else?
25    A    Well, not at this time, but if I think of it

1   practices because Northwestern did not conduct an IME

2   prior to discontinuing benefits. Do you see that?

3       A   Yes.

4       Q   So that's an insurance industry standard, to

5   have an IME done?

6       A   For this particular claim, yes, sir.

7       Q   Now, her benefits were terminated on March

8   17th, 2000, right?

9       A   Yes, sir.

10      Q   And do you agree with me that, although you

11  identified five or six medical items that you claim you

12  reviewed in formulating your opinion, but would you

13  agree with me that generally Dr. Seidman and Dr. Borgen

14  opined that she was totally disabled because of their

15  fear that stress would cause a recurrence of her cancer.

16  Do you agree with that?

17      A   Yes, sir. Not only their fear, but apparently

18  Dr. Powell had the same fear, and Mr. Gosse had the same

19  fear too. So apparently, the company thought the exact

20  same thing. Dr. Seidman was afraid she was going to die.

21  That didn't disturb Northwestern Mutual, I guess; just

22  based on they denied the claim.

23      Q   So at the time the claim was denied in March

24  of 2000, it's your opinion Dr. Seidman thought that Mrs.

25  Diveglia was terminal?

1    A    No, I didn't say terminal. I said that they

2  wanted to prevent her death.

3    Q    Because they thought stress had a chance of

4  increasing return of her breast cancer?

5    A    Yes, which Dr. Powell agreed to and Mr. Gosse

6  agreed to. So again, we have agreement between her

7  doctors and Dr. Powell and Mr. Gosse. No disagreement

8  there.

9    Q    Can you explain to me how an independent

10  medical examination would have assisted Northwestern in

11  answering an issue of whether stress would cause a

12  recurrence of her cancer?

13    A    Well, it would give her a doctor's opinion,

14  an independent opinion from another doctor. We don't

15  know what he would have said; I can't say what the other

16  doctor would have said. But at least they would have

17  gotten an opinion from an outside independent medical

18  examiner.

19    Q    Do you agree with me that actually examining

20  Mrs. Diveglia was not necessary to determine whether or

21  not the physician believed the theory that stress could

22  cause a recurrence of her cancer?

23    A    I can't answer that question; I don't know.

24  But certainly, they could have asked their oncologist on

25  staff and could have gotten an opinion from him, Dr.

1  to have a hands-on examination or physical examination
2  of Mrs. Diveglia when the issue is stress?
3      A    Well, because she's having a hands-on
4  examination by Dr. Seidman and by Dr. Borgen. And you
5  would want to do the exact same thing, to compare apples
6  with apples.
7      Q    But Mr. -- You've already agreed with me that
8  the theory of why Doctors Borgen and Seidman said she
9  was totally disabled was -- the majority of that theory
10 was because they thought stress would cause a recurrence
11 of her cancer. You agreed with that?
12     A    And they wanted her to live. I think that's
13 another important factor, they wanted her to live.
14     Q    These other medical items she had, a ten
15 pound restriction, and the fact that they prescribed the
16 stress test, --
17     A    That's part of total disability. That goes to
18 total disability. That goes to the definition of total
19 disability in a policy where she's unable to perform the
20 principal duties of her occupation, being a trial
21 attorney.
22     Q    And notwithstanding that, you agree with me
23 that the majority of the reasons they thought she was
24 totally disabled was because they thought that stress
25 could cause the risk of her recurrence of cancer?

1    A    They all thought that. Dr. Powell thought
2  that too. And Mr. Gosse thought that. So apparently they
3  were all on board.
4    Q    And I know you're not a medical physician.
5  But you have to agree with me that conducting a physical
6  examination would not necessarily change or add to an
7  opinion on that issue?
8    A    I don't know. How would you know unless you
9  did it?
10   Q    To your knowledge, how often was she seeing
11 Dr. Seidman or Borgen at the time the benefits were
12 terminated?
13   A    I'm not sure; I believe as often as
14 necessary.
15   Q    Is there an insurance industry standard on
16 how often a patient has to be seeing a doctor to be
17 under their regular care?
18   A    No, sir.
19   Q    Is that your opinion, or is there an actual
20 standard?
21   A    All I'm saying is, based on the diagnosis of
22 the claimant.
23   Q    Now, going back to your report the second to
24 last bullet.
25   A    All right.