

1 obtained that knowledge; in other words, was it
2 from your journal meetings, was it from your
3 discussions with Dr. Cannon -- or Conner, I'm
4 sorry.
5 Can you pinpoint to us, if you can, where
6 you think the source of the knowledge was that
7 stress reduction does not -- that there are not
8 studies that support stress reduction leads to
9 longer-term remission?
10 A  The knowledge would have come from the fact that I
11 have never run across any articles which support
12 that, all right, in 15 years of regularly reviewing
13 the medical literature and ten years of clinical
14 practice, where I also kept up an active review of
15 the medical literature and also dealt with oncology
16 patients.
17 Q  So you do read these journals that you subscribe
18 to?
19 A  I review them, yes.
20 Q  And when you review something -- I would take it
21 that this issue of stress reduction and cancer
22 remission may have come up more than once, from
23 what you've just told us?
24 A  I can recollect it's come up at least once or twice
25 before, but not as an isolated issue on a claim.

1  Q   Okay. Well, do you ever, when you read these
2      articles, make photocopies or some way make a note,
3      bring it to the office, tear it out of the journal,
4      so you have a file on this stuff?
5  A   If it is of interest to me, and I want to make a
6      copy, yes, I will.
7  Q   Do you have any file at all relating to this
8      focused issue as to whether stress reduction can
9      increase long-term remission? Do you have any file
10     at all where you just have a bunch of documents?
11 A   I don't have any file because as I said before,
12     I've never seen an article, okay, that supports or
13     doesn't support that issue. I've never seen a
14     study on that.
15 Q   Okay. Tell me in what manner Cynthia Diveglia's
16     claim came to your desk?
17 A   It was brought to my attention through consultation
18     with Pat Sheehan.
19 Q   Okay, and what was the point of the consultation?
20 A   The point of the consultation, initially, was the
21     stated reason for her continuing disability being
22     to reduce stress in order to lessen the likelihood
23     of a recurrence.
24 Q   The stated reason being her physicians, Drs. Borgen
25     and Seidman?

1   A   That is correct.
2   Q   Can you give us an idea as to initially, when you
3       first had this contact?
4   A   I would rather not off the top of my head.
5   Q   All right. Let me help you out here. Would it
6       have been in the year 2000 or earlier?
7   A   It was earlier, but I would have to have the file
8       and look at the --
9   Q   If you had the file, when you say the file, are you
10      talking about the claims file, or did you keep a
11      separate file?
12  A   No, the claims file.
13          MR. DIVEGLIA: Can we go off camera for a
14      minute, and let the doctor take a look at the
15      claims file?
16          VIDEOGRAPHER: We're off the record at
17      12:22 p.m. We are back on the record at 12:25 p.m.
18  BY MR. DIVEGLIA:
19  Q   Okay, Doctor, you had an opportunity to review the
20      file to see when you had initial contact in regard
21      to this file, and I think you had -- do you need
22      any additional time?
23  A   No, I do not.
24  Q   Can you tell us now from reviewing the file, when
25      you believe you first had contact with this file of

| | | |
|---|---|---|
| 1 | | Cynthia Diveglia? |
| 2 | A | January 15th, 1999. |
| 3 | Q | Okay. At that time, and you have that page in |
| 4 | | front of you, about 380, is that correct? |
| 5 | A | Yes. |
| 6 | Q | The reference I see is in the last paragraph, it |
| 7 | | says, "I discussed with Dr. Powell verbally. He |
| 8 | | agrees that this insured has a high risk of |
| 9 | | recurrent disease." Is that correct? |
| 10 | A | That's correct. |
| 11 | Q | Now, using that as a springboard for opening your |
| 12 | | mind up as to what occurred, can you just basically |
| 13 | | tell me what conversation took place that relates |
| 14 | | to that? |
| 15 | A | Yes. Basically, this was probably an inoffice |
| 16 | | review with Pat Sheehan of these records, at which |
| 17 | | point she gave me a capsule summary of the case |
| 18 | | while I reviewed the records and then asked me for |
| 19 | | my opinion of them, and then she summarized the |
| 20 | | records and my opinion. |
| 21 | Q | Was one of the questions that she asked you, "Does |
| 22 | | this lady have a high risk of recurrence"? |
| 23 | A | That is correct. |
| 24 | Q | And your answer was what? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | And in fact, in your review of the file, I think |
| 2 | | you'll find, or perhaps did you find that |
| 3 | | Dr. Seidman indicated that she had a 90 percent |
| 4 | | chance of recurrence? Do you remember reading |
| 5 | | that? |
| 6 | A | I don't remember the 90 percent, but based on the |
| 7 | | number of positive nodes, she has a very high |
| 8 | | recurrence rate. |
| 9 | Q | Just for your reference, that is on Page 196, if |
| 10 | | you want to review that for yourself, that that's |
| 11 | | what he indicates. It's in the next to the last |
| 12 | | sentence of the first paragraph on Page 196. |
| 13 | A | Yes. |
| 14 | Q | You wouldn't disagree with that, would you, Doctor? |
| 15 | A | No, I would not. |
| 16 | Q | This lady is in pretty big trouble? |
| 17 | A | This lady has a high likelihood of recurrent |
| 18 | | disease. |
| 19 | Q | So we want to do everything from the medical |
| 20 | | standpoint to prevent that from occurring, don't |
| 21 | | we? |
| 22 | A | Yes, you would. |
| 23 | Q | Now, when you met with Pat Sheehan on this date, |
| 24 | | she -- I would assume she presented to you the |
| 25 | | various attending physician statements of |

1  Drs. Borgen and Seidman that indicated that it was
2  their opinion that she should not return to trial
3  work. Do you remember that?
4  A  Yes, I do.
5  Q  And do you remember that the basis of their opinion
6  that she should not return to trial work was that
7  it was a high risk -- excuse me, that the stress
8  and the fatigue of that type of work, in their
9  opinion, could result in the lessening of the
10 likelihood of long-term remission?
11 A  Yes.
12             MR. HENEFER:  Objection to the form of
13 the question.  You can answer.
14 BY MR. DIVEGLIA:
15 Q  Words more or less to that effect.  Is that your
16 basic understanding?
17 A  Yes.
18 Q  They felt that the stress and fatigue of trial work
19 was something that could affect her system to the
20 point that she could have less likelihood of
21 remission?
22             MR. HENEFER:  Objection to the form of
23 the question.  You may answer.
24 BY MR. DIVEGLIA:
25 Q  Is that right?

1  A   Yes.
2  Q   Did Pat Sheehan come to you and say, "Doc, look,
3      this is what these doctors are saying? What do you
4      think?" Was that kind of question more or less
5      presented to you?
6  A   She presented this, is there any evidence, okay,
7      that you're aware of that this can happen, and the
8      reasoning for her question was, this was totally
9      inconsistent with recommendations of numerous other
10     women with high risk recurrent cancer whose claim
11     files we review from other cancer centers.
12 Q   But in fact, though, isn't it a distinguishment in
13     Cynthia's case that she is involved in the
14     occupation of trial law?
15 A   Most of our women claimants with breast cancer are
16     professionals in high stress jobs, physicians and
17     attorneys.
18 Q   So these other physicians are indicating, go ahead,
19     go back to work, go knock yourself out with the
20     stress? Is that what you're saying that these
21     other cases were saying?
22 A   No. The other physicians, okay, do not restrict
23     people from returning to high stress professions,
24     and this is very -- this recommendation was fairly
25     unique in my experience, okay, that most

1   oncologists are very anxious to get patients back
2   to their usual work, all right, and especially
3   if -- get their mind off thinking about a risk of
4   recurrence.
5   Q   In fact, when you reviewed this file, she was
6       already back to work for well over a year, was she
7       not, but just not as a trial lawyer?
8           MR. HENEFER:  Objection to the form of
9       the question.
10          THE WITNESS:  I do not remember knowing
11      what her working position was at the time.
12  BY MR. DIVEGLIA:
13  Q   If I showed you documents, I mean, I'm going to
14      represent to you that she had returned to work on
15      February 9, 1998 and worked continuously from that
16      date forward.
17          Wouldn't that in fact fit into what these
18      other doctors were saying about returning to work
19      because you get the good feelings of returning to
20      normalcy?
21  A   No.  What the other doctors, to my mind, allow
22      their patients, okay, and throughout my experience
23      oncologists have always encouraged patients to
24      return to their normal duties and not to let the
25      fact that they have had cancer, whether or not it

```
 1            has a high risk of occurrence, dictate what they do
 2            for the rest of their life.
 3      Q     I see, so even though -- let me ask you this.
 4                  Were any of those other doctors from
 5            Sloan Kettering Memorial Hospital?
 6      A     They were not from Sloan Kettering Memorial
 7            Hospital, but Sloan Kettering is not the only major
 8            medical cancer center.  I've had doctors from M.D.
 9            Anderson in Houston, doctors from Mass General,
10            doctors from Duke University Medical Center.  We
11            handle -- get medical records on women or people
12            with cancer from major cancer centers all over the
13            United States, and this was a very unusual
14            restriction which is why Pat brought it to my
15            attention to begin with.
16      Q     And would you agree, though, that even though there
17            are other cancer centers, that it is basically
18            recognized in the medical world that Sloan
19            Kettering is the No. 1 cancer institute, hospital
20            in the country?
21      A     I think M.D. Anderson and other centers might have
22            to take issue with that.
23      Q     Certainly, when this issue came -- are you telling
24            me that your position -- let me ask you this.  Has
25            your position changed at all?  Did your position
```