IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CYNTHIA ANNE DIVEGLIA       §
formerly CYNTHIA ANNE KAYLOR §
Plaintiff       §
      §      Civil Action No. 1 CV-00-1342
v.       §
      §
NORTHWESTERN MUTUAL LIFE    §
INSURANCE COMPANY       §
Defendant       §      (Judge James McClure)

### APPENDIX IN SUPPORT OF PLAINTIFF'S SECOND MOTION IN LIMINE

1. Attending Physician's Statements

2. Termination of Benefits letter of April 14, 2001

3. Portion of Deposition testimony of Balesteri

4. Portion of Deposition Testimony of Hyde

5. Pleadings

6. Disability Policy

7. Claims Manual Relating to specialty occupation

8. Applications for Liability Insurance

9. Portion of Deposition of Gosse

10. Portion of Defendant's Insurance Expert Report

11. Portion of Testimony of Newman




**POLICY BENEFITS DEPARTMENT**
**DISABILITY BENEFITS DIVISION**

**Northwestern Mutual Life°**
P.O. Box 2918
Milwaukee, Wisconsin 53201

# ATTENDING PHYSICIAN'S STATEMENT
## (FOR CONTINUING DISABILITY)

**To the insured:**

Please give this form to your doctor to be completed and returned to us by _____2-10-98_____

| INSURED | POLICY NUMBER |
|---|---|
| *Cynthia A Kaylor* | *D1070572* |

Dear Doctor: The following information is needed from you to help us evaluate your patient's continuing disability. Any expense incurred in completing this form is the responsibility of the insured.

**1. PRESENT CONDITION**
   (a) Subjective symptoms

   *INFECTION - SKIN GRAFT DONOR SITE.*

   (b) Objective findings.
       Include results of current x-rays, EKGs or other tests

   *HIGH RISK STAGE II BREAST CANCER. (16+ AXILLARY NODES)*

**2. DIAGNOSIS**

   *HIGH RISK STAGE II BREAST CANCER*
   *INFECTION - SKIN GRAFT DONER SITE*

**3. NATURE OF CURRENT TREATMENT** (include surgery and medications prescribed, if any)

   *TAMOXIFEN, CEPHALEXIN 500MG 4X DAILY, WARM BATH 3X DAILY*

**4. TREATMENT**
   (a) Date of first visit ......................... *4/24/97*
       MM / DD / YYYY
   (b) Date of last visit ........................... *2/3/98*
       MM / DD / YYYY
   (c) Date of last examination ............ *2/3/98*
       MM / DD / YYYY
   (d) Frequency of visits..................... ☐ Weekly ☐ Monthly ☒ Other *4- 6 months*

**5. PROGRESS**.....................................☐ Recovered  ☐ Improved  ☐ Unchanged  ☐ Retrogressed

**6. EXTENT OF DISABILITY**

(a) I understand the duties of the patient's occupation to be:

(b) The patient has been continuously totally disabled from his or her usual occupation .................................................

From _4/18/97_    To _pres._

(c) The patient was partially disabled from his or her usual occupation .................................................

_____    _____

(d) If the patient is now totally disabled, I would anticipate a return to partial work activity in the patient's usual work in

☑ 1 month or less ☐ 1 to 3 months ☐ 3 to 6 months ☐ 6 to 12 months
☐ more than 12 months ☐ Never

(e) If the patient is totally disabled for his or her usual work, could the patient return to other work?
☐ Yes ☑ with restrictions ☐ without restrictions ☐ No When? _2/9/98_

(f) What are the patient's current limitations?

1) LEFT ARM — NO HEAVY LIFTING; 10 # MAX
SEE REMARKS

(g) Does the patient have other disability insurance coverage to your knowledge? .................................................
☐ Yes; with whom? ☑ No

**7. REHABILITATION**

If the patient is now totally disabled, is he or she a suitable candidate for a rehabilitation program to assist the patient in returning to work?
☐ Yes ☐ No If no, please explain.

**8. MENTAL CONDITION**

Is the patient competent to endorse checks and direct the use of the proceeds?............☑ Yes ☐ No

**9. REMARKS**

A MAJOR STRESS REDUCTION WILL
ENHANCE THE LIKELIHOOD OF GETTING THIS
DISEASE INTO LONG TERM REMISSION. THIS MAY
MEAN A SABBATICAL FROM THIS WORK

Some states require us to inform you that any person who knowingly files a statement of claim containing any false, or misleading information is subject to criminal and civil penalties, depending upon the state. Such actions may be deemed a felony and substantial fines may be imposed. In New York, the fine shall not exceed $5,000 and the stated value of the claim for each such violation.

| NAME OF ATTENDING PHYSICIAN (PRINT) | DEGREE | (AREA CODE) TELEPHONE |
|---|---|---|
| Dr. Borgen MD | MD | (212) 639-5248 |

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE |
|---|---|---|---|
| 425 E. 67th St. | NY, NY | | 10021 |

SIGNATURE _____    DATE (MM/DD/YYYY) _2/3/98_

PLEASE SEND A COPY OF YOUR RECENT OFFICE NOTES WITH THIS FORM.

 

**POLICY BENEFITS DEPARTMENT
DISABILITY BENEFITS DIVISION**

**Northwestern
Mutual Life**
P.O. Box 2918
Milwaukee, Wisconsin 53201

# ATTENDING PHYSICIAN'S STATEMENT
## (FOR CONTINUING DISABILITY)

**To the insured:**

Please give this form to your doctor to be completed and returned to us by _5-10-98_

| INSURED | POLICY NUMBER |
|---|---|
| Cynthia A Kaylor | D1070572 |

Dear Doctor: The following information is needed from you to help us evaluate your patient's continuing disability. Any expense incurred in completing this form is the responsibility of the insured.

1. **PRESENT CONDITION**
   (a) Subjective symptoms
   
   _Dyspnea on minimal - moderate exertion, status post high dose chemotherapy (completed 10/97) for_
   
   (b) Objective findings.
   Include results of current x-rays, EKGs or other tests _hi-risk Stage II breast c_
   _→ to have Pulmonary Function Tests
   and Gated Nuclear Heart Scan 7/98._

2. **DIAGNOSIS** _Hx. hi risk Stage II breast cancer_

3. **NATURE OF CURRENT TREATMENT** (include surgery and medications prescribed, if any)
   
   _Tamoxifen 10 mg p.o bid_

4. **TREATMENT**
   (a) Date of first visit .................. _4/24/97_
      MM / DD / YYYY
   (b) Date of last visit .................. _5/7/98_
      MM / DD / YYYY
   (c) Date of last examination .......... _5/7/98_
      MM / DD / YYYY
   (d) Frequency of visits .................. ☐ Weekly  ☐ Monthly  ☒ Other _q 3-4 months_

5. **PROGRESS** .................. ☐ Recovered  ☐ Improved  ☒ Unchanged  ☐ Retrogressed

WORD 6-FE

**6. EXTENT OF DISABILITY**

(a) I understand the duties of the patient's occupation to be:

TRIAL ATTORNEY

(b) The patient has been continuously totally disabled from his or her usual occupation ....................

From 4/18/97    To 2/9/98

(c) The patient was partially disabled from his or her usual occupation ....................

2/9/98    Present

(d) If the patient is now totally disabled, I would anticipate a return to partial work activity in the patient's usual work in

☐ 1 month or less    ☐ 1 to 3 months    ☐ 3 to 6 months    ☐ 6 to 12 months
☐ more than 12 months    ☐ Never

(e) If the patient is totally disabled for his or her usual work, could the patient return to other work?

☐ Yes    ☒ with restrictions    ☐ without restrictions    ☐ No   When?_____

(f) What are the patient's current limitations?

Left arm - No Heavy lifting ; 10lb Max.
See Remarks

(g) Does the patient have other disability insurance coverage to your knowledge? ....................    ☐ Yes; with whom?    ☒ No

**7. REHABILITATION**

If the patient is now totally disabled, is he or she a suitable candidate for a rehabilitation program to assist the patient in returning to work?

☐ Yes    ☐ No    If no, please explain.

**8. MENTAL CONDITION**

Is the patient competent to endorse checks and direct the use of the proceeds? ............    ☒ Yes    ☐ No

**9. REMARKS**

A MAJOR Stress reduction will enhance the likelihood of getting this Disease into long term remission. This will mean a Sabatical from trial work.

Some states require us to inform you that any person who knowingly files a statement of claim containing any false, or misleading information is subject to criminal and civil penalties, depending upon the state. Such actions may be deemed a felony and substantial fines may be imposed. In New York, the fine shall not exceed $5,000 and the stated value of the claim for each such violation.

| NAME OF ATTENDING PHYSICIAN (PRINT)  Andrew D. Seidman | DEGREE  M.D. | (AREA CODE) TELEPHONE |
| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE |

SIGNATURE _Andrew Seidman_    DATE (MM/DD/YYYY)  5/7/98

PLEASE SEND A COPY OF YOUR RECENT OFFICE NOTES WITH THIS FORM



POLICY BENEFITS DEPARTMENT
DISABILITY BENEFITS DIVISION



**Northwestern Mutual Life**
P.O. Box 2918
Milwaukee, Wisconsin 53201

## ATTENDING PHYSICIAN'S STATEMENT
### (FOR CONTINUING DISABILITY)

To the Insured:

Please give this form to your doctor to be completed and returned to us by _____

| INSURED | POLICY NUMBER |
|---------|---------------|
| CYNTHIA KAYLOR | D1070572 |

Dear Doctor: The following information is needed from you to help us evaluate your patient's continuing disability. Any expense incurred in completing this form is the responsibility of the insured.

1. PRESENT CONDITION
   (a) Subjective symptoms



   (b) Objective findings.
       Include results of current x-rays, EKGs or other tests

   HIGH RISK STAGE II BREAST CANCER, (16+ AXILLARY NODES).

2. DIAGNOSIS

   HIGH RISK STAGE II BREAST CANCER

3. NATURE OF CURRENT TREATMENT (include surgery and medications prescribed, if any)

   TAMOXIFEN.



4. TREATMENT
   (a) Date of first visit ..................... 4/29/97
       MM / DD / YYYY
   (b) Date of last visit ..................... 8/14/98
       MM / DD / YYYY
   (c) Date of last examination ........... 8/14/98
       MM / DD / YYYY
   (d) Frequency of visits ................... ☐ Weekly   ☐ Monthly   ☒ Other   1 year

5. PROGRESS ................................☐ Recovered   ☐ Improved   ☒ Unchanged   ☐ Retrogressed

15-1956 (0397)                                                              WORD 6-FE

6. EXTENT OF DISABILITY

(a) I understand the duties of the patient's occupation to be:

TRIAL LAWYER

(b) The patient has been continuously totally disabled from his or her usual occupation ...................................................

From **4/18/97**    To **pres.**

(c) The patient was partially disabled from his or her usual occupation ...................................................

_____    _____

(d) If the patient is now totally disabled, I would anticipate a return to partial work activity in the patient's usual work in

☐ 1 month or less    ☐ 1 to 3 months    ☐ 3 to 6 months    ☐ 6 to 12 months
☐ more than 12 months    ☐ Never

(e) If the patient is totally disabled for his or her usual work, could the patient return to other work?

☐ Yes    ☒ with restrictions    ☐ without restrictions    ☐ No    When? **2/9/98**

(f) What are the patient's current limitations?

1) Left arm NO HEAVY LIFTING; 10# MAX
   SEE REMARKS

(g) Does the patient have other disability insurance coverage to your knowledge? ...................................................

☐ Yes; with whom? _____    ☒ No

7. REHABILITATION

If the patient is now totally disabled, is he or she a suitable candidate for a rehabilitation program to assist the patient in returning to work?

☐ Yes    ☐ No    If no, please explain.

8. MENTAL CONDITION

Is the patient competent to endorse checks and direct the use of the proceeds? ............ ☒ Yes    ☐ No

9. REMARKS    I continue to recommend Major stress reduction — this will enhance the likelihood of a long term remission.

Some states require us to inform you that any person who knowingly files a statement of claim containing any false, or misleading information is subject to criminal and civil penalties, depending upon the state. Such actions may be deemed a felony and substantial fines may be imposed. In New York, the fine shall not exceed $5,000 and the stated value of the claim for each such violation.

| NAME OF ATTENDING PHYSICIAN (PRINT) | DEGREE | (AREA CODE) TELEPHONE |
|---|---|---|
| PAT BORGEN M.D. | MD | (212) 639-5248 |

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE |
|---|---|---|---|
| 425 E. 67th St. | N.Y. N.Y. | | 10021 |

SIGNATURE    DATE (MM/DD/YYYY) **8/14/98**

PLEASE SEND A COPY OF YOUR RECENT OFFICE NOTES WITH THIS FORM.

OCT 13 '99  02:06PM  NML POLICY BENEFITS 4142991526                    P.2

DISABILITY INCOME DEPARTMENT
DISABILITY BENEFITS DIVISION



**Northwestern Mutual Life**
P. O. Box 2918
Milwaukee, Wisconsin 53201-2918

## ATTENDING PHYSICIAN'S STATEMENT
### (for continuing disability)

*Dear Doctor: The information you provide on this form is crucial to the consideration of the patient's claim. The more information you can initially provide will both expedite our decision and may reduce our need to request additional information from you in the future. Attaching copies of all clinical lab data, tests (CAT Scans, MRI's, treadmill, EKG, etc.), hospital discharge summaries and your office or chart notes may answer additional questions.*

*Any cost associated with completion of this form should be billed to the patient. Please mail this form directly to The Northwestern Mutual Life Insurance Company at the address noted above.*

**To the insured:**   Please give this form to your doctor to be completed and returned to us by   **11/7/99**

| PATIENT'S NAME | DATE OF BIRTH (MM/DD/YYYY) |
|---|---|
| Cynthia Diveglia | 12/22/50 |

| SOCIAL SECURITY NUMBER | POLICY NUMBER |
|---|---|
| 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 | D1070572 |

**1. DIAGNOSIS**

(a) Diagnosis(es) (including any complications).

Stage II high risk breast cancer.

(b) If applicable, provide the Global Assessment of Functioning (GAF) scale.  Current _____  Highest level past year _____

n/a

(c) Symptoms – (Please quantify if possible, e.g. HA's – daily, 8 on a scale of 1-10)

n/a

(d) Objective findings (please attach copies of recent reports, x-rays, EKGs, lab data and any clinical findings as well as copies of the most current objective data which support the diagnosis(es).)

16+ lymph nodes, mastectomy

(e) Current limitations that impair your patient's ability to return to work. Please be as specific as possible.

Major stress reduction to enhance the likelihood of a long term remission of the cancer.

(f) Is any follow-up testing planned in the near future? ☒ No   ☐ Yes  If yes, please indicate the date and type of testing that will be completed.

(g) Did you refer the patient or have other providers seen the patient? ☒ No   ☐ Yes
If yes, name and address.

**1. TREATMENT PLAN**

(a) Current and planned treatment. Please include specific treatment modalities.

tamoxifen 10mg p.o. bid; major stress reduction

(b) Is your patient compliant with recommended treatment? ☐ No  ☒ Yes
If no, please fully explain.

15-1358 (0399)

1999 NOV 12  A 10:44
DI DEPARTMENT
CENTRAL SERVICES

15-1358-LS
(Page 1 of 2)

0326

OCT 13 '99 02:06PM NYL/P     BENEFITS 4142991526                    P.3

**3. PROGRESS**..................... ☐ Recovered  ☐ Improved  ☒ Unchanged  ☐ Retrogressed

**4. DATES AND FREQUENCY OF MEDICAL CARE**

| | | Month | Day | Year |
|---|---|---|---|---|
| (a) | Date of most recent treatment/examination | 10 | 27 | 99 |
| (b) | Date of next appointment | 10 | | 2000 |
| (c) | Frequency of treatment | ☐ Weekly  ☐ Monthly  ☐ Quarterly  ☒ Other | | yearly |

**5. ACTIVITIES AND RESTRICTIONS**

(a) What is your understanding of the activities and duties of your patient's occupation?

*trial lawyer*

(b) Have you restricted your patient from these work activities/duties? ☐ No ☒ Yes, restricted as of  Month *Oct* Day *04* Year *98*
If yes, describe the specific restrictions and rationale for restrictions.

*major stress reduction, non litigation and no trial work.*

(c) To the best of your knowledge is your patient performing any work activities in any capacity? ☐ No ☒ Yes
If yes, please fully explain.

*non-trial/litigation attorney duties*

**6. PROGNOSIS**

(a) How long do you anticipate your patient will continue to have work related restrictions as described in 5(b)?

*INDEFINITELY*

(b) Could the patient work in another occupation? ☐ No ☒ Yes If yes, please fully explain.

*NON LITIGATION WORK*

(c) Do you believe your patient is motivated to return to his/her usual work on a full-time basis?
☐ No  ☒ Yes  If no, please fully explain.

*MOTIVATED TO PARTICIPATE IN WORK FORCE IN CONTROLLED SITUATION. NON LITIGATION*

(d) Are you aware of any non-medical factors, such as bankruptcy, loss of professional license, personal choice, etc., which inhibit the patient from wanting to or being able to return to his/her usual work or other full-time work?
☒ No  ☐ Yes  If yes, please fully explain.

**7. MENTAL COMPETENCY**
Do you believe the patient is competent to endorse checks and direct the use of proceeds thereof?
☐ No  ☒ Yes  If no, please fully explain.

**8. REMARKS**

Some states require us to inform you that any person who, knowingly and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information may be subject to criminal and civil penalties, depending upon the state. Such actions may be deemed a felony and substantial fines may be imposed. In New York, the fine shall not exceed $5,000 and the stated value of the claim for each such violation.

| NAME OF LICENSED ATTENDING PHYSICIAN | DEGREE | SPECIALTY | (AREA CODE) TELEPHONE |
|---|---|---|---|
| Patrick Borgen | MD | | (212) 639-5248 |

| STREET ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 425 E. 67th St. | NY | NY | 10021 |

SIGNATURE _____     DATE 10/27/99

DISABILITY INCOME DEPARTMENT
DISABILITY BENEFITS DIVISION

**Northwestern Mutual Life®**
P.O. Box 2918
Milwaukee, Wisconsin 53201-2918

## ATTENDING PHYSICIAN'S STATEMENT
### (FOR CONTINUING DISABILITY)

**To the insured:**

Please give this form to your doctor to be completed and returned to us by _11-10-99_

| INSURED Cynthia A Diveglia | POLICY NUMBER D 1070572 |

Dear Doctor: The following information is needed from you to help us evaluate your patient's continuing disability. Any expense incurred in completing this form is the responsibility of the insured.

---

1. **PRESENT CONDITION**
   (a) Subjective symptoms
   High Risk Stage II breast cancer,

   (b) Objective findings.
   Include results of current x-rays, EKGs or other tests
   High Risk Stage II breast cancer, 16+ lymph nodes, Mastectomy

2. **DIAGNOSIS**
   High Risk   Stage II breast cancer

---

3. **NATURE OF CURRENT TREATMENT** (include surgery and medications prescribed, if any)
   tamoxifen 10mg po bid

DI DEPARTMENT
CENTRAL SERVICES
1999 NOV 12 A 10:44

---

4. **TREATMENT**
   (a) Date of first visit ............... _4/ /97_
   MM/DD/YYYY
   (b) Date of last visit ............... _10/27/99_
   MM/DD/YYYY
   (c) Date of last examination ........... _10/27/99_
   MM/DD/YYYY
   (d) Frequency of visits ............ ☐ Weekly  ☐ Monthly  ☑ Other  _1 year prn_

---

5. **PROGRESS** ............... ☐ Recovered  ☐ Improved  ☐ Unchanged  ☐ Retrogressed

0324

0325

**ENT OF DISABILITY**

(a) I understand the duties of the patient's occupation to be:

*trial lawyer*

(b) The patient has been continuously totally disabled from his or her usual occupation .................................................

From 4-18-97    To 2-9-98

(c) The patient was partially disabled from his or her usual occupation .................................................

2-9-98    indefinite

(d) If the patient is now totally disabled, I would anticipate a return to partial work activity in the patient's usual work in

- [ ] 1 month or less
- [ ] more than 12 months
- [ ] 1 to 3 months
- [ ] Never
- [ ] 3 to 6 months
- [ ] 6 to 12 months

(e) If the patient is totally disabled for his or her usual work, could the patient return to other work?
- [ ] Yes
- [x] with restrictions
- [ ] without restrictions
- [ ] No    When? _____

(f) What are the patient's current limitations?

NON LITIGATION / NON TRIAL WORK — STRESS REDUCTION —

(g) Does the patient have other disability insurance coverage to your knowledge? .................................................  [ ] Yes; with whom? _____  [x] No

## 7. REHABILITATION

If the patient is now totally disabled, is he or she a suitable candidate for a rehabilitation program to assist the patient in returning to work?
- [ ] Yes
- [ ] No    If no, please explain.

## 8. MENTAL CONDITION

Is the patient competent to endorse checks and direct the use of the proceeds? .........  [x] Yes  [ ] No

## 9. REMARKS

Some states require us to inform you that any person who knowingly files a statement of claim containing any false, or misleading information is subject to criminal and civil penalties, depending upon the state. Such actions may be deemed a felony and substantial fines may be imposed. In New York, the fine shall not exceed $5,000 and the stated value of the claim for each such violation.

| NAME OF ATTENDING PHYSICIAN (PRINT) | DEGREE | (AREA CODE) TELEPHONE |
|---|---|---|
| Patrick Borgen | M.D. | (212) 639-7754 |

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE |
|---|---|---|---|
| 425 E 67th St. | NY NY | | 10021 |

SIGNATURE    DATE (MM/DD/YYYY)  10/27/99

**PLEASE SEND A COPY OF YOUR RECENT OFFICE NOTES WITH THIS FORM.**

15-1356 (0798)

WORD 8-LS
(Page 2 of 2)

*Balistreri*

DISABILITY INCOME DEPARTMENT
DISABILITY BENEFITS DIVISION



**Northwestern Mutual Life**
P. O. Box 2918
Milwaukee, Wisconsin 53201-2918

## ATTENDING PHYSICIAN'S STATEMENT
### (for continuing disability)

*Dear Doctor: The information you provide on this form is crucial to the consideration of the patient's claim. The more information you can initially provide will both expedite our decision and may reduce our need to request additional information from you in the future. Attaching copies of all clinical lab data, tests (CAT Scans, MRI's, treadmill, EKG, etc.), hospital discharge summaries and your office or chart notes may answer additional questions.*

*Any cost associated with completion of this form should be billed to the patient. Please mail this form directly to The Northwestern Mutual Life Insurance Company at the address noted above.*

**To the Insured:**    Please give this form to your doctor to be completed and returned to us by ___2-10-00___

| PATIENT'S NAME *Cynthia A Divealia* | DATE OF BIRTH (MM/DD/YYYY) |
|---|---|
| SOCIAL SECURITY NUMBER | POLICY NUMBER *D1070572* |

1. **DIAGNOSIS**
   (a) Diagnosis(es) (including any complications).
   *High Risk Stage II Breast Cancer*

   (b) If applicable, provide the Global Assessment of Functioning (GAF) scale. Current _____ Highest level past year _____
   *N/A*

   (c) Symptoms – (Please quantify if possible, e.g. HA's – daily, 8 on a scale of 1-10)
   *S/p mastectomy + chemotherapy*

   (d) Objective findings (please attach copies of recent reports, x-rays, EKGs, lab data and any clinical findings as well as copies of the most current objective data which support the diagnosis(es).)
   *High Risk Stg II breast Cancer, 16⊕ lymph nodes, mastectomy*

   (e) Current limitations that impair your patient's ability to return to work. Please be as specific as possible.
   *Left arm. No heavy lifting; 10 lbs. A major stress reduction will enhance the likelihood of getting this disease into long term remission. This will mean a sabatical from trial work.*

   (f) Is any follow-up testing planned in the near future? ☒ No   ☐ Yes If yes, please indicate the date and type of testing that will be completed.

   (g) Did you refer the patient or have other providers seen the patient? ☐ No   ☒ Yes
   If yes, name and address. *Dr. Patrick Borgen 205 E64st NY NY 10021 (Breast Surgeon)*

2. **TREATMENT PLAN**
   (a) Current and planned treatment. Please include specific treatment modalities.
   *Tamoxifen 10mg PO BID*
   *Stress reduction*

   (b) Is your patient compliant with recommended treatment? ☐ No   ☒ Yes
   If no, please fully explain.

*DI DEPARTMENT CENTRAL SERVICES 2000 APR 10 P 1:01*

15-1356 (0399)                                                    0058                    WORD 8-LS
                                                                                          (Page 1 of 2)

6900

**3. PROGRESS..** ..................  ☐ Recovered  ☐ Improved  ☒ Unchanged  ☐ Retrogressed

---

**4. DATES AND FREQUENCY OF MEDICAL CARE**

| | Month | Day | Year |
|---|---|---|---|
| (a) Date of most recent treatment/examination | 3 | 27 | 00 |
| (b) Date of next appointment | 9 | 11 | 00 |
| (c) Frequency of treatment | ☐ Weekly  ☐ Monthly  ☐ Quarterly  ☐ Other _6 mos_ |

**5. ACTIVITIES AND RESTRICTIONS**

(a) What is your understanding of the activities and duties of your patient's occupation?

TRIAL Lawyer

(b) Have you restricted your patient from these work activities/duties?  ☐ No  ☒ Yes, restricted as of **Month** 2 **Day** 9 **Year** 98
*If yes, describe the specific restrictions and rationale for restrictions.*

See 1E

(c) To the best of your knowledge is your patient performing any work activities in any capacity?  ☐ No  ☒ Yes
*If yes, please fully explain.*

NON Litigation Duties

---

**6. PROGNOSIS**

(a) How long do you anticipate your patient will continue to have work related restrictions as described in 5(b)?

indefinitely

(b) Could the patient work in another occupation?  ☐ No  ☒ Yes  *If yes, please fully explain.*

(c) Do you believe your patient is motivated to return to his/her usual work on a full-time basis?
☐ No  ☒ Yes  *If no, please fully explain.*

(d) Are you aware of any non-medical factors, such as bankruptcy, loss of professional license, personal choice, etc., which inhibit the patient from wanting to or being able to return to his/her usual work or other full-time work?
☒ No  ☐ Yes  *If yes, please fully explain.*

---

**7. MENTAL COMPETENCY**
Do you believe the patient is competent to endorse checks and direct the use of proceeds thereof?
☐ No  ☒ Yes  *If no, please fully explain.*

---

**8. REMARKS**

Some states require us to inform you that any person who, knowingly and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information may be subject to criminal and civil penalties, depending upon the state. Such actions may be deemed a felony and substantial fines may be imposed. In New York, the fine shall be $5,000 and the stated value of the claim for each such violation.

| NAME OF LICENSED ATTENDING PHYSICIAN | DEGREE | SPECIALTY | (AREA CODE) TELEPHONE |
|---|---|---|---|
| | MD | Medical Oncology | (212) 635 |
| STREET ADDRESS | CITY | STATE | ZIP CODE |
| 405 E. 64th St | NY | NY | 10021 |

SIGNATURE: Andrew Seidman / Andrew Seidl          DATE: 3/27/00

PLEASE SEND A COPY OF YOUR OFFICE NOTES WITH THIS FORM.

**SUZANNE BALISTRERI**
Sr. Disability Benefits Specialist - (414) 299-3857
Disability Benefits Division
Disability Income Department



April 14, 2000

MR ARCHIE V DIVEGLIA
ATTORNEY AT LAW
119 LOCUST ST
HARRISBURG  PA 17101

Re:  Cynthia A. Diveglia
D1070572

Dear Mr. Diveglia:

We have completed our review of Ms. Diveglia's claim for ongoing disability benefits.

As you are aware, benefits have been paid as an accommodation without admisssion of liability
while we waited for medical documentation to support ongoing disability. We anticipated
receiving this information following a November 29, 1999 examination by Dr. Seidman,
however, appointments were cancelled or rescheduled until March 27, 2000. We continued to
provide monthly benefits while awaiting the results of this office visit. We have received a copy
of the office notes from the March 27, 2000 examination and our medical consultants have
reviewed the information. The documentation provided does not support ongoing disabilty due
to medical restrictions or limitations. As a result, this disability claim has been terminated.

Premiums will no longer be waived as of the following policy anniversary:

| POLICY | ANNIVERSARY |
|--------|-------------|
| D1070572 | July 28, 2000 |

Should the insured have any additional information or documentation she would like us to
consider in support of her claim, please provide it to us within 30 days.

Please contact me with any questions you may have regarding this matter.

Sincerely,

*Suzanne Balistreri*

Suzanne Balistreri

cc:  BRADLEY NEWMAN, CLU
     TURNER AGENCY (072)

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202-4797 • 414 271-1444

7

**BROWN & JONES REPORTING, INC.**

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF PENNSYLVANIA

------------------------------------------------------------

CYNTHIA ANNE DIVEGLIA formerly CYNTHIA ANNE KAYLOR,

                    Plaintiff,

            -vs-                     Case No. 1-CV-00-1342

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

                    Defendant.

------------------------------------------------------------


            Video Examination of SUZANNE BALISTRERI,

taken at the instance of the Plaintiff, under and

pursuant to the Federal Rules of Civil Procedure,

pursuant to Notice, before JANE M. JONES, a Certified

Realtime Reporter, Registered Merit Reporter and Notary

Public in and for the State of Wisconsin, at Brown &

Jones Reporting, Inc., 312 East Wisconsin Avenue,

Milwaukee, Wisconsin, on the 24th day of April, 2001,

commencing at 10:21 a.m. and concluding at 11:47 a.m.

BY MR. DIVEGLIA:

Q    Okay.  Now, let's talk about who on the medical
     staff you are referring to.  Tell us the names.

A    That would be Pat Sheehan and Dr. Powell.

Q    I'm sorry, Dr. --

A    Powell.

Q    Anyone else?

A    Not to my recall.

Q    Now, in regard to the termination of benefits, you
     wrote to me a letter indicating the benefits to be
     terminated, is that correct?

A    Correct.

Q    And I'm going to hand to you what has been
     previously marked Plaintiff's Exhibit No. 8, and I
     want you to look at Plaintiff's Exhibit No. 8, and
     tell me, is that the letter of termination of
     benefits?

A    That's our letter that we would no longer be paying
     benefits.

Q    You can keep that there because I'm going to be
     asking you some questions on it.  Looking at that
     letter for a second, the last two sentences, in
     particular, did you say, "The documentation
     provided does not support ongoing disability due to
     medical restrictions or limitations.  As a result,

11

1    this disability claim has been terminated"?

2  A   Yes.

3  Q   All right.  Now, my question to you, my first

4     questions to you relate to the first sentence, "The

5     documentation provided does not support ongoing

6     disability due to medical restrictions or

7     limitations."

8         What documentation are you specifically

9     referring to when you say the documentation

10    provided?

11 A   I believe I'd be referring to the medical

12    information we were provided.

13 Q   Okay.  Are you talking about the recent medical

14    information -- I mean, can you give us -- you wrote

15    this letter to terminate benefits, which is a

16    serious matter.  At this point, where you used the

17    term "documentation," I need to have a more

18    specific understanding as to what documentation you

19    felt was inadequate?

20        MR. HENEFER:  Objection to the form of

21    the question, but you can answer.

22        THE WITNESS:  The medical documentation

23    we received from her treating physician.

24 BY MR. DIVEGLIA:

25 Q   Well, are you talking about from the very first

1      could use?

2   A    Yes, he did.

3   Q    Isn't that the fact on all of these attending

4        physician statements given, that the doctors, under

5        remarks, filled up all the space?  You didn't give

6        them enough space, did you, to go on to a

7        dissertation as to why this is so?  You didn't give

8        them that space, did you?

9   A    They have many other options.

10  Q    But the fact is, what you've given to them is all

11       that you have requested -- this is all that you

12       requested of them, the form?  You didn't give --

13       when you wanted something more, you wrote to the

14       doctor.  Dr. Powell wrote to the doctor, isn't that

15       right?  When you wanted something more, he could

16       write?

17  A    We've written to the doctor.

18  Q    And you got the answer of Dr. Seidman of February

19       18, '99?

20  A    To that letter.

21  Q    Now, we've talked about two documents so far that

22       you indicated that you used that terminated -- as a

23       basis for terminating benefits, and you said that

24       they didn't have the data supporting their

25       position.  Tell me what data you had that indicated

1  that their belief as set forth in their attending

2  physician reports that stress reduction would

3  enhance long-term remission, tell me what data that

4  you had that contradicted that?

5        MR. HENEFER:  Objection to the form.  You

6  can answer if you're able.

7        THE WITNESS:  I had nothing.

8  BY MR. DIVEGLIA:

9  Q  Nothing?

10  A  I wouldn't have access to that.  I'm not a medical

11    expert.

12  Q  Wait a minute.  You had a medical director, and you

13    had Pat Sheehan, didn't you?

14  A  Yes, I did.

15  Q  Did you ask them, hey, look, this doctor is saying

16    stress reduction will enhance her long-term

17    remission, but he hasn't supplied data.  Do you

18    have any data that is contrary to this?  Can you

19    give me something?  Did you ask them that?

20  A  We discussed that.

21  Q  Did you ask them to give you data that refuted what

22    Drs. Seidman and Borgen were saying?

23  A  I don't recall if that was a specific question.

24  Q  Well, would that have been something that you would

25    have logged?

1   A     Yes.

2   Q     Okay.  And that is -- would you take the next

3         couple of moments and look through your log and

4         tell me whether you ever logged that, okay?

5   A     Sure.

6                 VIDEOGRAPHER:  We're off the record at

7         11:18 a.m.

8                 THE WITNESS:  I think I need a break.

9                 (Short recess.)

10                VIDEOGRAPHER:  We're back on the record

11        at 11:25 a.m.

12  BY MR. DIVEGLIA:

13  Q     Your answer to my prior question as to whether or

14        not you ever logged, if you asked for specific

15        data, is what?

16  A     I don't believe that's logged.  I asked for a

17        medical referral to assist me with understanding

18        the medical issues on this claim.

19  Q     And am I correct that you never asked for any basis

20        for their -- let me ask you this.  Maybe I'm

21        overreaching myself.  Did either Dr. Powell or Pat

22        Sheehan ever say to you that the opinions of Drs.

23        Borgen and Seidman that trial work would be a major

24        stress factor, therefore, she shouldn't do it, to

25        have long-term remission, did they ever say to you

1    that that position of those two doctors was

2    contradicted by medical literature, medical

3    studies?

4  A    No.

5  Q    So if -- they didn't say that to you, you have no

6    literature or documents that indicate that, you

7    don't have anything to the contrary of their

8    position, do you?

9  A    I have nothing to support their position.

10  Q    No, no. My question is this. They said their

11    position. Before you get to that point, did you

12    have anything that would contradict their position?

13            MR. HENEFER:  Whose position?

14  BY MR. DIVEGLIA:

15  Q    Drs. Borgen and Seidman?

16  A    Yes, I did.

17  Q    What was it that you had that contradicted their

18    position?

19  A    The opinion of our medical staff.

20  Q    I thought we just went through that. What was the

21    opinion of the medical staff?

22  A    I would have to look at the referral, but that

23    there was not documentation that stress would

24    enhance the likelihood of a recurrence.

25  Q    Now, because you didn't have any documents of your

# BROWN & JONES REPORTING, INC.

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF PENNSYLVANIA

-------------------------------------------------------

CYNTHIA ANNE DIVEGLIA formerly CYNTHIA ANNE KAYLOR,

            Plaintiff,

    -vs-             Case No. 1-CV-00-1342

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

            Defendant.

-------------------------------------------------------


        Video Examination of SHARON HYDE, taken
at the instance of the Plaintiff, under and pursuant to
the Federal Rules of Civil Procedure, pursuant to
Notice, before JANE M. JONES, a Certified Realtime
Reporter, Registered Merit Reporter and Notary Public in
and for the State of Wisconsin, at Brown & Jones
Reporting, Inc., 312 East Wisconsin Avenue, Milwaukee,
Wisconsin, on the 24th day of April, 2001, commencing at
1:11 p.m. and concluding at 1:49 p.m.

11

1   Q   Now, you sent to me this letter of May 30th, which

2       we previously identified as Exhibit 7.  Would you

3       read the second sentence of this letter, please?

4   A   "I have completed my review of the file, and I'm

5       writing to advise you that I'm in full agreement

6       with Ms. Balistreri's determination that Ms. Kaylor

7       no longer qualifies for continuing disability

8       benefits."

9   Q   What was the determination of Ms. Balistreri that

10      you were in full agreement with?

11  A   That she -- that Ms. Kaylor didn't qualify for

12      benefits.

13  Q   For what reason?

14  A   There was no medical proof of ongoing disability.

15  Q   Now, any other reasons other than that, which is

16      what she set forth?

17  A   No.  I didn't see anything different from that.

18  Q   So after you reviewed the file, you were of the

19      same opinion?

20  A   That's correct.

21  Q   Let me ask you this.  Did you rely on any specific

22      documentation to reach that conclusion?

23  A   No.  My review encompassed the entire file and all

24      of the information that was in the file.

25  Q   Did you bring into this review process any

12

1      additional information?

2   A  Not that I recall, no.

3   Q  So this is the -- this is what I understand and

4      what I set forth.  Benefits were terminated because

5      of what was considered lack of medical proof of

6      ongoing disability, right?

7   A  Correct.

8   Q  And is it correct, though, that despite that

9      conclusion that Drs. Seidman and Borgen had

10     provided attending physician statements

11     periodically as requested from February 9, 1998

12     through March 27th, 2000?

13  A  Yes, they had provided APS's with their opinions

14     on.

15  Q  Would you agree that their opinions were consistent

16     over that two-year period -- not only their own

17     opinions, but the opinions of each doctor was

18     consistent with the other?

19  A  As I recall, yes.

20  Q  And did they basically -- was it the stated

21     opinions of the doctors over two years that Cynthia

22     Diveglia was disabled as a trial lawyer -- I'm now

23     summarizing.  This is not word for word.  Disabled

24     as a trial lawyer because the stress and fatigue of

25     trial work would compromise her ability to stay in

28

1    A    The International Standard Lawyer Number Database

2         was checked and shows that the law firm profile of

3         Diveglia & Kaylor spends a hundred percent of

4         practice devoted to litigation.

5    Q    So it was investigated, and it was determined that

6         she was a trial lawyer, right?

7                   MR. HENEFER:  Objection to the form of

8         the question.  You can answer if you're able.

9                   THE WITNESS:  It says she's a trial

10        attorney; however, we continued to try to confirm

11        that that was indeed factual.

12   BY MR. DIVEGLIA:

13   Q    And that wasn't the basis for discontinuing the

14        benefits, was it?

15   A    The basis we closed the claim was because there was

16        no medical proof of continuing disability.

17   Q    And you agreed 100 percent with what Ms. Balistreri

18        had said in her --

19   A    Yes.

20                  MR. DIVEGLIA:  No further questions.

21                  MR. HENEFER:  You're done.

22                  VIDEOGRAPHER:  Off the record at 1:49

23        p.m.

24                  (Proceedings concluded at 1:49 p.m.)

25

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CYNTHIA ANNE DIVEGLIA
formerly CYNTHIA ANNE KAYLOR
Plaintiff

v.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY
Defendant

§
§
§
§
§
§
§
§
§

1: CV-00-1342

Civil Action No. _____

HARRISBURG, PA

JUL 2 4 2000

MARY E. D'ANDREA, CLERK

## PLAINTIFF'S ORIGINAL COMPLAINT

### A. Parties

1. Plaintiff is an adult individual who is a citizen of the Commonwealth of Pennsylvania.

2. Defendant is a corporation that is incorporated under the laws of a State other than Pennsylvania. Defendant has its principal place of business in the State of Wisconsin, with no registered agent with the Commonwealth of Pennsylvania. However it does maintain a sales office at 100 Pine Street, Harrisburg, Pennsylvania.

### B. Jurisdiction

3. The court has jurisdiction over the lawsuit under 28 U.S.C. § 1332 (a) (1) because the Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

### C. Plaintiff's Demand for Jury Trial

4. Plaintiff, Cynthia A. Diveglia, asserts her rights under the Seventh Amendment of the U.S. Constitution demands a trial by jury on all issues, in accordance with the Federal Rule of Civil Procedure 38.

## D. Conditions Precedent

5. On July 25, 1994, the Defendant issued to Plaintiff a contract for insurance that provided for disability income in the event of her disability from her regular occupation as a trial attorney (See Exhibit A).

6. On April 24, 1997, Plaintiff became disabled from her regular occupation and timely filed for disability benefits, and provided proof of disability up to and including the present. In all other respects, Plaintiff performed all the terms and conditions precedent of the disability policy.

## E. Count 1 - Breach of Contract

7. Defendant paid to plaintiff the disability benefits provided by the contract relating to her disability from her regular occupation as a trial lawyer through March 2000.

8. Plaintiff continued to perform her obligations under the contract by providing medical documentation in the form of Attending Physician Statements and physician responses to defendant's specific questionnaire all of which supported ongoing disability.

9. Despite providing the medical documentation, the Defendant by letter dated April 14, 2000, denied further benefits on the basis: "The documentation provided does not support ongoing disability due to medical restrictions or limitations."

10. Defendant's non-performance of its contractual obligation to pay disability benefits when it received the necessary medical documentation of continuing disability constitutes a breach of the parties agreement.

## F. Count 2 - Bad Faith

11. The Statutes of the Commonwealth of Pennsylvania provide that if the Court finds that an insurer has acted in bad faith toward the insured, a claim exists against the insurer. 42 Pa. C.S.A.§ 8371.

12. Defendant has acted in bad faith throughout its dealings with Plaintiff and by terminating Plaintiff's disability benefits on the basis that the medical documentation provided does not support ongoing disability. Such a determination in light of the medical documentation supporting ongoing disability was an unreasonable basis for denial since the defendant knew of the documentation and acted in reckless disregard of the treating physician's documentation.

## G. Damages

13. As a direct and proximate result of Defendant's breach and bad faith, plaintiff has suffered and is entitled to receive the following damages:

a.. Continuation of the monthly disability benefits from April 2000 through the foreseeable future;

b.  Continuation of the waiver of premium through the foreseeable future;

c.  Interest on the unpaid disability benefits equal to the prime rate plus 3%;

d.  Punitive damages.

### G.  Attorney Fees

14.  As a result of Defendant's bad faith Plaintiff is entitled to the reasonable value of attorney fees and court costs under 42 Pa.C.S.A.§ 8371 (3).

### H.  Prayer

15.  For reasons set forth above, Plaintiff asks for judgment against defendant for:

a..  $5,949 monthly since April 2000 and continuing;

b.  $4,567.66 yearly for the premium on the policy from July 2000 into the foreseeable future;

c.  Punitive damages;

d.  Court costs and reasonable attorney fees;

e.  Interest;

f.  Costs of suit.

Respectfully submitted,

By: _____

Archie V. Diveglia. Esq.
PA. Attorney I.D. 171'04
119 Locust Street
Harrisburg, PA 17101
Telephone: (717) 236-5985
Fax: (717) 231-4083

DIVEGLIA AND KAYLOR, P.C.          ATTORNEY IN CHARGE FOR
                                   Plaintiff, Cynthia A. Diveglia

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CYNTHIA ANNE DIVEGLIA,

        Plaintiff,

        v.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

        Defendant.

:  CIVIL ACTION NO. 1: CV-00-1342
:
:
:
:
:
:
:
:
:  (Judge Rambo)
:
:

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant Northwestern Mutual Life Insurance Company ("Northwestern") hereby sets forth its answer and affirmative defenses to Plaintiff's complaint.

## ANSWER TO COMPLAINT

### Parties

1.    Admitted.

2.    Admitted in part and denied in part. It is denied that Northwestern maintains a sales office in Harrisburg as any such sales office would be an office of an independent contractor. The remaining averments in paragraph 2 of the complaint are admitted.

### Jurisdiction

3.    Denied. The averments contained in paragraph 3 of the complaint are conclusions of law to which no response is required.

**Plaintiff's Demand For A Jury Trial**

4.     Denied. The averments contained in paragraph 4 of the complaint are conclusions of law to which no response is required.

**Conditions Precedent**

5.     Admitted in part and denied in part. It is admitted only that Northwestern issued a disability policy to plaintiff with a date of issue of July 28, 1994. It is denied that the averments in paragraph 5 of the complaint accurately or completely summarize the relevant terms of the policy which is in writing and speaks for itself.

6.     Admitted in part and denied in part. It is admitted only that plaintiff filed a claim for benefits and that Northwestern paid certain disability benefits. The remaining averments are denied.

**Count I – Breach Of Contract**

7.     Admitted in part and denied in part. It is admitted only that plaintiff filed a claim for benefits and that Northwestern paid certain disability benefits. It is denied that the averments in paragraph 7 of the complaint accurately or completely summarize the relevant terms of the policy relating to when benefits are payable. To the contrary, the policy is in writing and speaks for itself.

8.     Denied.

9.     Admitted in part and denied in part. It is admitted only that Northwestern denied benefits. It is denied that the averments in paragraph 9 of the complaint accurately or completely summarize the relevant terms of the letter which is in writing and speaks for itself.

10.     Denied.

laches.

7. To the extent plaintiff's complaint could be construed as requesting extra-contractual damages, the complaint fails to state a claim upon which relief can be granted.

8. To the extent Plaintiff's complaint seeks an award of punitive damages, the complaint fails to state a claim upon which relief can be granted because even if Defendant's determination of benefits under the policy was incorrect (which is denied), Defendant's conduct did not rise to the level which would support an award of punitive damages and any award of punitive damages in this action would violate Defendant's constitutional rights including Defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 1 of the Pennsylvania Constitution.

9. Plaintiff's claims are barred because Defendant's conduct in this case was justified and/or privileged.

10. Plaintiff is not entitled to recover in this case because, among other things, the decision to deny plaintiff's claim was a reasonable, correct and appropriate decision.

11. Plaintiff is not entitled to recover in this case because, among other things, Defendant properly applied the terms of the policy and complied with all of its obligations under applicable law in reviewing and deciding plaintiff's claim.

12. Plaintiff is not entitled to recover in this case because, among other things, she failed to comply with her burden to submit sufficient proof of her alleged disability.

13. Any entitlement to benefits (the existence of which is denied) may be subject to certain monthly benefit reductions.

14. Even if plaintiff is entitled to benefits at this time, which is denied, such immediate entitlement does not mean that plaintiff has an entitlement to unlimited future benefits

### Count II – Bad Faith

11.    Denied.  The averments contained in paragraph 11 of the complaint are conclusions of law to which no response is required.

12.    Denied.

### Damages

13.    Denied.

### Attorney Fees

14.    Denied.

### Prayer

15.    Denied.

WHEREFORE, Defendant respectfully requests the Court to enter judgment in its favor together with such costs and fees as are permitted by law.

### AFFIRMATIVE DEFENSES

1. Plaintiff's complaint fails to state a claim upon which plaintiff can recover.

2. Plaintiff's complaint fails to state a claim under Pennsylvania's insurance bad faith statute, 42 Pa. C.S.A. § 8371.

3. Plaintiff is not entitled to recover attorneys' fees and costs under 42 Pa. C.S.A. § 8371 or otherwise.

4. Plaintiff's claims may be barred by applicable statutes of limitation and/or contractual limitation of action provisions.

5. Plaintiff is not entitled to the benefits she seeks because, among other things, she is not disabled within the meaning of the policy.

6. Plaintiff's claims may be barred by the doctrines of waiver, estoppel and/or

given, inter alia, the possibility for future recovery from any disabling conditions (the existence of which is denied), as well as the effect of different policy requirements, exclusions and/or limitations.

15. Plaintiff's claims are barred in whole or in part by the doctrine of mitigation and her failure to mitigate her alleged damages.

WHEREFORE, Defendant respectfully requests the Court to enter judgment in its favor together with such costs and fees as are permitted by law.

STEVENS & LEE

By _____
E. Thomas Henefer
Attorney I.D. No. 55773
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania 19603
(610) 478-2000

Attorneys for Defendant, Northwestern Mutual Life Insurance Company

The Northwestern Mutual Life Insurance Company agrees to pay the benefits provided in this policy, subject to its terms and conditions. Signed at Milwaukee, Wisconsin on the Date of Issue.

This disability income policy is guaranteed renewable upon timely payment of premiums to the first policy anniversary after the Insured's 65th birthday and, during that period, can neither be cancelled nor have its terms or premiums changed by the Company.

PRESIDENT AND C.E.O.                    SECRETARY

**IMPORTANT NOTICE CONCERNING STATEMENTS IN THE APPLICATION FOR YOUR INSURANCE**

Please read the copy of the application attached in this policy. Omissions or misstatements in the application could cause an otherwise valid claim to be denied. Carefully check the application and write to THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, 720 E. Wisconsin Avenue, Milwaukee, Wisconsin 53202, within 10 days, if any information shown on it is not correct and complete, or if any past medical history has been left out of the application. The application is a part of the policy and the policy was issued on the basis that the answers to all questions and the information shown on the application are correct and complete.

**DISABILITY INCOME POLICY**

**Eligible For Annual Dividends.**

Guaranteed Renewable with Guaranteed Premiums to Age 65

Conditionally Renewable to Age 75

**Right To Return Policy --** Please read this policy carefully. The policy may be returned by the Owner for any reason within ten days after it was received. The policy may be returned to your agent or to the Home Office of the Company at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202. If returned, the policy will be considered void from the beginning and any premium paid will be refunded.

QQ.DI.PA

## Northwestern Mutual Life®

| | | | |
|---|---|---|---|
| NSURED | Cynthia A Kaylor | AGE AND SEX | 44 Female |
| OLICY DATE | July 28, 1994 | POLICY NUMBER | D1 070 572 |
| LAN | Disability Income | | |
| xclusions--See | Section 3. | | |

 

**This policy is a legal contract between the Owner and The Northwestern Mutual Life Insurance Company. Read your policy carefully.**

# GUIDE TO POLICY PROVISIONS

**BENEFITS AND PREMIUMS**

**SECTION 1. GENERAL TERMS AND DEFINITIONS**

Insured and Owner. Terms on schedule of Benefits and Premiums. Regular Occupation. Total Disability. Partial Disability. Licensed Physician. Consumer Price Index.

**SECTION 2. BENEFITS**

Disabilities covered. Full Benefit payable for total disability. Proportionate Benefit payable for partial disability. How the Proportionate Benefit is determined. Transition Benefit. Lifetime Benefit payable for Presumptive Disability. Waiver of Premium Benefit.

**SECTION 3. EXCLUSIONS AND LIMITATIONS**

**SECTION 4. CONDITIONAL RIGHT TO RENEW TOTAL DISABILITY COVERAGE TO AGE 75**

**SECTION 5. CLAIMS**

How to notify the Company of a claim. Proof of disability. How the benefits will be paid. Limits on when you may start a legal action.

**SECTION 6. OWNERSHIP**

Rights of Owner. Assignment as collateral.

**SECTION 7. PREMIUMS AND REINSTATEMENT**

Payment of premiums. Grace Period of 31 days to pay premiums. Refund of unused premium at death. How to reinstate the policy.

**SECTION 8. THE CONTRACT**

Changes. Time limit on certain defenses. Change of plan. Conversion to level premium disability insurance. Dividends. Definition of dates. Termination.

**ADDITIONAL BENEFITS** (if any)

**APPLICATION**

QQ.DI

BENEFITS AND PREMIUMS

Date of Issue - July 28, 1994

| LAN AND ADDITIONAL BENEFITS | FULL BENEFIT PER MONTH | ANNUAL PREMIUM | PAYABLE FOR |
|---|---|---|---|
| isability Income | $  4,200 | see page 3A | 22 Years |
| ocial Security Substitute (SSS) Benefit | 1,300 | see page 3A | 22 Years |
| uture Increase Benefit | | | |

  Effective until July 28, 1998 - Renewable

enewal of coverage beyond age 65 may require an increase in the premium.
ee Section 4.

 monthly premium, plus an ISA administrative charge, is payable on
uly 28, 1994 and on the 28th day of every calendar month after that.
he monthly premium equals the annual premium multiplied by .0856.

he first monthly premium is $225.23.

he premium for this policy is on a nonsmoker basis for Occupation Class 6A.

EGINNING DATE

        Disability          91st day of disability in the first 180 days
        Income              after the start of disability.

        SSS Benefit         91st day of disability in the first 180 days
                            after the start of disability.

AXIMUM BENEFIT PERIOD

    Disability Income       To the first policy anniversary (July 28,
                            2016) following the Insured's 65th birthday,
                            but not less than 24 months of benefits.

    SSS Benefit             To the first policy anniversary (July 28,
                            2016) following the Insured's 65th birthday.

NITIAL PERIOD  (Coverage for the Insured's own occupation)

    Disability Income       To the first policy anniversary (July 28,
                            2016) following the Insured's 65th birthday,
                            but not less than 24 months of benefits.

    SSS Benefit             To the first policy anniversary (July 28,
                            2016) following the Insured's 65th birthday.

WNER            Cynthia A Kaylor, The Insured

TATE OF ISSUE   Pennsylvania

NSURED          Cynthia A Kaylor              AGE AND SEX        44 Female

OLICY DATE      July 28, 1994                 POLICY NUMBER      D1 070 572

LAN             Disability Income

xclusions--See Section 3.

BENEFITS AND PREMIUMS

Date of Issue - July 28, 1994

FULL BENEFIT PER MONTH

Disability Income

    Annually Renewable Premium    $     4,200 #

Social Security Substitute (SSS) Benefit

    Annually Renewable Premium         1,300 #

# THIS AMOUNT IS CONVERTIBLE TO LEVEL PREMIUM UNTIL JULY 28, 2009.

## TABLE OF ANNUAL PREMIUMS

| FOR POLICY YEARS BEGINNING JULY 28, | DISABILITY INCOME ANNUALLY RENEWABLE | ADDITIONAL BENEFIT SSS | TOTAL |
|---|---|---|---|
| 1994 | $ 2,126.80 | $ 504.40 | $ 2,631.20 |
| 1995 | 2,143.60 | 504.40 | 2,648.00 |
| 1996 | 2,181.40 | 508.30 | 2,689.70 |
| 1997 | 2,261.20 | 523.90 | 2,785.10 |
| 1998 | 2,416.60 | 553.80 | 2,970.40 |
| 1999 | 2,622.40 | 595.40 | 3,217.80 |
| 2000 | 2,849.20 | 640.90 | 3,490.10 |
| 2001 | 3,059.20 | 683.80 | 3,743.00 |
| 2002 | 3,059.20 | 715.00 | 3,774.20 |
| 2003 | 3,059.20 | 715.00 | 3,774.20 |
| 2004 | 3,059.20 | 715.00 | 3,774.20 |
| 2005 | 3,059.20 | 715.00 | 3,774.20 |
| 2006 | 3,059.20 | 715.00 | 3,774.20 |
| 2007 | 3,059.20 | 715.00 | 3,774.20 |
| 2008 | 3,059.20 | 715.00 | 3,774.20 |
| 2009 | 3,059.20 | 715.00 | 3,774.20 |
| 2010 | 3,059.20 | 715.00 | 3,774.20 |
| 2011 | 3,059.20 | 715.00 | 3,774.20 |
| 2012 | 3,059.20 | 715.00 | 3,774.20 |
| 2013 | 3,059.20 | 715.00 | 3,774.20 |
| 2014 | 3,059.20 | 715.00 | 3,774.20 |
| 2015 | 3,059.20 | 715.00 | 3,774.20 |

INSURED          Cynthia A Kaylor          AGE AND SEX          44 Female

POLICY DATE     July 28, 1994          POLICY NUMBER      D1 O70 572

PLAN            Disability Income

Exclusions--See Section 3.



# SECTION 1. GENERAL TERMS AND DEFINITIONS

This policy provides benefits when the Insured is totally or proportionately disabled. Section 1 gives information about or the meaning of several terms that are used in the policy.

## 1.1 INSURED AND OWNER

The Insured and Owner are named on page 3.

## 1.2 TERMS ON SCHEDULE OF BENEFITS AND PREMIUMS

The schedule of Benefits and Premiums (page 3) has a number of important terms that are used in this policy. These terms are:

**Full Benefit.** This is the maximum amount of monthly income payable under this policy.

**Beginning Date.** This is the date on which benefits begin to accrue after the Insured becomes disabled. Benefits are not payable for the time the Insured is disabled before the Beginning Date. Days of disability due to different causes will be accumulated to satisfy the Beginning Date.

**Maximum Benefit Period.** This is the longest period of time that benefits are payable for disability. In determining the maximum length of time for which benefits are payable, periods of total and proportionate disability are added together. If page 3 provides that the Maximum Benefit Period has a lifetime benefit for total disability, then see Section 2.7.

**Initial Period.** (Coverage for the Insured's own occupation). During the Initial Period the definition of total disability is based on the Insured's regular occupation at the time the disability starts. The Initial Period starts on the Beginning Date and continues, while the Insured is disabled, for the length of time shown on page 3.

## 1.3 REGULAR OCCUPATION

The words "regular occupation" mean the occupation of the Insured at the time the Insured becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time the disability starts will be combined together to be "the regular occupation."

If the Insured is exclusively engaged in:
- a medical or dental specialty for which board certification is available; or
- the specialty of trial law

that specialty is the "regular occupation."

## 1.4 TOTAL DISABILITY

Until the end of the Initial Period, the Insured is totally disabled when unable to perform the principal duties of the regular occupation. After the Initial Period, the Insured is totally disabled when both unable to perform the principal duties of the regular occupation and not gainfully employed in any occupation.

If the Insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled; however, the Insured may qualify as proportionately disabled.

## 1.5 PROPORTIONATE DISABILITY

The Insured is proportionately disabled when:

a. the Insured is unable:
- to perform one or more but not all of the principal duties of the regular occupation; or
- to spend as much time at the regular occupation as before the disability started;

b. the Insured has at least a 20% Loss of Earned Income; and

c. the Insured is gainfully employed in an occupation.

During a period of proportionate disability following the Beginning Date, the Proportionate Benefit may be payable. Until the Proportionate Benefit has been payable for six months, the Insured need not have a 20% Loss of Earned Income to be proportionately disabled if:
- the Insured is unable to perform one or more principal duties which accounted for at least 20% of the time the Insured spent at the regular occupation before the disability started; or
- the Insured has at least a 20% loss of time spent at the regular occupation.

## 1.6 LICENSED PHYSICIAN

Licensed Physician means a physician, other than the Insured, who is acting within the scope of his or her license. If disability is due to a mental or nervous condition, Licensed Physician means psychiatrist or licensed doctoral level psychologist other than the Insured.

## 1.7 REGULAR CARE OF A LICENSED PHYSICIAN

Regular Care of a Licensed Physician means personal care and attention appropriate to the condition causing disability. This care must be at such intervals and frequency as will lead to the Insured returning to the principal duties of the regular occupation.

If the Company determines that Regular Care of a Licensed Physician would be of no further use to the Insured, the requirement of such care will be waived.



## 1.8 CONSUMER PRICE INDEX

A consumer price index is used to determine the Indexing Factor as described in Section 2.4 of this policy. The consumer price index used in this policy is the Consumer Price Index for All Urban Consumers, United States City Average, All Items ("CPI-U"). The CPI-U is published by the Bureau of Labor Statistics. If the method for determining the CPI-U is changed, or if it is no longer published, it will be replaced by some other index found by the Company and the insurance supervisory official of the state to serve the same purpose.

The "consumer price index for the year the disability started" is the CPI-U for the fourth month before the start of disability. The "consumer price index for the current year of disability" is the CPI-U for the fourth month before the most recent anniversary of the start of disability.

## 1.9 SOCIAL SECURITY SUBSTITUTE (SSS) BENEFIT

This policy may have the SSS Benefit. If so, the schedule of Benefits and Premiums will show the Full Benefit, Beginning Date and Maximum Benefit Period applicable to the SSS Benefit. The terms and conditions of the SSS coverage are set out in the SSS Benefit.

# SECTION 2. BENEFITS

## 2.1 DISABILITIES COVERED BY THE POLICY

Benefits are provided for the Insured's total or proportionate disability only if:

- the Insured becomes disabled while this policy is in force;

- the Insured is under the Regular Care of a Licensed Physician during disability;

- the disability results from an accident that occurs or a sickness that was diagnosed or treated while this policy is in force; and

- the disability is not excluded under Section 3.

Sickness means sickness or disease of the Insured which is diagnosed or treated while this policy is in force.

Accident means accidental bodily injury sustained by the Insured and which occurs while this policy is in force.

## 2.2 FULL BENEFIT FOR TOTAL DISABILITY

The Full Benefit is payable at the end of the month for each month of total disability between the Beginning Date and the end of the Maximum Benefit Period. When a total disability lasts for a part of a month, 1/30th of the Full Benefit will be payable for each day of total disability.

## 2.3 PROPORTIONATE BENEFIT FOR PROPORTIONATE DISABILITY

The Proportionate Benefit is payable at the end of the month for each month of proportionate disability between the Beginning Date and the end of the Maximum Benefit Period. When a proportionate disability lasts for a part of a month, 1/30th of the Proportionate Benefit will be payable for each day of proportionate disability.

## 2.4 HOW THE PROPORTIONATE BENEFIT IS DETERMINED

The Proportionate Benefit is intended to compensate for a loss of earned income caused by the Insured's disability. The amount of each monthly benefit is the Full Benefit multiplied by Loss of Earned Income and divided by Base Earned Income. Thus, the Proportionate Benefit amount equals:

$$\frac{\text{Full}}{\text{Benefit}} \quad X \quad \frac{\text{Loss of Earned Income}}{\text{Base Earned Income}}$$

However, if the Insured has at least an 80% Loss of Earned Income, the Proportionate Benefit amount will be 100% of the Full Benefit. In no event will the amount payable be more than 100% of the Full Benefit.

As required by Pennsylvania Law, the Proportionate Benefit will not duplicate benefits payable under an automobile insurance policy issued to comply with the Motor Vehicle Financial Responsibility Law or Worker's Compensation.

**Choice Of Benefit Amount For First Six Months.** For each of the first six months in which a Proportionate Benefit is payable, the Owner may choose:

- to receive 50% of the Full Benefit; or

- to receive a Benefit based on Loss of Earned Income.

The Owner may alternate between these two choices as to each of the six months. However, the Owner may not change the choice after the Benefit is paid for that month.

The Choice of Benefit Amount does not apply to a Transition Benefit payable under Section 2.5.

**Loss Of Earned Income.** This is:

- the Insured's Base Earned Income; less

- the Insured's Earned Income for the month for which the Benefit is claimed.

The Loss of Earned Income must be caused by the disability for which claim is made.

**Earned Income.** For an Insured who is an employee, Earned Income is:

- the sum of salary, bonuses and commissions paid to the Insured as reported for federal income tax (FIT) purposes; plus

- amounts earned by the Insured which would have resulted in current taxable employee compensation, but instead were contributed by the Insured to a benefit or retirement plan; less

- unreimbursed employee business expenses as reported by the Insured for FIT purposes.

For an Insured who is an owner of a sole proprietorship or a partnership interest, Earned Income is based on amounts as reported for FIT purposes on individual and business tax returns and is:

- the share of gross income from each business, earned by the Insured or others under the Insured's supervision or direction; less

- the Insured's share of normal and customary business expenses. (However, any form of compensation for the Insured's spouse is not deducted as an expense unless the spouse was a paid employee working at least 30 hours per week in the business during the 30 day period before the start of disability.)

For an Insured who is an owner-employee of a corporation or who has Earned Income from more than one source, Earned Income is calculated using all five items of Earned Income as described above.

For amounts in the current or recently ended tax year which have not yet been reported on FIT returns, the calculations above will be based on amounts that will be reported for FIT purposes. Earned Income is determined before the deduction of federal, state and local income taxes. Earned Income does not include forms of unearned income such as: benefits from disability coverage, from deferred compensation, or from retirement plans; dividends; interest; or annuity payments.

At the time a claim for a Proportionate Benefit begins, the Owner must choose:

- to have all items of Earned Income, as described above, credited to the period in which they are earned (accrual basis); or

- to have all items of Earned Income, as described above, credited to the period in which they are received (cash basis). However, income received during a period of disability for work performed prior to the start of the period of disability will not be included in income during the period of disability.

The accounting basis chosen by the Owner will be used to determine both Base Earned Income and Earned Income during a period of disability.

**Base Earned Income.** During the first 12 months of a disability, Base Earned Income is the average monthly Earned Income of the Insured for:

- a 12 consecutive month period during the 24 month period before the start of disability; or

- any two of the five calendar years before the start of disability.

The period which generates the highest average (and therefore the highest benefit amount) will be used.

After the first 12 months of a disability, Base Earned Income is the average monthly Earned Income of the Insured multiplied by an Indexing Factor. The Indexing Factor is:

- the consumer price index for the current year of disability; divided by

- the consumer price index for the year the disability started.

Thus, after 12 months of a disability, Base Earned Income equals:

$$\text{average monthly Earned Income} \times \frac{\text{consumer price index for the current year of disability}}{\text{consumer price index for the year disability started}}$$

In the event the Indexing Factor is less than one, a value of one will be used.

## 2.5 TRANSITION BENEFIT

The Company will pay a Proportionate Benefit for up to the first 12 months after the Insured's recovery from a disability, provided:

- the Insured was disabled until the Beginning Date;

- the Insured has returned to continuous full-time employment;

- the Insured has at least a 20% Loss of Earned Income for the month for which the benefit is claimed; and

- the month for which the benefit is claimed is within the Maximum Benefit Period.

The amount of this Benefit will be determined under Section 2.4. A Loss of Earned Income is used to determine the amount of Transition Benefit to the extent that it is caused by the disability from which the Insured has recovered.

A disability occurring while the Transition Benefit is payable is considered as a continuation of the previous disability.

This Benefit is payable for up to 12 months for each separate disability. For any month this Benefit is payable, premiums will be waived.



## 2.6 TRANSPLANT DONOR

If the Insured donates an organ for transplant to another person, a disability caused by the donation will be considered as caused by sickness.

## 2.7 LIFETIME BENEFIT FOR TOTAL DISABILITY

If page 3 provides that the Maximum Benefit Period has a lifetime benefit for total disability, then the Full Benefit is payable as long as total disability continues during the lifetime of the Insured, provided:

- the Insured is totally disabled on the policy anniversary that follows the 60th birthday of the Insured;

- the total disability continues without interruption to the policy anniversary that follows the 65th birthday of the Insured; and

- the total disability continues without interruption beyond the policy anniversary that follows the 65th birthday of the Insured.

## 2.8 LIFETIME BENEFIT FOR PRESUMPTIVE TOTAL DISABILITY

Even if the Insured is able to work, the Insured will be considered totally disabled if the Insured incurs the total and irrecoverable loss of:

- sight in both eyes;
- use of both hands;
- use of both feet;
- use of one hand and one foot;
- speech; or
- hearing in both ears.

The Full Benefit is payable for this loss provided: the loss occurs while this policy is in force; the loss occurs before the first policy anniversary that follows the 65th birthday of the Insured; the loss results from an accident or sickness; and the loss is not excluded under Section 3. The Insured does not need to be under the care of a physician.

The Full Benefit for the loss:

- is payable monthly;
- starts with the date of loss, not the Beginning Date;
- is payable for as long as the loss continues during the lifetime of the Insured; and
- is in lieu of other benefits payable for total or partial disability.

## 2.9 WAIVER OF PREMIUM BENEFIT

The Company will waive premiums which become due on this policy while the Insured is totally or partially disabled if:

- the disability lasts for at least 90 days; or

- the disability lasts beyond the Beginning Date, if sooner.

The Waiver of Premium Benefit is not limited by the Maximum Benefit Period.

If premiums are waived, the Company will also refund that portion of a premium paid which applies to a period of disability beyond the policy month in which the disability began. If a premium is to be waived on a policy anniversary, an annual premium will be waived.

The Company will not waive the payment of premiums after the end of the disability (except where the waiver continues under Section 2.5). The Owner may then keep the policy in force by resuming the payment of premiums as they become due.

## 2.10 REHABILITATION BENEFIT

At the Insured's request, the Company will consider joining in a program to rehabilitate the Insured. The Company's role in the program will be determined by written agreement with the Insured. Benefits will continue during the program under the terms of the agreement.

## 2.11 DISABILITY WITH MULTIPLE CAUSES

If the Insured is disabled from more than one cause, the amount and duration of benefits will not be more than that for any one of the causes.

## 2.12 BENEFITS FOR SEPARATE DISABILITIES

Each separate time the Insured is disabled, a new Initial Period, Beginning Date and Maximum Benefit Period start. A disability is considered a separate disability if:

- Full, Proportionate, or Transition Benefits were, but no longer are, payable for the earlier disability; and either

  - the cause of the later disability is not medically related to the cause of the earlier one, and the Insured had resumed on a full-time continuous basis the principal duties of an occupation for at least 30 consecutive days; or

  - the cause of the later disability is related to the cause of the earlier one, and the later disability starts at least 12 months (or 6 months if this contract has a 24 month or 60 month Maximum Benefit Period) after Full, Proportionate, or Transition Benefits cease being payable for the earlier one.

All other disabilities are considered to be a continuation of the prior disability.

# SECTION 3. EXCLUSIONS AND LIMITATIONS

## 3.1 PRE-EXISTING CONDITIONS

There will be no benefits for a disability or loss that:

- results from an accident that occurred within five years before the Date of Issue; or

- results from a sickness that was diagnosed or treated within five years before the Date of Issue

if the accident or sickness was not disclosed or was misrepresented in the application.

## 3.2 OTHER EXCLUSIONS

There will be no benefits for a disability or loss that:

- is caused or contributed to by an act or incident of war, declared or undeclared; or

- is excluded from coverage by an Agreement for Limitation of Coverage.

There will be no benefits for a disability or loss which results from the Insured committing or attempting to commit a felony.

## 3.3 LIMITATION REGARDING PREGNANCY AND CHILDBIRTH

For a disability caused by normal pregnancy or childbirth, the Beginning Date will be the 91st day of disability or the Beginning Date shown on page 3, if later. This limitation does not apply to a disability caused by complications of pregnancy or childbirth.

Complications are physical conditions physicians consider distinct from pregnancy even though caused or worsened by pregnancy. For purposes of this policy, a non-elective caesarian birth is a complication of pregnancy. Examples of conditions that are not complications include false labor, fatigue, and morning sickness. Examples of complications of pregnancy are conditions requiring medical treatment prior or subsequent to the termination of pregnancy that your physician considers to be a complication of pregnancy.

# SECTION 4. CONDITIONAL RIGHT TO RENEW TOTAL DISABILITY COVERAGE TO AGE 75

On each policy anniversary between the Insured's 65th and 75th birthdays, the Owner may renew this policy for one year if:

- the Insured is actively and gainfully employed at least 30 hours per week; and

- premiums to renew this policy are paid.

Actively and gainfully employed means performing the principal duties of an occupation for salary or income.

This right to renew ends on the first anniversary on which the Insured is not so employed or on which the Owner chooses not to renew the policy.

For a policy that is renewed, benefits are provided only for total disability. The total disability must be one:

- which occurs while this policy is in force; or

- which commences within 30 days of an accident which occurred while this policy was in force, provided the disability results from the accident.

The premium for each year of renewal will be based on the Insured's age and the Company's rates in use at the time of renewal.



# SECTION 5. CLAIMS

## 5.1 CLAIM FOR POLICY BENEFITS

**Notice Of Claim.** To start a claim for benefits, written notice of claim must be given to the Company within 60 days after the start of any loss covered by this policy. If the notice cannot be given within 60 days, it must be given as soon as reasonably possible. The notice should:

- give the Insured's name and policy number; and
- be sent to the Home Office or be given to an authorized agent of the Company. Mail sent to the Home Office should be addressed as follows:

> The Northwestern Mutual Life Insurance Co.
> Attn: Disability Benefits
> 720 East Wisconsin Avenue
> Milwaukee, Wisconsin 53202

**Proof Of Loss.** For a claim to be payable, the Company must be provided with satisfactory written proof of loss. This is information that the Company deems necessary to determine whether benefits are payable, and if so, the amount of the benefits. The proof of loss will include information about the Insured's health, occupational duties, income both before and after the disability started (including income tax returns for the Insured and for businesses in which the Insured has or had an interest), overhead expenses and disability benefits along with other information as may be required by the Company from time to time. The Company will also need to be provided information as described below under "Other Requirements."

The Company will furnish claim forms for an initial written proof of loss within 15 days after receiving notice of claim. These forms will need to be completed by the Owner, the Insured and the Insured's physician. If these forms are not furnished within the 15 day period, this initial written proof of loss may be made without the use of the Company's forms.

The Company will furnish additional claim forms from time to time while a claim for monthly benefits continues.

Written proof of loss must be given to the Company within 90 days after the end of each monthly period for which benefits are claimed. If the proof is not given within the 90 days, the claim will not be affected if the proof is given as soon as reasonably possible. In any event, the proof required must be given no later than one year and 90 days after the end of each monthly period for which which benefits are claimed unless the Owner was legally incapacitated.

**Other Requirements.**

- **Authorizations.** From time to time, the Company will furnish the Insured with authorizations to obtain information. These authorizations must be signed by the Insured and returned to the Company.
- **Medical Examination.** The Company may have the Insured examined by a health care practitioner.
- **Personal Interview.** The Company may conduct a personal interview of the Insured.
- **Financial Examination.** The Company may have the financial records of the Insured or the Owner examined.

Any examination or interview will be performed:

- at the Company's expense;
- by a health care practitioner, interviewer or financial examiner of the Company's choice; and
- as often as is reasonably necessary in connection with a claim.

## 5.2 TIME OF PAYMENT OF CLAIMS

When the Company has received satisfactory proof of loss and other information as required by section 5.1 and the Company has determined that benefits are payable, the Company will pay benefits on a monthly basis.

## 5.3 PAYMENT OF CLAIMS

Benefits will be paid to the Owner or to the Owner's estate.

## 5.4 LEGAL ACTIONS

No legal action may be brought for benefits under this policy within 60 days after written proof of loss has been given. No legal action may be brought after three years (or a longer period that is required by law) from the time written proof is required to be given.

# SECTION 6. OWNERSHIP

## 6.1 POLICY RIGHTS

All policy rights may be exercised by the Owner, or the Owner's successor or transferee.

## 6.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy. Written proof of transfer satisfactory to the Company must be received at its Home Office. The transfer will take effect as of the date it was signed. The Company may require that the policy be sent to its Home Office for endorsement to show the transfer.

## 6.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security. The Company is not responsible for the validity or effect of a collateral assignment. The Company will not be responsible to an assignee for any payment or other action taken by the Company before receipt of the assignment in writing at its Home Office.

A collateral assignee is not an Owner. A collateral assignment is not a transfer of ownership. Ownership can be transferred only by complying with Section 6.2.

# SECTION 7. PREMIUMS AND REINSTATEMENT

## 7.1 PREMIUMS

**Payment.** All premiums after the first are payable at the Home Office or to an authorized agent. A premium must be paid on or before its due date. A receipt signed by an officer of the Company will be furnished on request.

**Frequency.** Premiums may be paid annually, semi-annually or quarterly at the published rates of the Company. A change in premium frequency will take effect on the Company's acceptance of the premium for the new frequency. Premiums may be paid on any other frequency approved by the Company.

**Grace Period.** A grace period of 31 days will be allowed for payment of a premium that is not paid on its due date. This policy will be in full force during this period.

The policy will terminate at the end of the grace period if the premium is not paid.

**Premium Refund At Death.** The Company will refund that portion of any premium paid for a period beyond the date of the Insured's death.

## 7.2 REINSTATEMENT

**Within Late Payment Period.** The late payment period is the first 31 days after the grace period. Within the late payment period, the policy will be reinstated as of the date the overdue premium is paid. No evidence of insurability will be required.

**After The Late Payment Period.** After the late payment period, the cost to reinstate must be paid to the Company. The Company may also require an application for reinstatement and evidence of insurability. The policy will be reinstated as of the date the cost to reinstate was paid to the Company if:

- the application is approved by the Company; or
- notice that the application has been disapproved is not given within 45 days from the date the Company receives the application.

The policy will be reinstated as of the date the Company accepts payment of the cost to reinstate if the Company does not require an application.

**Coverage.** If no evidence of insurability is required, the reinstated policy will cover only a disability that starts after the date of reinstatement. If evidence of insurability is required:

- the reinstated policy will cover only a disability that results from an accident that occurs, or from a sickness that was diagnosed or treated after the date of reinstatement; and
- the Company may attach new provisions and limitations to the policy at the time of reinstatement. All other rights of the Owner and the Company will remain the same.

**Duty With Armed Forces.** If the policy terminates while the Insured is on active duty with the armed forces of any nation or group of nations, the policy may be reinstated without evidence of insurability. The policy will be reinstated as of the date a written request and the pro-rata premium for coverage until the next premium due date are received by the Company. The request must be received:

- no later than 90 days after the Insured's release from active duty; and
- no later than 5 years after the due date of the unpaid premium.

# SECTION 8. THE CONTRACT

## 8.1 ENTIRE CONTRACT; CHANGES

This policy with the application and attached endorsements is the entire contract between the Owner and the Company. No change in this policy is valid unless approved by an officer of the Company. The Company may require that the policy be sent to it to be endorsed to show a change. No agent has authority to change the policy or to waive any of its provisions.

## 8.2 TIME LIMIT ON CERTAIN DEFENSES

In issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a material misstatement in the application. However, after this policy has been in force for two years from the Date of Issue, no misstatement, except a fraudulent misstatement, in the application may be used to rescind the policy or to deny a claim for a disability or loss that starts after the two year period.

In addition, a claim may be denied on the basis that a disability or loss is caused by a Pre-Existing Condition (see Section 3.1). However, the Company may not reduce or deny a claim on that basis if the disability or loss:

- starts after two years from the Date of Issue; and
- is not excluded from coverage by an Agreement for Limitation of Coverage.

## 8.3 CHANGE OF PLAN

The Owner may change this policy to any plan of disability insurance agreed to by the Owner and the Company. The change will be subject to:

- payment of required costs; and

- compliance with other conditions required by the Company.

All premiums and dividends after the date of change will be the same as though the new plan had been in effect since the Policy Date.

## 8.4 CONVERSION TO LEVEL PREMIUM DISABILITY INSURANCE

The Owner may convert the Annually Renewable Premium (ARDI) coverage, if any, shown on page 3 to a level premium disability income insurance policy. The conversion may be done on or before the the conversion date shown on page 3. No evidence of insurability will be required. The right to convert is not available if the premiums are being waived for this policy.

A portion of the ARDI coverage may be converted, subject to conditions set by the Company.

The new policy will be in the form and have the same terms as policies being issued by the Company at the time of conversion. The terms available for the new policy will be based on the classification of risk of this policy. The new policy will have the following terms:

- the amount of the Full Benefit will be the amount of benefit converted;

- the Maximum Benefit Period and Initial Period will not be longer than the Maximum Benefit Period and Initial Period of this policy;

- the Beginning Date will be any Beginning Date offered at the time the new policy is purchased that is not earlier than the Beginning Date of this policy; and

- the new policy will be issued with additional benefits which are on the converted coverage and which are then available to new Insureds.

**Limitations Of Coverage.** The new policy will include any Agreement for Limitation of Coverage that is a part of this policy.

**Premium.** The premium for the new policy is determined as of its date of issue by:

- the Company's premium rates then in effect in the state where the Insured then resides;

- the Insured's age on the policy date of the new policy;

- the plan and amount of insurance issued; and

- the classification of risk of this policy.

**Cost Of Conversion.** The cost of conversion will be the first premium for the new policy less any dividend and premium credit for the benefit amount converted.

**Effective Date.** The new policy takes effect on the date the Company receives the application or the cost of conversion, whichever is later.

## 8.5 MISSTATED AGE OR SEX

If the age or sex of the Insured has been misstated, the benefits will be those which the premiums paid would have purchased at the correct age or sex.

## 8.6 CONFORMITY WITH STATE STATUTES

Any provisions of this policy which, on the Date of Issue, are in conflict with the statutes of the State of Issue on that Date are amended to conform to such statutes. The State of Issue is shown on page 3.

## 8.7 DIVIDENDS

This policy will receive its share of the divisible surplus, if any, of the Company. Divisible surplus is determined annually. This policy's share will be credited as an annual dividend.

Dividends will be:

- used to reduce premiums; or

- paid to the Owner when premiums are being waived.

## 8.8 DATES

Provided the first premium is paid, this policy will take effect on the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3 of this policy.

## 8.9 TERMINATION

If premiums are paid when due, this policy will not terminate until the first policy anniversary following the 65th birthday of the Insured or, if later, when the right to renew the policy ends (see Section 4). However, if the Insured is disabled on the date determined above, the termination will not take effect until benefits are no longer payable due to that disability.

 

# SOCIAL SECURITY SUBSTITUTE (SSS) BENEFIT RIDER

## 1. THE BENEFIT

The Company will increase the amount of the monthly income payable under the policy when disability benefits are not available from Social Security, subject to the terms and conditions stated below.

Between the SSS Benefit Beginning Date and the end of the SSS Benefit Maximum Benefit Period, the Full Benefit otherwise payable under the policy will be increased by either:

- the amount of the SSS Benefit when the Insured is not entitled to Social Security benefits based on the Insured's disability; or

- 40% of the amount of the SSS Benefit when the Insured, but no member of the Insured's family, is entitled to Social Security benefits based on the Insured's disability.

This increase can occur only while the SSS Benefit is in force. The Full Benefit, as increased, will be used to determine the amount of the Proportionate and Transition Benefits. The six month period for which a 50% benefit is available under the Proportionate Benefit is measured from the Beginning Date for disability income coverage, not the SSS Benefit Beginning Date.

The premium for and the amount of this Benefit are shown on page 3. The SSS Benefit Beginning Date and the SSS Benefit Maximum Benefit Period are also shown on page 3.

The SSS Benefit is not convertible.

## 2. EXCEPTIONS

**No Benefits After 65.** In no event will the Full Benefit be increased by the terms of the SSS Benefit after the first policy anniversary that follows the 65th birthday of the Insured. At that time, the SSS Benefit will terminate.

**Social Security Benefits.** The Full Benefit is not increased by the terms of the SSS Benefit:

- when both the Insured and at least one member of the Insured's family are entitled to Social Security benefits based on the disability of the Insured; or

- when the Insured has elected to receive retirement benefits from Social Security.

## 3. PROOF OF SOCIAL SECURITY BENEFITS

For the Full Benefit to be increased by the terms of the SSS Benefit, evidence as required by this section must be given to the Company. These requirements are in addition to those set out in the Claims Section of the policy.

**Entitlement To Benefits.** At the request of the Company, written proof must be given to the Company that the Insured is not entitled at that time to Social Security benefits based on the Insured's disability. The proof must show:

- that the Insured has applied for Social Security

benefits based on the Insured's disability; and

- the decision made by Social Security on the application.

If the Insured's application is denied and the Insured appears to the Company to be entitled to Social Security benefits, the proof must show:

- that the Insured has asked for a reconsideration of the decision; and

- if the decision is not changed, that the Insured has appealed the decision further.

The Company must also be given the Insured's written authorization to obtain information from Social Security about the Insured's claim.

**Benefits Pending Decision By Social Security.** Once the Insured has applied for benefits from Social Security, the Full Benefit will be increased under the terms of the SSS Benefit:

- for six months; or

- until the Insured receives the decision from Social Security, if sooner.

The Company will continue the increases beyond six months if it is satisfied that Social Security has not made a decision on the Insured's claim for reasons which are beyond the Insured's control. If increases have been stopped and Social Security later denies the Insured's claim, the Company then will pay those increases that would have been paid under the SSS Benefit had they not been stopped.

**Change In Status.** The Company must be notified at the time there is a change in the Insured's entitlement to Social Security benefits based on the status of the Insured's disability.

**Proof As To Family Member.** When a member of the Insured's family may be entitled to Social Security benefits based on the Insured's disability, the terms of this section as to the Insured also apply to that member.

## 4. ADDITIONAL DEFINITIONS

**Social Security.** The words "Social Security" mean the program established under the federal Social Security Act in its present form or as it may be amended or replaced in whole or in part.

**Member Of Family.** A member of the Insured's family is one who is entitled to Social Security benefits due to a relationship to the Insured.

## 5. TERMINATION

The SSS Benefit will terminate on the earliest of the following dates:

- the date of termination of this policy;

- the first policy anniversary that follows the 65th birthday of the Insured; or

- the date on which the Home Office receives the Owner's written request.

*John M. Bremer*

Secretary
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

# FUTURE INCREASE BENEFIT RIDER (FIB)

## 1. THE BENEFIT

The Company will annually index the Full Benefit on each policy anniversary to reflect increases in consumer price levels, subject to the terms and conditions in this Benefit. The increased coverage which results from the indexing will remain in effect for as long as the policy is in force and premiums are paid for the increased Full Benefit. Any benefit that is based on the amount of the Full Benefit will be increased in proportion to the increase in the Full Benefit.

**Increases Deferred During Disability.** Increases will not be made during a period for which premiums are waived. However, increases that would have been made during a period of disability but for the limitation in the prior sentence will take effect after premiums cease to be waived. The increases will be in effect for a separate disability suffered by the Insured (see Section 2.12 of the policy). The period for which premiums are waived includes any period for which the Transition Benefit is payable.

## 2. PREMIUM INCREASE

The premium for this policy will increase on the same date as each increase in the Full Benefit takes effect. The amount of each premium increase will be based on the increase in the Full Benefit and the premium rates as shown on page 3A.

When the Full Benefit is increased, the Company will provide an amendment to the schedule of Benefits and Premiums.

## 3. HOW AN INCREASED FULL BENEFIT IS DETERMINED

The Full Benefit for a policy year will be the Full Benefit for the prior policy year multiplied by the Indexing Factor. For purposes of determining the amount of the increase, the "Full Benefit" will be the sum of the disability income Full Benefit and any Social Security Substitute Full Benefit. The increase will be subject to a minimum and maximum described below. The Indexing Factor is:

- the consumer price index for the prior calendar year; divided by
- the consumer price index for the next prior calendar year.

Thus, the new Full Benefit equals:

$$\text{prior year Full Benefit} \quad X \quad \frac{\text{consumer price index for the prior calendar year}}{\text{consumer price index for the next prior calendar year}}$$

**Minimum And Maximum Increase.** The Full Benefit for a policy year will not be less than 104% of the Full Benefit for the prior policy year. The Full Benefit for a policy year will not be more than 108% of the Full Benefit for the prior policy year.

**Consumer Price Index.** The "consumer price index for the prior calendar year" is the <u>Consumer Price Index for All Urban Consumers, United States City Average, All Items</u> (CPI-U) for the month of September of the prior calendar year. The "consumer price index for the next prior calendar year" is the CPI-U for the month of September for the calendar year before the prior calendar year.

The CPI-U is published by the Bureau of Labor Statistics. If the method for determining the CPI-U is changed, or if it is no longer published, it will be replaced by some other index found by the Company and the insurance supervisory official of the state to serve the same purpose.

## 4. WHEN INCREASES IN THE FULL BENEFIT OCCUR

Except for increases that are deferred during a period for which premiums are waived, an increase in the Full Benefit will occur on each policy anniversary if the Owner has the right to receive increases at that time. The right to receive increases starts on the first policy anniversary and continues until:

- the Owner refuses two increases; or
- the last date on which this Benefit is in effect, as stated on page 3, if earlier.

The Owner can refuse to accept an increase:

- by not paying the increased premium resulting from this Benefit; or
- by sending a written notice to the Home Office of the Company before the increase takes effect.

If increases have stopped due to two refusals of increases, or because the Insured did not meet the Company's financial underwriting standards when this Benefit was previously renewable, the Owner will regain the right to receive further increases starting on the earlier of:

- the date, if any, this Benefit may be renewed under Section 5 of this Benefit, provided the Insured meets the Company's financial underwriting standards that are then in effect and the renewal date is not later than the first policy anniversary following the 55th birthday of the Insured; or
- the first policy anniversary after the Insured meets all of the Company's standards of insurability that are then in effect. These standards include the Insured's health, activities, and occupation as well as the Insured's financial condition.



## 5. RENEWAL

Page 3 shows the last date on which this Benefit is in effect. However, if it is stated on page 3 that this Benefit is renewable, the Owner may renew this Benefit for subsequent five-year periods. In no event will the Benefit be in effect after the first policy anniversary after the 64th birthday of the Insured.

To renew this Benefit, the Insured must meet the Company's financial underwriting standards that are then in effect. These standards include:

- the Insured's earned and unearned income;

- the Insured's net worth;

- the amount and type of disability coverage that the Insured has or for which the Insured may be eligible after a qualifying period of employment; and

- the Company's issue limits.

Satisfactory evidence of insurability must be provided to the Company no more than 90 days and no less than 45 days before the anniversary on which this Benefit is to be renewed.

For purposes of Section 8.2 of the policy, the Date of Issue for increases during any renewal of this Benefit will be the policy anniversary on which this Benefit is renewed.

**Conditional Renewal Excluded.** This Benefit will not be in force if the policy is in force under the Conditional Right to Renew Total Disability Coverage to Age 75.

## 6. TERMINATION

The Future Increase Benefit will terminate on the earliest of the following dates:

- the date the policy terminates;

- the date the Home Office receives the Owner's written request; or

- the first policy anniversary that follows the Insured's 64th birthday.

*John M. Bremer*

Secretary
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY



Policy Number: D1070? ?6

# DI DISABILITY INSURANCE APPLICATION
## Northwestern Mutual Life Insurance Company • Milwaukee, Wisconsin

| •Complete entire application for individual business and MultiLife Association Business. <br> •Complete the application omitting the shaded areas for MultiLife Employer Sponsored Business. | For MultiLife Business. complete Supplement #17-1052 - Enter MultiLife Discount Plan Number: _____ |
|---|---|

☑ NEW ISSUE | ☐ APB OPTION | CONVERSION
☐ GROUP LTD APB OPTION | ☐ ARDI   ☐ Interim Term   ☐ Group LTD   Original Policy Number : _____

Has an application or informal inquiry ever been made to Northwestern Mutual Life for annuity, life or disability insurance on the life of the Insured?   ☐ Yes   ☑ No   If yes. the last policy number is _____

## INSURED

**1**

A. Name: ☐ Mr.  ☐ Mrs.  ☑ Ms.   FIRST | MIDDLE INITIAL | LAST
   ☐ Dr.  ☐ Other_____ | C Y N T H I A | A | K A Y L O R

B. ☑ Female   C. Social Security Number:   D. Birthdate:   E. State of Birth (or Foreign Country):
   ☐ Male   1 9 5 - 4 2 - 8 1 9 9   MO 12 DAY 22 YR 50   PA

F. Primary Residence: STREET & NO. OR RFD   CITY   STATE   ZIP
   246 Willis RD   ETTERS   PA   1731?

## APPLICANT - IF OTHER THAN INSURED

**2**

A. Name: ☐ Mr.  ☐ Mrs.  ☐ Ms.   FIRST | MIDDLE INITIAL | LAST
   ☐ Dr.  ☐ Other_____

B. Relationship to Insured:   C. Address: STREET & NO. OR RFD   CITY   STATE   ZIP.

## OWNER - DO NOT COMPLETE FOR KEYPERSON OR BUYOUT

**3**

The OWNER of the policy(ies) will be:
☑ Insured   ☐ Applicant   ☐ Other (Full Name and Relationship) _____

## PREMIUM PAYER

**4**

A. Send premium notices and other notices for this policy(ies):
   TO: ☑ Insurance Service | ☐ Insured  ☐ Applicant  ☐ Owner  ☐ Other_____
   Account (ISA)   OR   AT: ☐ Insured's Address in #1F.   ☐ Applicant's Address in #2C.   FULL NAME
   Payer   ☐ Other_____
   STREET & NO. OR RFD   CITY   STATE   ZIP

B. Daytime Telephone Number:   C. Taxpayer ID Number: (See TIN Instructions p.14)
   Area Code ( 7 ? ) 231-4081   ☑ Insured's SS# in 1C. or   ☐ Other: # _____
   TIN NUMBER

D. Has the premium for the policy applied for been paid in exchange for the Conditional   E. Payable: ☑ Annually
   Disability Insurance Agreement with the same number as this application?   ☑ Yes ☐ No   ☐ Semiannually  ☐ Quarte

F. Will the Insured's employer pay the whole premium for this disability insurance? If yes. answer G and H.   ☐ Yes  ☑ N
G. Will any part of the premium be included in the Insured's taxable income?   ☐ Yes  ☐ N
H. Will the Insured reimburse the employer for any part of the premium?   ☐ Yes  ☐ N

## OCCUPATION

**5**

A. Name of Employer or Business:   B. Product or service the employer provides:
   DIVEELIA & KAYLOR P.C.   LEGAL SERVICES

C. Employer's Address: STREET & NO. OR RFD   CITY   STATE   ZIP
   119 LOCUST ST   HARRISBURG   PA   17101

D. PRIMARY Occupation:   E. Other Occupations:
   ATTORNEY

F. Professional Degree or Credentials:   G. Professional Specialty. if any:
   J.D. DICKSON SCHOOL OF LAW   LITIGATOR

H. Describe Insured's occupational duties by stating the percentage of time spent on these duties:   ____ % Managerial/Adm
   (Do not complete if the Insured's occupation is an attorney. dentist or physician.)   ____ % Travel
   ___ % Sales   ___ % Keyboard work   ___ % Physical/Manual   ____ % Other: LITIGATION

I. Average number of hours worked per week 60 hrs.   J. Business located in the home?   ☐ Yes ☐
   Average hours per week worked outside of home _____

K. Length of time: In current occupation 5   With current employer 3   L. Current State of Employment
   If less than 3 years. state prior occupation(s) and employer(s) for the last 3 years:   PA

M. Does the Insured intend to change occupation, employer, or employment status in the next six months?   ☐ Yes ☐ N
   If yes, explain:

**ADDITIONAL PURCHASE BENEFIT OF** ●  - *COMPLETE THIS SECTION IF EXERC* ● *AN APB OPTION*

**6**

NOTE: If available, up to two Regular or two Special/Advance options may be exercised.

A. List the policy number(s) and purchase amount(s) for each option used:

1. Policy Number _____    Regular $ _____    Special/Advance $ _____

2. Policy Number _____    Regular $ _____    Special/Advance $ _____

3. Policy Number _____    Regular $ _____    Special/Advance $ _____

B. Special or Advance Purchase applied for within 90 days after: (check one)

▭ Marriage*    ▭ Birth of child*    ▭ Adoption of child*    ▭ Employer discontinued group DI coverage    ▭ Increase in annual earned in___

*Name:  ▭ Spouse  ▭ Child    *Date and place of marriage, birth or final decree of adoption:

| FIRST | MIDDLE INITIAL | LAST | MO / DAY / YR | CITY | STATE |

**POLICY APPLIED FOR**

**7**

| | Monthly Benefit | Maximum Benefit Period | Beginning Date | Initial Perio to Age |
|---|---|---|---|---|
| ☒ DISABILITY INCOME POLICY | | | | |
| Level Premium ............................................. $ _____ | | _____ | _____ | ▭ 65 ▭ 7 |
| Level Premium/Annually Renewable Premium ............. $ _____ / $ _____ LEVEL / ARDI | | _____ | _____ | ▭ 65 ▭ 7 |
| Step Rate Premium ...................................... $ _____ | | _____ | _____ | ▭ 65 ▭ 7 |
| Step Rate/Annually Renewable Premium ................... $ _____ / $ _____ STEP / ARDI | | _____ | _____ | ▭ 65 ▭ 7 |
| Annually Renewable Premium ........................ $ _4,200_ | | _65_ | _91_ | ▭ 65 ▭ 7 |
| ▭ INTERIM TERM POLICY (term period _____ ) ...... $ _____ (1-5 years) | | _____ | _____ | ▭ 65 ▭ 7 |
| ▭ DISABILITY OVERHEAD EXPENSE POLICY | | | | |
| ▭ Business  ▭ Professional | | | | |
| Aggregate Benefit ▭ 12 ▭ 24 (times monthly maximum benefit) | | | | |
| Level Premium ............................................. $ _____ | | _____ | | |
| Level Premium/Annually Renewable Premium ............. $ _____ / $ _____ LEVEL / ARDI | | _____ | | |
| Annually Renewable Premium ........................ $ _____ | | _____ | | |

▭ KEYPERSON POLICY (Complete Keyperson Supplement, form #90-1927)

▭ BUYOUT POLICY (Complete Buyout Supplement, form #90-1928)

**ADDITIONAL BENEFITS**

**8**

| | Amount on each Purchase Date | If more than one policy is appl for, indicate to which policy each benefit should be attach |
|---|---|---|
| ▭ Additional Purchase Benefit (APB) .......................................... $ _____ | | _____ |
| ▭ Business Additional Purchase Benefit (BAPB) ....................... $ _____ | | _____ |
| ☒ Social Security Substitute Benefit (SSSB) ........................ $ _1,300_ MONTHLY BENEFIT | | _____ |
| SSSB Beginning Date _____ (USED ONLY FOR CASH SICKNESS STATES) | | |
| ▭ Indexed Income Benefit (IIB - Cost of living adjustment) ......................... | | _____ |
| ▭ Future Increase Benefit (FIB) ............................................. | | _____ |

**9**

If Northwestern Mutual Life is not able to issue the policy and/or any additional benefit(s) as applied for, should the Company issu a policy if it can do so in a smaller amount, or on a different plan, or without an additional benefit? ............................. ☒ Yes ▭ N

**SPECIAL DATING** - *POLICY DATE*

**10**

A. Prepaid:    ▭ Short term - Policy Date will coincide with ISA Payment Date. (For monthly ISA only)

▭ Short term to _____ / _____ / _____    ▭ Date to save age    ▭ Backdate to _____ / _____ / _____
MONTH / DAY / YEAR                                                                                      MONTH / DAY / YEAR

B. Non-prepaid:    ▭ Specified future date _____ / _____ / _____    ▭ Date to save age    ▭ Backdate to

**INCOME**

Policy Number:

**11** Fill in the amounts that are (or will be) shown on the Insured's Individual and/or business income tax returns and supporting schedules. Do not list income that is not reported to the IRS. Use the "Remarks" section to explain significant changes between years or changes since the end of the last calendar year. Losses should be shown in parentheses. NOTE: The Company may request tax forms for underwriting or claim purposes.

A. INSURED'S EMPLOYER OR BUSINESS is a ☐ Sole Proprietorship  ☐ Partnership  ☐ C Corporation
☐ S Corporation  ☒ Other _P.C._____

B. 1. Does the Insured have an ownership interest in the business? ☐ Yes ☒ No  If yes, what is the percentage? _____%

   2. How long has the Insured had ownership in the business? _____

C. Are the most recently filed tax returns or the most recent Form W-2 and pay stub being sent with this application? ☒ Yes ☐ No

_This column is optional if returns have been filed with the IRS for the most recent ended calendar year_

| | Current Year Estimate Jan. 1 - Dec. 31, 19 94 | Most Recently Ended Calendar Year Jan. 1 - Dec. 31, 19 93 | Two Calendar Years Ago Jan. 1 - Dec. 31, 19 __ |
|---|---|---|---|
| **D. EARNED INCOME** | | | |
| 1. Non-owner/employee's compensation. (Deduct unreimbursed business expenses reported on Form 1040, Schedule A) Source: Form W-2 | $ 120,000 | $ 85,000 | $ |
| 2. Owner/employee's compensation. Source: Form W-2. (Also see 3 or 4 below) | | | |
| 3. Share of after-tax C corporation net income or (loss) after expenses if the Insured owns at least 20% of the corporation. Source: Form 1120 or 1120A | | | |
| 4. Share of S corporation net income or (loss) after expenses if the Insured is actively involved. Source: Form 1120S, Schedule K-1 | | | |
| 5. Sole proprietorship net profit or (loss) after expenses. Source: Form 1040, Schedule C | | | |
| 6. Share of partnership net profit or (loss) after expenses. Source: Form 1065, Schedule K-1 | | | |
| 7. Pension, profit sharing, or before-tax savings contributions (e.g., 401(K) plans) that would cease if the Insured were disabled and that **the Insured had the option to receive as salary.** (Not for SEP, KEOGH or other amounts not deductible as a business expense) | | | |
| 8. Other earned income (Explain source in Remarks) | | | |
| 9. **TOTAL EARNED INCOME:** Add the amounts above | $ 120,000 | $ 85,000 | $ |

E. UNEARNED INCOME: State if more than $5,000. This includes taxable and tax-exempt interest, dividends, capital gains, net rental income, income from businesses in which the Insured is not actively involved, pensions, annuities and alimony. $ _____ $ _____ $ _____

F. NET WORTH: Is the Insured's net worth (assets minus liabilities) more than $5,000,000? ☐ Yes ☒ No
If yes, complete an Insured's personal balance sheet or use Supplement #17-0912.

G. In the last 5 years, has the Insured, or a business in which the Insured has had a 10% or greater ownership interest, been in bankruptcy, or defaulted on any loans with an owed balance of more than $10,000? ☐ Yes ☒ No
If yes, describe the circumstances and amounts owed in Remarks.

Date of Discharge ____/____/____  Bankruptcy Chapter _____ ☐ Personal  ☐ Business
            MONTH  DAY   YEAR

**ADDITIONAL REMARKS - INCOME**

## DISABILITY COVERAGES

**12**

A. List and describe all disability benefits the Insured may be entitled to, including: Individual disability insurance and group disability insurance in all companies, including Northwestern Mutual Life; pension or retirement plans; salary continuation plans; association plans; credit insurance plans; overhead expense insurance; and any other coverage which provides disability benefits. Include coverage for which the Insured will become eligible within the next five years after a qualifying period of employment has been met.

Type = Individual DI, Group LTD, Group STD, Association DI, Overhead, Buyout, Keyperson, Other

I.P.C = (I) In force, (P) Pending or (C) Contemplated.  If none, check: ................................. ☐ None

| Insurer | Type of Insurance | Benefit Amount | Benefit Period | | I. P. C or Date of Eligibility | Check if Offset by Social Security | Employer Pays for coverage |
|---|---|---|---|---|---|---|---|
| | | | Accident | Sickness | | | |
| | | | *N/A* | | | | |

B. 1. Is additional contributory group DI coverage available through the Insured's employer? ................................. ☐ Yes ☐
    2. Does the Insured have plans to participate in the future? ................................................ ☐ Yes ☐
    If yes, give details in Remarks.

C. ANSWER ONLY IF THE INSURED IS A LAST YEAR MEDICAL RESIDENT/FELLOW.  If the Insured is covered by a group disability plan, does the Insured intend to continue or to convert to an individual policy? .......... ☐ Yes ☐

D. Will the insurance applied for replace insurance with Northwestern Mutual Life? ................................. ☐ Yes ☐
    If yes, complete the Conditional Surrender form #17-0789.  The agent should submit any required papers.

E. Will the insurance applied for replace insurance from a source other than Northwestern Mutual Life? .................... ☐ Yes ☐
    If yes, complete the information below. The agent should submit any required papers.

When issuing insurance as a result of this application, Northwestern Mutual Life will rely on the fact that the coverage listed below and will be terminated by the next premium due date which must be within 90 days of the date of this application.  If the coverage listed is not terminated by that date, or if it is terminated and later reinstated, any policy issued and accepted will be rescinded and premiums will be returned.  Northwestern Mutual Life may contact a listed insurer to confirm that the coverage has been terminated.

| Insurance Company | Type of Insurance | Group or Association Name | Policy Number | Amount to be Replaced | Next Premium Due Date | | |
|---|---|---|---|---|---|---|---|
| | | | | | Month | Day | Year |
| | | *N/A* | | | | | |

## DISABILITY OVERHEAD EXPENSE POLICY - *IF APPLYING*

**13**

A. Using the Insured's percentage of ownership in the business, insert the Insured's share of the typical monthly tax deductible business expense as reported on IRS forms and supporting schedules.  (For principal on business loans, give the current monthly installment payment.)

Rent................................................................................................................................
Heat................................................................................................................................ $ _____
Telephone ......................................................................................................................
Electricity ......................................................................................................................
Professional dues and license fees................................................................................
Maintenance...................................................................................................................
Real estate taxes............................................................................................................
Other taxes *(Itemize):* ................................................................................................
Interest on business loans .............................................................................................
Depreciation or principal on business loans *(Enter the larger of monthly depreciation expense or monthly principal on business loans)* .....
Insurance premiums.......................................................................................................
Legal and professional fees ...........................................................................................
Employees' salaries *(Professional DOE only) Do not include salaries of employees in the same occupation as the Insured)* ....
Other normal expenses *(Itemize):* ..............................................................................
TOTAL ........................................................................................................................ $ _____

B. How many people are employed by this firm? *(Include the Insured in the total.)*
    Owners: Full-time_____ Part-time_____   Non-owners: Full-time_____ Part-time_____

C. How many of the employees are in the same occupation as the Insured? *(Include the Insured in the total.)*
    Owners: Full-time_____ Part-time_____   Non-owners: Full-time_____ Part-time_____

## ADDITIONAL REMARKS - *DISABILITY COVERAGES/DISABILITY OVERHEAD EXPENSE*

**PERSONAL HISTORY**

Policy Number

## 14

**A.** Have you ever had life, disability or health insurance declined, rated, modified (as by an exclusion rider), cancelled, or not renewed? If yes, explain in Remarks.................................................................... ☐ Yes  ☒

**B.** When was your last examination or application for life, disability, or accidental death insurance?
Month_____ Year_____ Company_____ ☒ None

**C.** Marital Status:.......................................................................... ☒ Single, Widowed or Divorced   Married

**D. 1.** Citizen of: ☒ USA  ☐ Other
If other: Visa Type _____  Visa Number_____
If not a citizen of the U.S.A. complete 2 below.
**2.** I have read this statement and agree to its terms................................................................... ☐ Yes  ☐ N
*"I am not a U.S. citizen but do not intend to travel to any location outside the U.S.A. for more than 90 days each year. If I am disabled while traveling, I will return to the U.S.A."*
If no, please explain:

**E.** Do you regularly travel outside the U.S.A. or do you have plans to leave the U.S.A. for travel or residence?.......... ☐ Yes  ☒
If yes, explain in the chart below.

| Destination (List all Cities and Countries) | No. of Trips Per Year This Yr. | Last Yr. | Duration of Each Trip (No. of Days) | Departure Date (Month/Year) | Purpose of Trip |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  | N/A |  |  |  |
|  |  |  |  |  |  |

**F.** Are you a member of, or do you plan on joining any branch of the Armed Forces or reserve military unit?.............. ☐ Yes  ☒
If yes, complete the Military Section.

**G.** Except as a passenger on a regularly scheduled flight, have you flown within the past 2 years, or do you have plans to fly in the future? If yes, complete the Aviation Section. ................................................................... ☐ Yes  ☒

**H.** In the past 2 years have you participated in or do you have plans to participate in: racing (automobile, snowmobile, motorcycle, boat or go-cart), underwater or sky diving, hang gliding, bungee jumping, mountain or rock climbing, or rodeos? If yes, complete the Avocation Section.................................................... ☐ Yes  ☒

**I. 1.** What is your automobile driver's license number? # 14 813 793 _____ State PA
or, ☐ I do not have a driver's license.
**2.** In the past 5 years, have you been in a motor vehicle accident, been charged with a moving violation of any motor vehicle law, or had your license restricted, suspended or revoked? If yes, explain in the chart below.......... ☐ Yes  ☒ N

| Date | Type of Details (Speeding, Reckless Driving, Driving While Intoxicated, Etc.) | Action (Citation, Fine, Etc.) | Accident (Yes or No) |
|---|---|---|---|
| 1/94 | ACCIDENT ON ICE - ONLY 1 CAR INVOLVED - NO INJURIES | NO FINE | YES |
|  |  |  |  |

**J.** Have you ever been convicted of violating any criminal law other than a traffic violation?................................. ☐ Yes  ☒ No
If yes, provide full details in Remarks. Include dates, city and state, reason, charge convicted of, time served and the date of parole termination.

**ADDITIONAL REMARKS - *PERSONAL HISTORY***

**15** The Insured consents to this application and declares that the answers and statements made on this application are correctly recorded, complete and true to the best of the Insured's Knowledge and belief. Answers and statements brought to the attention of the agent, medical examiner, or paramedical examiner are not considered information brought to the attention of the Company unless stated in the application. Statements in this application are representations and not warranties.

It is agreed that:
(1) If the premium is not paid when the application is signed, no insurance will be in effect. The insurance will take effect at the time the policy is delivered and the premium is paid if the answers and statements in the application are still true to the best of the Insured's knowledge and belief.
(2) If the premium is paid when the application is taken, no disability insurance will be in effect if Section 1 of the Conditional Disability Insurance Agreement applies.
(3) Receipt of an outline of coverage for the policy applied for is acknowledged.
(4) No agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements.

## INSURED'S AUTHORIZATION TO OBTAIN AND DISCLOSE INFORMATION

**16** I authorize Northwestern Mutual Life, its agents, employees, reinsurers, insurance support organizations and their representatives to obtain information about me to evaluate this application and to verify information in this application. This information will include: (a) age; (b) medical history, condition and care; (c) physical and mental health; (d) occupation; (e) income and financial history; (f) foreign travel; (g) avocations; (h) driving record; (i) other personal characteristics; and (j) other insurance. This authorization extends to information on the use of alcohol, drugs and tobacco; the diagnosis or treatment of HIV (AIDS virus) infection and sexually transmitted diseases; and the diagnosis and treatment of mental illness. During the time this authorization is valid it extends to information required to determine eligibility for benefits under any policy issued as a result of this application.

I authorize any person, including any physician, health care professional, hospital, clinic, medical facility, government agency including the Veterans and Social Security Administrations, the MIB, Inc., employer, consumer reporting agency, accountant, tax preparer, or other insurance company, to release information about me to Northwestern Mutual Life or its representatives on receipt of this Authorization. Northwestern Mutual Life or its representatives may release this information about me to its reinsurer, to the MIB, Inc., or to another insurance company to whom I have applied or to whom a claim has been made. No other release may be made except as allowed by law or as I further authorize.

I have received a copy of the Medical Information Bureau and Fair Credit Reporting Act notices. I authorize Northwestern Mutual Life to obtain an investigative consumer report on me.

☑ I request to be interviewed if an investigative consumer report is done.

This authorization is valid for 30 months from the date it is signed. A copy of this authorization is as valid as the original and will be provided on request.

**The signatures below apply to the authorization and to the application.**

_____
Signature of INSURED (if other than Applicant)

X  _Cynthia A Kay_
Signature of APPLICANT

Signed at  _HARRISBURG_     _DAUPHIN_     _PA_
              CITY              COUNTY        STATE

Date  _7_ / _28_ / _94_
      MONTH   DAY    YEAR

_Richard N Fore_
Signature of LICENSED AGENT

_____
State License No. (FLORIDA AGENTS ONLY)

INSURED'S NAME   CYNTHIA A KEYLOR

# PARAMEDICAL QUESTIONNAIRE

CHECK PURPOSE: New Insurance ☐   Life, EP, VA ☐   Change ☐   Payor Benefit ☐   Add Benefit ☐   Reconsideration ☐   Reinstatement ☐

Each question must be individually asked and answered. Give details of "Yes" answers below: 1) Identify question number. 2) State signs, symptoms and diagnosis of each illness or injury. 3) List the details and results of any treatment. 4) List the name, full address and dates of each health care provider consulted.

| | | YES | NO | Details |
|---|---|---|---|---|
| **31.** a. | Have you smoked cigarettes in the last 10 years? <br> ☐ Current smoker <br> ☐ Past smoker-Date last smoked a cigarette ___/___/ | | ✓ | *(handwritten notes)* |
| b. | Do you use a pipe, cigar, snuff or chewing tobacco? If yes, specify. | | ✓ | |
| c. | Are you currently using nicorette gum, nicotine patch or other form of nicotine? If yes, specify. | | ✓ | |
| **32.** | Are you taking medication or drugs (legal or illegal, prescription or nonprescription) for any reason? If yes, list and explain. | ✓ | | |
| **33.** | Have you ever been medically advised or medically treated for: | YES | NO | |
| a. | Disorder of eyes (including double vision), ears, nose, mouth, throat or speech? | ✓ | | |
| b. | Dizziness, loss of balance, headaches, seizures or convulsions, muscle weakness, tremor, paralysis, stroke, memory loss, or any disease of the brain or nervous system? | | ✓ | |
| c. | Anxiety, depression, stress, or any psychological or emotional condition or disorder? | | ✓ | |
| d. | Persistent shortness of breath, hoarseness, cough, coughing up blood, asthma, emphysema, tuberculosis, or any lung or respiratory disorder? | | ✓ | |
| e. | Jaundice, hepatitis, intestinal bleeding, ulcer, hernia, colitis, diverticulitis, recurrent indigestion, or any disorder of the stomach, intestines, liver, gall bladder or pancreas? | | ✓ | |
| f. | High blood pressure, chest pain, chest discomfort, chest tightness, irregular heart beat, heart murmur, heart attack or any disorder of the heart or blood vessels? | | ✓ | |
| g. | Sugar, albumin, blood or pus in the urine, sexually transmitted or venereal disease, or any disorder of the kidney, bladder, prostate or reproductive organs? | | ✓ | |
| h. | Diabetes, thyroid or any glandular (endocrine) disorder? | | ✓ | |
| i. | Cancer, tumor, polyp, or disorder of the lymph gland(s) or breast(s)? | | ✓ | |
| j. | Anemia, bleeding tendency, or any disorder of the blood? | | ✓ | |
| k. | Arthritis, sciatica, gout, or any disorder of the muscles, bones, joints, spine, back or neck? | ✓ | | |
| l. | Chronic or unexplained fatigue, fever, or illness? | | ✓ | |
| m. | Any allergies? | | ✓ | |
| n. | Any disorders of the skin? | | ✓ | |
| o. | Deformity, lameness or amputation? | | ✓ | |
| **34.** a. | Have you ever sought or received counseling or medical treatment for the use of alcohol or drugs or ever missed work because of alcohol or drug use? | YES | NO ✓ | |
| b. | In the last 10 years, have you used marijuana, cocaine, heroin, amphetamines or hallucinogens? | | ✓ | |
| c. | In the last 10 years have you used any tranquilizers, sedatives or narcotic drugs? | | ✓ | |
| d. | In the last 10 years, have you used legally prescribed drugs in excess of dosages prescribed by a physician or medical practitioner? | | ✓ | |
| **35.** | Are you pregnant? If yes, due date: _____ | YES | NO | |

Each question must be individually asked and answered. Give details of "Yes" answers below: 1) Identify question number. 2) State signs, symptoms and diagnosis of each illness or injury. 3) List the details and results of any treatment. 4) List the name, full address and dates of each health care provider consulted.

| | | YES | NO |
|---|---|---|---|
| **36.** Other than as previously stated on this application, have you: | | | |
| a. | Consulted any other health care providers (medical doctor, psychiatrist, psychologist, osteopath, chiropractor, counselor, therapist or other)? | | ✓ |
| b. | Been a patient in a hospital, clinic or medical facility? | | ✓ |
| c. | Had any diagnostic studies (EKG, x-ray, blood tests or any other)? | | ✓ |
| d. | Had surgery? | | ✓ |
| e. | Been advised to have any test, consultation, hospitalization, or surgery which was not completed? | | ✓ |

Details

| | | YES | NO |
|---|---|---|---|
| **37.** a. | During the last 6 months have you worked in your regular occupation less than your usual number of hours per week because of any sickness or injury? | | ✓ |
| b. | Have you ever requested or received payments, benefits, or a pension because of any injury, accident, sickness or disability? | | ✓ |

| | | YES | NO |
|---|---|---|---|
| **38.** a. | Do you have a family history of diabetes, cancer, melanoma, heart or kidney disease, mental illness or suicide, or any hereditary disease? | ✓ | |
| b. | Family History | | |

| | Age if Living | Medical History or Cause of Death | Age at Death |
|---|---|---|---|
| Father | 77 – healthy | | |
| Mother | | 1st M.I. & diabetes | 1993/76 |
| Brothers or Sisters | 28 – 47/46 | ... | |
| | 15 – 50 | 3 healthy | |

CVA

**39.** a. Height 5 ft. 0 in.   b. Weight 112 lbs.
c. Have you lost weight in the past 6 months?   YES ☐  NO ✓
If yes, loss was _A_ lbs.
Reason for weight loss_____

**40.** (Do not complete for Disability Insurance)
If the insured is under age 1, what was the weight at birth? _____ lbs. N/A ozs.

| | | YES | NO |
|---|---|---|---|
| **41.** a. | Have you ever been told that a test for the virus that causes AIDS, the HIV virus, has been positive, reactive or that you are infected with HIV? | | ✓ |
| b. | Have you ever been medically diagnosed as having HIV infection, ARC (AIDS Related Complex), or other disorder or condition of the immune system, or as requiring treatment of immune disease? | | ✓ |

**42.** Who is your regular or personal physician, doctor or health care provider? ☐ None
Name: Dr Robert D McElroy  717 – 763
Address: 850 Poplar Church Rd  0154
City, State & Zip Code: Camp Hill Pa 17011
Date last seen 2/_/94  Phone number: 717 – 4154
Reason: 1st visit Neck – Upper respiratory problem – Pharyngitis

I declare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief. Statements in this application are representations and not warranties.

Signed in my presence _____  PARAMEDICAL EXAMINER   Signature of INSURED (or Informant)

Date 7 / 27 / 94
  Month  Day  Year

SANDRA M. NALLY
PORTAMEDIC EXAMINER

**It is recommended that you ...**

read your policy.

notify your Northwestern Mutual agent or the Company at 720 E. Wisconsin Avenue, Milwaukee, Wisconsin 53202, of an address change.

call your Northwestern Mutual agent for information -- particularly on a suggestion to terminate or exchange this policy for another policy or plan.

**Election Of Trustees**

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees. Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy.

**DISABILITY INCOME POLICY**

**Eligible For Annual Dividends.**

Guaranteed Renewable with Guaranteed Premiums to Age 65

Conditionally Renewable to Age 75

QQ.DI.PA

Countersigned by _____
                    Licensed Resident Agent



## TOTAL DISABILITY
### - DURING INITIAL PERIOD
### - AFTER INITIAL PERIOD

# CONFIDENTIAL

Our ability to determine whether or not an Insured is totally disabled is critical to effective claim analysis.  How we do so depends on:
- the contract definition of total disability for the particular contract series involved, *and*
- whether the claim falls within the Initial Period (known as "own occupation period" in pre-LL contracts) or after.

*During the Initial Period, regardless of policy series,* an Insured is considered to be totally disabled if unable to perform the principal duties of his or her *own occupation* at the time he or she becomes disabled.

*After the Initial Period, for JJ, KK, and KL contracts,* an Insured is considered to be totally disabled if unable to perform the principal duties of "any occupation for which (the Insured) is or becomes reasonably fitted by education, training or experience with due regard to his vocation and earnings prior to disability."

[Note that the JJ contract does not include the "due regard" clause
but it is our administrative practice to apply it.]

*After the Initial Period, for LL, MM, MM90, and QQ contracts,* an Insured is totally disabled if "unable to perform the principal duties of his occupation and not gainfully employed in any occupation".

[The term "Initial Period" was first introduced with the LL series.]

---

➲ *Always review the LL and later series definition when
reviewing pre-LL claims.  Apply the definition most favorable
to the Insured.*

➲ For specific contract language, refer to
the *Contract and Benefits* section of this manual
or the appropriate contract.

---

*Exhibit A* shows the steps to follow in evaluating claims during the Initial Period.
*Exhibit B* illustrates the steps to follow in evaluating claims after the Initial Period has expired.



---

## Procedures for Determining Total Disability *During* Initial Period

During the Initial Period, we determine whether the Insured is unable to perform the *principal duties* of his or her "own", or regular, occupation. A *principal* duty is one which is important to the Insured's profession based on time spent and income generated. After the Initial Period, we also determine whether the Insured is employed in another occupation.

We evaluate each Insured's situation by:

[1] asking what duties the Insured performed *before* disability, and the percentage of time spent on each, for *each* of the Insured's jobs or professions; if a question arises about whether a particular duty is a principal one, we should look at the income derived from it;

[2] reviewing the duties the Insured is still performing;

[3] evaluating the duties the Insured is still capable of performing in light of his or her medical condition.

Most people perform from three to eight principal duties at work. These do not include duties which are incidental or do not contribute to the Insured's income. Since every job is different, you will need to examine each situation to determine what constitutes an Insured's principal duties.

If after disability an Insured is unable to perform any pre-disability principal duties, he or she is considered *totally disabled.* If he or she can perform some but not all, we consider the Insured *partially disabled.*

### Job Titles and Place of Employment
Job titles and place of employment are *not* determinative factors. Our contracts cover the Insured's ability to perform the principal duties that generate income; they do not guarantee employment with a certain employer or business or in a particular position.

### Specialty Occupations
If the Insured is working full-time as a trial lawyer or a board-certified medical specialist, our guidelines concerning specialty occupations may apply. The QQ contract automatically includes language addressing specialty occupations. See *Employment of Insured* section of this manual for further details.


CONFIDENTIAL



## Own Occupation Examples

The following examples illustrate the concepts of principal duties and own occupation to determine total disability.

υ    **SITUATION:** A thoracic surgeon spends 70% of his time doing surgery and 30% of his time consulting with patients before and after their surgery.  He only takes patients who are referred by other physicians.  When he determines that a patient does not need surgery, he refers the patient to another physician.  He has a medical impairment that prevents him from performing surgery.  He opens a family practice.

**CONCLUSION:** *This Insured is totally disabled.*  All of his job duties directly related to surgery and all of his income was generated by surgery.  All of the patients coming to him sought surgery.  Therefore, we would view this Insured as having only one principal duty (surgery) of the regular occupation and he is totally disabled because he is unable to perform that principal duty.

υ    **SITUATION:** An orthopedic physician in a sports medicine clinic spends 20% of his time in surgery, 30% of his time consulting with patients before and after their surgery, and 50% of his time providing non-surgical treatment to patients who do not want surgery.  70% of his income is related to the surgical part of his practice, including the pre- and post-op visits, and 30% from non-surgical duties.  He has a medical impairment that prevents him from performing surgery, but he can continue to perform his non-surgical duties.

**CONCLUSION:** *This Insured is partially disabled.*  He is able to perform a principal duty (non-surgical treatment) that produced almost a third of his pre-disability income.  As partially disabled, he would receive a Proportionate Benefit based on his loss of income.  If his patient load further declines because he can no longer do surgery or if he is released by the clinic because of his disability, the Proportionate Benefit may increase to 100% of the Full Benefit.

υ    **SITUATION:** An attorney spends 40% of her time in court, 20% of her time on litigation that is settled before trial, and 40% of her time doing estate planning.  She has a medical impairment that prevents her from practicing trial law, but she continues to do estate planning.

**CONCLUSION:** *This Insured is partially disabled.*  Benefits would be based on income loss.  Although we recognize trial law as an occupational specialty, the Insured was not engaged in trial law full-time at the time the disability began.  Since she is still able to perform one of her principal duties (estate planning), she would be considered partially disabled.

CONFIDENTIAL

ʊ    **SITUATION:** A trial attorney spends 45% of his time in the courtroom litigating cases and 55% of his time taking depositions, meeting with clients, settling cases, and preparing for trials. All of his income comes from litigation. He has a medical impairment that prevents him from making court appearances.

**CONCLUSION:** *This Insured is totally disabled.* All of his duties are related to his ability to conduct trials and all of his income is generated by litigation work. All of his clients come to him because of his ability to conduct trials. Therefore, we view him as having one principal duty (courtroom advocacy) and because he is unable to perform it, he is totally disabled from the practice of trial law.

ʊ    **SITUATION:** During the Initial Period, an Insured is unable to perform any of the principal duties of his "own" occupation but is capable of performing some other occupation. He chooses not to change occupations and get another job.

**CONCLUSION:** *This Insured is totally disabled.* Under our contract, benefits are due during the Initial Period if an Insured is totally disabled for his own occupation.

> *Remember:* The key to analyzing each of these claims is identifying the principal duties of the Insured's occupation (including specialty occupation) at time of disability and determining whether the Insured can perform those duties while impaired. Our focus is on *time spent* on a job duty and the *income generated* by it.
>
> If the Insured is unable to perform his principal duties, he is totally disabled for his own occupation. If he can perform one or more but not all duties, or has a loss of time, he may be partially disabled.

# CONFIDENTIAL

## Procedures for Determining Total Disability *After* Initial Period

We call the six-month period preceding the end of the Initial Period the *own occupation transitional evaluation period*. During this time, we determine whether or not the Insured meets the more stringent definition of total disability applied after the Initial Period.

This transitional evaluation is important. It's significant because sufficient inquiry of an Insured's situation will ensure that benefits are appropriately payable beyond the Initial Period. Prompt and adequate investigation will also ensure that the Company does not lose the right to apply this different definition of total disability to the Insured's situation.

**Follow these steps if appropriate:**

[1]    Six months before the Initial Period ends, a system greenbar form is generated for each policy:

| | | SUPERVISOR - GIVE THIS TO THE CLAIM ANALYST<br>ANALYST - THE OWN OCCUPATION PERIOD ENDS IN SIX MONTHS | | | | 2:07 THURSDAY, JUNE 1, 1994 | | |
|---|---|---|---|---|---|---|---|---|
| | | | ANALYST=JONES LIFENR=9999999 | | | | | |
| INSURED | POLICY | MOBENFT<br>ENDS | OWN OCC<br>DATE | MAX PMT | PAID_TO | PREM_ANN | MAT_YR | BFTNR |
| JOHN J DOE | D999999 | 500 | 123194 | 071816 | 53194 | 0718 | 2016 | C00000 |

Review the file to determine if the Insured remains totally disabled from the principal duties of the regular occupation. If the file is well documented, and the Insured's inability to perform those duties is clear, document this on the Claim History/Requirements form.

If the Insured is working in another occupation, a proportionate benefit might apply if he or she has a qualifiable loss of earned income. Refer to the *Partial Disability* section of this manual.

If a re-evaluation of the Insured's condition is necessary, proceed with step [2].

[2]    Initiate a comprehensive medical re-evaluation including updated statements from attending physicians and any other sources of treatment. These statements should include a clinical description, a schedule of the course of therapy, and a prognosis.

Also consult with physicians and other practitioners to determine the Insured's motivation to return to work as well as the feasibility of rehabilitation.

CONFIDENTIAL

[3]    Communicate clearly with the Insured *(see ACS letters located in the subcategory "Own Occupation/Initial Period" for a guide).* Explain the change in definition, and develop an updated personal profile. This should include all current activities: Are those activities in line with pre-disability duties? Can the Insured now perform some duties? What are the Insured's future plans?

[4]    If appropriate, refer the file to the Rehabilitation Committee (see *Rehabilitation Benefit* section of this manual).

[5]    Make a recommendation to your management referral person if you believe benefits should be denied or if you have any questions on how to proceed.

*What if the Insured is capable of working in some other occupation but chooses not to do so?* Even if suitable employment is available and offered, an Insured continues to qualify for total disability benefits if unable to perform his regular occupation and not gainfully employed in any other. The choice to return to work is the Insured's; proceed cautiously in these cases, and always verify that total disability for the regular occupation continues.

If it appears an Insured may be able to perform some of his occupational duties and chooses not to work, see the *Partial Disability* section of this manual.

**Claim Scenarios:**

ʋ    A disabled surgeon cannot either perform surgery or work as a general practitioner. He does, however, find employment in a wholly unrelated field with a significant income loss -- as a sales clerk, for example.
       *Pre-LL -* We pay total disability benefits. This is because the Insured is unable to perform an occupation for which he is qualified.
       *LL or later -* We pay only a partial benefit. The Insured would not be eligible for a total benefit because he is, in fact, employed.

ʋ    Another disabled surgeon whose only duty was surgery cannot perform surgery, but is able to work as a general practitioner. This surgeon, however, decides not to work.
       *Pre-LL -* Contractually, the pre-LL series language would prevent payment of benefits because the issue in these contracts is whether or not the Insured is *able* to work. As administrative practice, however, we use whichever definition is most beneficial to the Insured -- in this case, the LL definition.
       *LL or later -* We pay a total benefit. This is because the surgeon is *not* employed. If this surgeon began working as a general practitioner at a lower income than before, he would be paid a partial benefit based on income loss.

6   CONFIDENTIAL

### Coding the System after the Initial Period

| Situation | Action to Take |
|---|---|
| • Insured remains totally disabled from own occupation, chooses not to work | • Code the payment screens for total disability payment.<br>• Send Request for Continuance of Total Disability Benefits form. |
| • Insured remains totally disabled from own occupation, is working in another occupation | If contract series is pre-LL:<br>• Code the payment screens for total disability.<br>• Send Request for Continuance of Total Disability Benefits form.<br><br>Otherwise:<br>• Code the payment screens for partial disability.<br>• Send Request for Continuance of Proportionate Disability Benefits form. |
| • Insured is partially disabled from own occupation, chooses not to work | • Code the payment screens for partial disability.<br>• Send Request for Continuance of Proportionate Disability Benefits form. |
| • Insured is partially disabled from own occupation, is working in another | • Code the payment screens for partial disability.<br>• Send Request for Continuance of Proportionate Disability Benefits form. |

In any of these situations, continue to send the "End of Own Occupation" letter to the Insured at the appropriate time.



---

### Specialty Occupations

An Insured whose occupation meets our criteria for a *specialty occupation* may be eligible for full benefits when unable to perform the principal duties of that specialty but able to work in a related field.

The QQ contract states:

CONFIDENTIAL

> "If the Insured is exclusively engaged in:
> • a medical or dental specialty for which
>   board certification is available; or
> • the specialty of trial law
> that specialty is the "regular occupation".

This language is effective March 1, 1994 and is retroactive to all prior series of disability income contracts.

Our criteria for determining whether an occupation qualifies as a specialty for determining benefits are as follows:

✓    The occupation must be a medical or dental specialty for which board certification is available, or trial law.

✓    The Insured must be exclusively engaged in the specialty when the disability begins.

**Non-Claim Inquiries**

If you receive a request for information on specialty occupations when no claim has been filed, do not respond to these inquiries in writing. The sample language below can

**Claims**

When claim-related questions arise, the following sample language may be used as a guide:

> *Under the terms of these policies, "Total Disability" is defined in terms of your ability to perform your occupation. During the Initial Period, you would be considered totally disabled if you cannot perform the principal duties of the occupation in which you were engaged at the time you became disabled. After the Initial Period, you would be considered totally disabled if you were unable to*

perform the principal duties of your occupation and were not gainfully employed in any occupation.

If you were engaged exclusively in a medical or dental specialty for which board certification is available or the specialty of Trial Law, the Northwestern Mutual will consider that specialty to be your occupation.  Examples include oral surgery, therapeutic radiology, or *(insert a specialty occupation* – the specialty MUST be a recognized medical specialty or trial law).

As stated in the contract, "occupation" means the occupation you were engaged in at the time you became disabled.  If you were regularly engaged in more than one occupation, all of the occupations would be combined together to be your "occupation".

See your management referral person for any questions you may have.

CONFIDENTIAL

**Determining Disability**

These examples may help clarify how we determine disability in a specialty occupation situation.

*Example One:*

A surgeon spends 70% of her time performing surgery and 30% of her time consulting with patients before and after surgery. All of her patients are referred by other physicians; when she determines that a patient does not need surgery, she refers the patient to another physician. This Insured's medical impairment prevents her from performing surgery, and she opens a family practice. *Is she totally disabled?*

*Yes.* All of her job duties directly related to surgery, all of her income was generated by surgery, and all of her patients sought surgery at the time she became disabled. Therefore, we view surgery as her principal duty, and, because she is unable to perform that duty, she is totally disabled.

*Example Two:*

An attorney spends 40% of his time in court, 20% of his time on litigation that is settled before trial, and 40% of his time doing estate planning. His medical impairment prevents him from practicing trial law, but he continues to do estate planning. Is he *totally* or *partially* disabled?

*Partially disabled with benefits based on income loss.* Although we recognize trial law as an occupational specialty, the Insured was not engaged in trial law full time at the time his disability began. Since he is still able to perform one of his principal duties -- estate planning -- he would be considered partially disabled.

*Example Three:*

A trial attorney spends 45% of his time in the courtroom litigating cases and 55% of his time taking depositions, meeting with clients, settling cases, and preparing for trials. All of his income comes from litigation work. His medical impairment prevents him from making court appearances. Is he *totally* or *partially* disabled?

*This Insured is totally disabled.* All of his duties are related to his ability to conduct trials and all of his income is generated by litigation work. All of his clients come to him because of his litigation ability. Once again, we have an Insured with only one principal duty (courtroom advocacy) who is totally disabled under our DI contracts because he is unable to perform that principal duty.

CONFIDENTIAL



## Procedures

[1]  Gather information that provides you with a clear understanding of the Insured's pre-disability and post-disability job duties and the exact percentage of time spent at each of these duties.  This is crucial in determining whether the Insured was exclusively engaged in a professional specialty and is now unable to engage in that specialty.  Resources for you to use are as follows:

> υ  Pattern Letter 322 *(DI Miscellaneous Letters)* for physicians

> υ  Job Comparison Statement *(15-1428)*

> υ  Disability Phone Survey *(15-1454)* with a follow-up letter summarizing the conversation, providing space for any additional information, and requesting the Insured's signature to verify the verbal information provided

> υ  MED PHYS function to verify professional credentials *(see Computer Functions and Applications Manual)*

> υ  American Board of Medical Specialties toll-free hotline – 1-800-776-2378 – to determine if a physician meets advanced ABMS Board Certification Standards and in what specialties *(about 2/3 of the nation's licensed MDs are ABMS board certified)*

> υ  Wisconsin Board of Specialties – 1-608-266-2811 *(contact Corporate Information Services for addresses and phone numbers of specialty boards in other states)*

[2]  If the Insured appears to meet the criteria, submit a written referral to your management referral person outlining the information you've obtained.

[3]  Even if you determine that the Insured is exclusively engaged in a specialty occupation at the time disability began, the Insured must be unable to perform the principal duties of that specialty occupation in order to qualify as totally disabled.  For the surgeon specialty, there is only one principal duty – the ability to perform surgery.  There is also only one principal duty for the trial law specialty -- the ability to advocate in court on behalf of a client.

For other specialty occupations, such as a physician specializing in internal medicine, there are several principal duties based on the nature of the Insured's practice.



04/12/2004 15:45 FAX 6108332738          US1 COLBURN INSURANCE                    ☑002

# *Westport Insurance Corporation*

**A Missouri Corporation**
**Jefferson City, Missouri**
**Mailing Address: 181 W. Madison, Suite 2600, Chicago IL 60602**

*CUSTOMIZED PRACTICE COVERAGE®*

**LAWYERS PROFESSIONAL LIABILITY INSURANCE RENEWAL APPLICATION**
**Claims-Made and Reported Basis**

Name of Applicant Firm: Diveglia And Kaylor, P.C.

| Mailing Address: | Two Lincoln Way West | New Oxford | Adams | PA | 17350 |
|---|---|---|---|---|---|
| | Street Address | City | County | State | Zip |

Contact Name: _____   Telephone: (717) 624-2500   Facsimile: (717) 624-3857
Current Policy Number: PLL-348318-9   Limits:$500,000/$1,000,000 Deductible: _____ $5,000   Expiration Date: 03/09/2004
E-mail Address: _____
Website Address: _____

1. Has the address of the primary location changed?
   If yes, please make your corrections directly on this form.                                          Yes ☐  No ☒

2. Has the firm added any new locations?
   If yes, please provide full details on the Detail Information Addendum.                               Yes ☐  No ☒

3. Has there been any change in the percentage of practice devoted to any specific area/specialty by ten (10) percent or more?   Yes ☐  No ☒
   If yes, please describe how your practice has changed on the Detail Information Addendum..

4. Is your firm or any individual proposed for this insurance engaged in business activities other than the private practice of law?  Yes ☐  No ☒
   If yes, please provide complete details on the Detail Information Addendum.

5. Have your Docket Control/Scheduling/Calendaring systems changed in the past 12 months?           Yes ☐  No ☒
   If yes, please provide complete details on the Detail Information Addendum.

6. Lawyers Changes
   a. Has the firm added any lawyer(s) in the past 12 months?                                         Yes ☐  No ☒
      If yes, any new lawyer to the firm must complete the New Lawyer Application Form.
   b. Has any lawyer(s) left the firm in the past 12 months?                                          Yes ☐  No ☒
      If yes, please provide name of lawyer and date of departure on the Lawyer Detail Addendum, Section III.
   c. Has the status of any lawyer(s) with regard to Of Counsel or Independent Contractor changed in the past 12 months?  Yes ☐  No ☒
      If yes, please provide details on the Lawyer Detail Addendum, Section II.

7. Has the firm's letterhead changed in any way other than adding and/or deleting lawyers noted in question 6 above?   Yes ☐  No ☒
   If yes, please provide sample copy of new letterhead.

8. Other than for a not for profit entity, in the past year has the applicant or any individual proposed for this insurance, for
   any client or in any client's business enterprise:
   a. Assumed a position as a director, officer, partner or trustee; or                               Yes ☐  No ☒
   b. Assumed any form of managerial or fiduciary control; or                                         Yes ☐  No ☒
   c. Obtained or changed any equity interest?                                                        Yes ☐  No ☒
   If yes to any of the above, please complete the Director's and Officer's/Outside Interests Supplemental Application.

9. Has any lawyer proposed for this insurance ever been denied the right to practice, been suspended, disbarred,
   reprimanded or had other disciplinary action instituted against them by any court or administrative agency within
   the past 12 months?                                                                                Yes ☐  No ☒
   If yes, please provide full details on the Detail Information Addendum.

10. During the current policy year, have any claims or suits been made against the applicant, its predecessor firms
    or any individual proposed for this insurance and not previously reported to the firm's insurance carrier?   Yes ☐  No ☒
    If yes, please complete a Claim Information Supplement.

11. Is any new individual proposed for this insurance aware of any circumstance, act, error, omission or personal
    injury which might be expected to be the basis of a legal malpractice claim or suit that has not previously been
    reported to the firm's insurance carrier?                                                          Yes ☐  No ☒
    If yes, please complete a Claim Information Supplement.

FEB 1 8 2004

04/12/2004 15:45 FAX 6108332736        USI COLBURN INSURANCE                      Ø004

# *Westport Insurance Corporation*

**A Missouri Corporation**
**Jefferson City, Missouri**
**Mailing Address: 181 W. Madison, Suite 2600, Chicago IL 60602**

*CUSTOMIZED PRACTICE COVERAGE®*

### LAWYERS PROFESSIONAL LIABILITY INSURANCE RENEWAL APPLICATION
### Claims-Made and Reported Basis

Name of Applicant Firm: Diveglia And Kaylor, P.C.    *NEW OXFORD*

Mailing Address: Two Lincoln Way West,          Adams          PA          17350
                 Street Address          City          County          State          Zip

Contact Name:                    Telephone: (717) 624-2500       Facsimile: (717) 624-3857
Current Policy Number: PLL-344577-6    Limits: $500,000/$1,000,000 Deductible: $5,000    Expiration Date: 03/09/2003
E-mail Address: *NONE*
Website Address:

| | | Yes | No |
|---|---|---|---|
| 1. | Has the address of the primary location changed? | ☐ | ☒ |
| | If yes, please make your corrections directly on this form. | | |
| 2. | Has the firm added any new locations? | ☐ | ☒ |
| | If yes, please provide full details on the Detail Information Addendum. | | |
| 3. | Has there been any change in the percentage of practice devoted to any specific area/specialty by ten (10) percent or more? | ☐ | ☒ |
| | If yes, please describe how your practice has changed on the Detail Information Addendum. | | |
| 4. | Is your firm or any individual proposed for this insurance engaged in business activities other than the private practice of law? | ☐ | ☒ |
| | If yes, please provide complete details on the Detail Information Addendum. | | |
| 5. | Have your Docket Control/Scheduling/Calendaring systems changed in the past 12 months? | ☐ | ☒ |
| | If yes, please provide complete details on the Detail Information Addendum. | | |

6. Lawyers Changes
   a. Has the firm added any lawyer(s) in the past 12 months?    Yes ☐  No ☒
     If yes, any new lawyer to the firm must complete the New Lawyer Application Form.
   b. Has any lawyer(s) left the firm in the past 12 months?    Yes ☐  No ☒
     If yes, please provide name of lawyer and date of departure on the Lawyer Detail Addendum, Section III.
   c. Has the status of any lawyer(s) with regard to Of Counsel or Independent Contractor changed in the past 12 months?    Yes ☐  No ☒
     If yes, please provide details on the Lawyer Detail Addendum, Section II.

7. Has the firm's letterhead changed in any way other than adding and/or deleting lawyers noted in question 6 above?    Yes ☐  No ☒
   If yes, please provide sample copy of new letterhead.

8. Other than for a not for profit entity, in the past year has the applicant or any individual proposed for this insurance, for any client or in any client's business enterprise:
   a. Assumed a position as a director, officer, partner or trustee; or    Yes ☐  No ☒
   b. Assumed any form of managerial or fiduciary control; or    Yes ☐  No ☒
   c. Obtained or changed any equity interest?    Yes ☐  No ☒
   If yes to any of the above, please complete the Director's and Officer's/Outside Interests Supplemental Application

9. Has any lawyer proposed for this insurance ever been denied the right to practice, been suspended, disbarred, reprimanded or had other disciplinary action instituted against them by any court or administrative agency within the past 12 months?    Yes ☐  No ☒
   If yes, please provide full details on the Detail Information Addendum.

10. During the current policy year, have any claims or suits been made against the applicant, its predecessor firms or any individual proposed for this insurance and not previously reported to the firm's insurance carrier?    Yes ☐  No ☒
   If yes, please complete a Claim Information Supplement.

11. Is any new individual proposed for this insurance aware of any circumstance, act, error, omission or personal injury which might be expected to be the basis of a legal malpractice claim or suit that has not previously been reported to the firm's insurance carrier?    Yes ☐  No ☒    *N/(*
   If yes, please complete a Claim Information Supplement.

04/12/2004 15:45 FAX 6108332736          USI COLBURN INSURANCE                    ☒005

12. Within the past 12 months, have there been any claims or changes in the status of claims reported other insurance companies?                                                                                    Yes ☐   No ☒
    If yes, please complete a Claim Information Supplement or submit a copy of a claims information supplement with updated information.

13. Do the CLE hours for any lawyer in your firm in the last 12 months NOT exceed your state's minimum CLE requirements?   Yes ☐   No ☒
    If your state does not have CLE requirements, answer no.
    If yes, please provide the average CLE hours per lawyer in the last 12 months: _____

Indicate additional coverage units you are applying for by checking the boxes. No checks will warrant no interest in the additional coverages.
    Employee Dishonesty            ☐      Employment Practices Liability   ☐*     Non-Profit Director and Officer Liability ☐
    Public Officials Liability     ☐      Title Insurance Agents Liability ☐*

*Does the applicant wholly own or operate any Title Insurance Agencies? Yes ☐   No ☒
If yes, please complete the Title Insurance Agents Coverage Unit Application.

If you have responded "YES" to any of the above questions, please contact your Administrator for further assistance and instructions as to how you should proceed. If ALL responses are "NO," will warrant no interest in the additional coverages.
If Title Insurance Agents Liability Coverage Unit is currently included in your policy it will continue to be included.

NOTICE TO APPLICANT

I hereby authorize the release of claim information from any prior insurer to Westport.

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

The undersigned represents that the statements set forth herein, including all coverage unit applications, supplemental forms and attachments, are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known.

Applicant understands and agrees that the completion of the application does not bind Westport to issuance of an insurance policy.

For your protection, the following Fraud Warning is required to appear on this application.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**THIS APPLICATION MUST BE SIGNED BY A PARTNER, OFFICER and/or OWNER**

SIGNED _____ President          DATED  1/29/13
            Partner, Officer and/or Owner

*The applicant understands and agrees that she or he is obligated to report any changes in the information provided in this application that occur after the date of the application.*

Mail to the following address
**USI Colburn Insurance Service**
 One International Plaza, Suite 400, Philadelphia, PA 19113

# *Westport Insurance Corporation*

**A Missouri Corporation**
**Jefferson City, Missouri**
Mailing Address: 181 W. Madison, Suite 2600, Chicago IL 60602

*CUSTOMIZED PRACTICE COVERAGE®*

**LAWYERS PROFESSIONAL LIABILITY INSURANCE RENEWAL APPLICATION**
**Claims-Made and Reported Basis**

Name of Applicant Firm: Diveglia And Kaylor, P.C. ~~2 LINCOLN WAY WEST, New OXFORD, PA (ADAMS Co)~~

Mailing Address: ~~110 Court Street~~ ←    ~~Harrisburg~~    ~~Dauphin~~    PA    ~~17101~~ *17350*
     Street Address      City      County      State      Zip

Contact Name: _____ Telephone: _____ Facsimilex: _____
Current Policy Number:   PLL-340782-3   Limits $500,000/$1,000,000 Deductible:   $5,000   Expiration Date:   03/09/2002
E-mail Address: _____
Website Address: _____

1. Has the address of the primary location changed?     Yes ☑   No ☐
   If yes, please make your corrections directly on this form. *( See above )*

2. Has the firm added any new locations?   *— Yes, see above*     Yes ☑   No ☐
   If yes, please provide full details on the Detail Information Addendum.

3. Has there been any change in the percentage of practice devoted to any specific area/specialty by ten (10) percent or more?   Yes ☐   No ☑
   If yes, please describe how your practice has changed on the Detail Information Addendum..

4. Is your firm or any individual proposed for this insurance engaged in business activities other than the private practice of law?   Yes ☐   No ☑
   If yes, please provide complete details on the Detail Information Addendum.

5. Have your Docket Control/Scheduling/Calendaring systems changed in the past 12 months?   Yes ☐   No ☑
   If yes, please provide complete details on the Detail Information Addendum.

6. **Lawyers Changes**
   a. Has the firm added any lawyer(s) in the past 12 months?   Yes ☐   No ☑
       If yes, any new lawyer to the firm must complete the New Lawyer Application Form.
   b. Has any lawyer(s) left the firm in the past 12 months?   Yes ☐   No ☑
       If yes, please provide name of lawyer and date of departure on the Lawyer Detail Addendum, Section III.
   c. Has the status of any lawyer(s) with regard to Of Counsel or Independent Contractor changed in the past 12 months?   Yes ☐   No ☑
       If yes, please provide details on the Lawyer Detail Addendum, Section II.

7. Has the firm's letterhead changed in any way other than adding and/or deleting lawyers noted in question 6 above?   Yes ☑   No ☐
   If yes, please provide sample copy of new letterhead. *— See attached*

8. Other than for a not for profit entity, in the past year has the applicant or any individual proposed for this insurance, for any client or in any client's business enterprise:
   a. Assumed a position as a director, officer, partner or trustee; or   Yes ☐   No ☑
   b. Assumed any form of managerial or fiduciary control; or   Yes ☐   No ☑
   c. Obtained or changed any equity interest?   Yes ☐   No ☑
   If yes to any of the above, please complete the Director's and Officer's/Outside Interests Supplemental Application

9. Has any lawyer proposed for this insurance ever been denied the right to practice, been suspended, disbarred, reprimanded or had other disciplinary action instituted against them by any court or administrative agency within the past 12 months?   Yes ☐   No ☑
   If yes, please provide full details on the Detail Information Addendum.

10. During the current policy year, have any claims or suits been made against the applicant, its predecessor firms or any individual proposed for this insurance and not previously reported to the firm's insurance carrier?   Yes ☐   No ☑
    If yes, please complete a Claim Information Supplement.

11. Is any new individual proposed for this insurance aware of any circumstance, act, error, omission or personal injury which might be expected to be the basis of a legal malpractice claim or suit that has not previously been reported to the firm's insurance carrier?   Yes ☐   No ☑
    If yes, please complete a Claim Information Supplement.

12. Within the past 12 months, have there been any claims or changes in the status of claims reported to other
insurance companies?                                                                                          Yes ☐  No ☑
    If yes, please complete a Claim Information Supplement or submit a copy of a claims information supplement with
    updated information.

13. Do the CLE hours for any lawyer in your firm in the last 12 months NOT exceed your state's minimum CLE requirements?   Yes ☐  No ☑
    If your state does not have CLE requirements, answer no.
    If yes, please provide the average CLE hours per lawyer in the last 12 months:  _____

Indicate additional coverage units you are applying for by checking the boxes. No checks will warrant no interest in the additional coverages.
    Employee Dishonesty ☐              Employment Practices Liability ☐           Non-Profit Director and Officer Liability ☐
    Public Officials Liability ☐           Title Insurance Agents Liability ☐*

*Does the applicant wholly own or operate any Title Insurance Agencies? Yes ☐   No ☑
If yes, please complete the Title Insurance Agents Coverage Unit Application.

If you have responded "YES" to any of the above questions, please contact your Administrator for further assistance and instructions
as to how you should proceed. If ALL responses are "NO," will warrant no interest in the additional coverages.
If Title Insurance Agents Liability Coverage Unit is currently included in your policy it will continue to be included.


## NOTICE TO APPLICANT

I hereby authorize the release of claim information from any prior insurer to Westport.

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

The undersigned represents that the statements set forth herein, including all coverage unit applications, supplemental forms and attachments, are true, complete
and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known.

Applicant understands and agrees that the completion of the application does not bind Westport to issuance of an insurance policy.

For your protection, the following Fraud Warning is required to appear on this application.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing
any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act,
which is a crime and subjects such person to criminal and civil penalties.


**THIS APPLICATION MUST BE SIGNED BY A PARTNER, OFFICER and/or OWNER**

SIGNED _____ _President___        DATED _1/23/02_
         Partner, Officer and/or Owner

*The applicant understands and agrees that she or he is obligated to report any changes in the information provided in this application
that occur after the date of the application.*


Mail to the following address
**USI Colburn Insurance Service**
**One International Plaza, Suite 400, Philadelphia, PA  19113**

# *Westport Insurance Corporation*

181 West Madison, Suite 2600
Chicago, IL 60602

Return Completed
Application to:

Colburn Insurance Service
One International Plaza
Suite 400
Philadelphia, PA 19113
Phone: (610) 833-1800
Fax: (610) 833-2736

## Renewal Application for Lawyers Professional Liability Insurance
### (Claims Made and Reported Basis)

### Current Policy Information:

Policy # PLL-336690-9          Exp. Date:  03/09/2001

**PLEASE NOTE:**  If you know of any claims or incidents that you have not reported, please notify the company prior to renewal.

**APPLICANT INSTRUCTIONS:**

1. Please read all statements and questions on this application carefully.
2. Answer all questions in ink.
3. If space is insufficient to answer all questions fully, use separate sheets of paper.
4. Attach a copy of your business stationery.
5. Application and all attachments must be signed and dated by named Applicant, partner, officer or owner.

1. **NAMED INSURED:  Diveglia And Kaylor, P.C.**

2. **PRINCIPAL ADDRESS: 119 Locust Street , Harrisburg, PA 17101**
   e-mail:

3. **HAVE THE NUMBER OF LAWYERS CHANGED FROM THE PREVIOUS YEAR?**
   Yes _____ No _X_ (If Yes, please indicate only the + or - change in the number of lawyers: _____. Also, list the names of all lawyers who have left the firm on a separate attachment. Please complete the New Lawyers Application form attached for those who have joined the firm.)

4. **REQUESTED LIMITS AND DEDUCTIBLE:**
   [X] Same as expiring    [ ] Please quote other options    Limit: _____ Deductible: _____

5. **HAS THERE BEEN A CHANGE IN THE PERCENTAGE OF PRACTICE DEVOTED TO ANY ONE AREA/SPECIALTY BY 10% OR MORE SINCE LAST YEAR'S APPLICATION WAS COMPLETED?**
   Yes _____ No _X_ (If Yes, please allocate only the effected areas of practice on a separate attachment, assuring that the total will remain at 100%.)

6. **HAVE YOUR DOCKET CONTROL SYSTEMS CHANGED IN THE PAST 12 MONTHS?**
   Yes _____ No _X_ (If Yes, please provide details on a separate attachment.)
   **HAVE YOUR INTERNAL PROCEDURES CHANGED IN THE PAST 12 MONTHS?**
   Yes _____ No _X_ (If Yes, please provide details on a separate attachment.)
   **PROVIDE THE TOTAL NUMBER OF CLE HOURS IN THE PAST 12 MONTHS** _____

7. **HAS ANY LAWYER WITH THE NAMED INSURED BEEN THE SUBJECT OF ANY DISCIPLINARY PROCEEDINGS WITHIN THE PAST 12 MONTHS?**
   Yes _____ No _X_ (If so, please attach details.)

8. **PLEASE REVIEW THE SUPPLEMENTAL APPLICATION PACKET AND COMPLETE ALL SUPPLEMENTS THAT APPLY TO YOUR FIRM.**

The undersigned represents that the statements set forth herein are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, to the best of his/her knowledge, and agrees that this application shall become the basis of any coverage and a part of any policy that may be issued by the Company. The execution of this application does not bind the undersigned to purchase any coverage offered, nor does the receipt and/or review of this application bind the company to offer coverage or issue a policy.

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Signature _____ Date _____      3-5-01
                                                                  3-5-01

*Partner, Officer and/or Owner*        **[Please sign in blue ink]**

PA

FEB. 7. 2000    9:19AM    COLBURN INS 6108332736                                NO. 6791    P. 2/2

# Westport Insurance Corporation

181 West Madison, Suite 2600
Chicago, IL 60602

Return Completed    Colburn Insurance Service
Application to:    One International Plaza
Suite 400
Philadelphia, PA 19113
Phone: (610) 833-1800
Fax: (610) 833-2736

## Renewal Application for Lawyers Professional Liability Insurance
### (Claims Made and Reported Basis)

### Current Policy Information:

Policy # PLL-332465-4                Exp. Date:  03/09/2000

**PLEASE NOTE:**  If you know of any claims or incidents that you have not reported, please notify the company prior to renewal.

**APPLICANT INSTRUCTIONS:**

1. Please read all statements and questions on this application carefully.
2. Answer all questions in ink.
3. If space is insufficient to answer all questions fully, use separate sheets of paper.
4. Attach a copy of your business stationery.
5. Application and all attachments must be signed and dated by named Applicant, partner, officer or owner.

1. **NAMED INSURED:  Diveglia And Kaylor, P.C.**

2. **PRINCIPAL ADDRESS: 119 Locust Street , Harrisburg, PA 17101**

3. **HAVE THE NUMBER OF LAWYERS CHANGED FROM THE PREVIOUS YEAR?**
   Yes _____   No _X_ (If Yes, please indicate only the + or - change in the number of lawyers: _____.  Also, list the names of all lawyers who have left the firm on a separate attachment.  Please complete the New Lawyers Application form attached for those who have joined the firm.)

4. **REQUESTED LIMITS AND DEDUCTIBLE:**
   [X] Same as expiring        [ ] Please quote other options        Limit: _____    Deductible: _____

5. **HAS THERE BEEN A CHANGE IN THE PERCENTAGE OF PRACTICE DEVOTED TO ANY ONE AREA/SPECIALTY BY 10% OR MORE SINCE LAST YEAR'S APPLICATION WAS COMPLETED?**
   Yes _____   No _X_ (If Yes, please allocate only the effected areas of practice on a separate attachment, assuring that the total will remain at 100%.)

6. **HAVE YOUR DOCKET CONTROL SYSTEMS CHANGED IN THE PAST 12 MONTHS?**
   Yes _____   No _X_ (If Yes, please provide details on a separate attachment.)
   **HAVE YOUR INTERNAL PROCEDURES CHANGED IN THE PAST 12 MONTHS?**
   Yes _____   No _X_ (If Yes, please provide details on a separate attachment.)
   **PROVIDE THE TOTAL NUMBER OF CLE HOURS IN THE PAST 12 MONTHS** _12 for each attorney_

7. **HAS ANY LAWYER WITH THE NAMED INSURED BEEN THE SUBJECT OF ANY DISCIPLINARY PROCEEDINGS WITHIN THE PAST 12 MONTHS?**
   Yes _____   No _X_ (If so, please attach details.)

8. **PLEASE REVIEW THE SUPPLEMENTAL APPLICATION PACKET AND COMPLETE ALL SUPPLEMENTS THAT APPLY TO YOUR FIRM.**

The undersigned represents that the statements set forth herein are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, to the best of his/her knowledge, and agrees that this application shall become the basis of any coverage and a part of any policy that may be issued by the Company.  The execution of this application does not bind the undersigned to purchase any coverage offered, nor does the receipt and/or review of this application bind the company to offer coverage or issue a policy.

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Signature _____                        Date _____

_Partner, Officer and/or Owner_

PA                                                              [Please sign in blue ink]

04/12/2004 15:45 FAX 6108332736        USI COLBURN INSURANCE                    ☒006

## Westport Insurance Corporation

181 West Madison, Suite 2600
Chicago, IL 60602

Return Completed    Colburn Insurance Service
Application to:     200 East State Street
                    Box 77
                    Media, PA 19063
                    Phone: (800) 265-2876, (610) 565-3450
                    Fax: (610) 565-7619

## Renewal Application for Lawyers Professional Liability Insurance
### (Claims Made and Reported Basis)

**Current Policy Information:**

Policy # PLL-327853-8              Exp. Date: 03/09/1999

**PLEASE NOTE:**  If you know of any claims or incidents that you have not reported, please notify the company prior to renewal.

**APPLICANT INSTRUCTIONS:**

1. Please read all statements and questions on this application carefully.
2. Answer all questions in ink.
3. If space is insufficient to answer all questions fully, use separate sheets of paper.
4. Attach a copy of your business stationery.
5. Application and all attachments must be signed and dated by named Applicant, partner, officer or owner.

1. **NAMED INSURED:  Diveglia And Kaylor, P.C.**

2. **PRINCIPAL ADDRESS: 119 Locust Street, Harrisburg, PA 17101**

3. **HAVE THE NUMBER OF LAWYERS CHANGED FROM THE PREVIOUS YEAR?**
   Yes _____  No _X_ (If Yes, please indicate only the + or - change in the number of lawyers: _____.  Also, list the names of all lawyers who have left the firm on a separate attachment.  Please complete the New Lawyers Application form attached for those who have joined the firm.)

4. **REQUESTED LIMITS AND DEDUCTIBLE:**
   ☒ Same as expiring    ☐ Please quote other options    Limit: _____  Deductible: _____

5. **HAS THERE BEEN A CHANGE IN THE PERCENTAGE OF PRACTICE DEVOTED TO ANY ONE AREA/SPECIALTY BY 10% OR MORE SINCE LAST YEAR'S APPLICATION WAS COMPLETED?**
   Yes _____  No _X_ (If Yes, please allocate only the effected areas of practice on a separate attachment, assuring that the total will remain at 100%.)

6. **HAVE YOUR DOCKET CONTROL SYSTEMS CHANGED IN THE PAST 12 MONTHS?**
   Yes _____  No _X_ (If Yes, please provide details on a separate attachment.)
   **HAVE YOUR INTERNAL PROCEDURES CHANGED IN THE PAST 12 MONTHS?**
   Yes _____  No _X_ (If Yes, please provide details on a separate attachment.)
   **PROVIDE THE TOTAL NUMBER OF CLE HOURS IN THE PAST 12 MONTHS _____**

7. **HAS ANY LAWYER WITH THE NAMED INSURED BEEN THE SUBJECT OF ANY DISCIPLINARY PROCEEDINGS WITHIN THE PAST 12 MONTHS?**
   Yes _____  No _X_ (If so, please attach details.)

8. **PLEASE REVIEW THE SUPPLEMENTAL APPLICATION PACKET AND COMPLETE ALL SUPPLEMENTS THAT APPLY TO YOUR FIRM.**

The undersigned represents that the statements set forth herein are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, to the best of his/her knowledge, and agrees that this application shall become the basis of any coverage and a part of any policy that may be issued by the Company.  The execution of this application does not bind the undersigned to purchase any coverage offered, nor does the receipt and/or review of this application bind the company to offer coverage or issue a policy.

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Signature  _____        Date  2-15-99

                    Partner, Officer and/or Owner

PA                                          [Please sign in blue ink]



Return Completed Application to: Colburn-Bertholon-Rowland
200 East State Street
Box 77
Media, PA 19063
Phone: (800) 265-2876, (610) 565-3450
Fax: (610) 565-7619

## CUSTOMIZED PRACTICE COVERAGE ℠

## LAWYERS PROFESSIONAL LIABILITY INSURANCE RENEWAL APPLICATION
### (Claims-Made and Reported Basis)

1. **Name of Applicant Firm:** Diveglia And Kaylor, P.C.

   **Mailing Address:**     119 Locust Street
   Harrisburg, PA 17101

   **Contact:** Archie Diveglia          **Telephone:** (717) 236-5985     **Fax:** (717) 231-4083

   **Current Policy Information:**

   **Policy#:** PLL-323464-5    **Limits:** 500,000/1,000,000    **Deductible:** 2,500        **Expiration Date:** 03/09/98

2. Indicate the number of lawyers as of the renewal date in the right hand column for whom coverage is desired. The left hand column indicates the total number of lawyers from last year's application.

   Please list **all lawyers** currently with the firm on the attached Lawyers Detail Addendum. Any lawyer new to the firm since the last renewal must complete a New Lawyer Application, if one has not previously been submitted to the Program Administrator in your state.

|  | Last Year | Current Year |
|---|---|---|
| Lawyers - Including all Officers/Directors/Shareholders/Partners/Sole Proprietors and Employed Lawyers | 2 | 2 |
| Of Counsel Lawyers and Independent Contractors |  |  |
| Total Number of Lawyers to be Covered | 2 | 2 |

3. Review the percentage of areas of practice shown in the left hand column reflective of last year's application. Provide changes in the right hand column or indicate "No Change" in the box to the right.     No Change ☑

   **Failure to provide updated details will warrant "No Change".**

| Area | Last Year | Current Year | Area | Last Year | Current Year | Area | Last Year | Current Year |
|---|---|---|---|---|---|---|---|---|
| Abstracting/Title |  |  | Criminal |  |  | Municipal (not bonds) |  |  |
| Ad Valorem Tax |  |  | Domestic Law & Family Relations |  |  | Oil and Gas* |  |  |
| Admiralty - Law |  |  | Entertainment* |  |  | Personal Injury–Plaintiff | 99 |  |
| Admiralty–Plaintiff |  |  | Environmental* |  |  | Personal Injury–Defendant | 1 |  |
| Admiralty–Defendant |  |  | Estate Planning |  |  | Public Utilities |  |  |
| Antitrust/Trade Regulation |  |  | Estate/Probate/Trust |  |  | Real Estate–Residential |  |  |
| Banking** |  |  | ERISA |  |  | Real Estate–Commercial |  |  |
| Bankruptcy |  |  | Fin. Planning or Invest. Couns.* |  |  | Securities Law: ⇨ Federal S.E.C.** |  |  |
| Bonds** |  |  | Foreclosure/Repossession |  |  | ⇨ Federal Exemptions** |  |  |
| Civil Rights |  |  | Health |  |  | ⇨ State S.E.C.** |  |  |
| Collection* |  |  | Housing Court |  |  | ⇨ Private Placements** |  |  |
| Comm. Litigation–Plaintiff |  |  | Immigration |  |  | Syndication** |  |  |
| Comm. Litigation-Defendant |  |  | Insurance Company - Defendant |  |  | Taxation–Individual |  |  |
| Communication (FCC) |  |  | International |  |  | Taxation–Corporate |  |  |
| Copyright/Patent/ Trademark** |  |  | Juvenile Proceedings |  |  | Water Law |  |  |
| Corporate Administrative Law |  |  | Labor–Management |  |  | Wills and Trusts |  |  |
| Corporate Formation |  |  | Labor-Union |  |  | Workers Comp–Plaintiff |  |  |
| Corporate General* |  |  | Limited Partnerships** |  |  | Workers Comp–Defendant |  |  |
| Corporate Mergers&Acquisitions* |  |  | Mediation/Arbitration |  |  | Other_____ |  |  |

*Provide details on the Detail Information Addendum for any percentage listed for current year.
**Complete the appropriate supplemental application when any percentage is listed for current year:
   Copyright/Patent/Trademark, Financial Institution or Securities

3a. Based on the percentage of areas of practice in the Current Year column above, what percentage is defense work? *less than 1%*

All rights reserved. The reproduction or utilization of this work in any form whether by any electronic, mechanical, or other means, now known or hereafter invented, including xerography, photocopying, and recording, and information storage and retrieval system is forbidden, unless otherwise noted, without the written permission of Coregis Insurance Company.

4.  a. State the total number of CLE course hours attended by all lawyers in the firm within the past year. __26__
    b. How many lawyers have attended a Bar Sponsored Risk Management Seminar this past year? __0__
    c. Circle the number of scheduling/docket control/calendaring systems used by the firm.    1 ②  3  4
    d. Is a computerized docket/scheduling/calendaring system used?    ☐ Yes   ☒ No
    e. State the number of support staff in the firm. __4__
    f. How many suit for fees were initiated by the firm in the past 12 months? __0__

5.  Has the firm changed procedures in its use of:
    a. engagement letters, including the scope of services and fee arrangements?    ☐ Yes   ☒ No
    b. non-engagement/declination letters?    ☐ Yes   ☒ No
    c. disengagement/closing letters?    ☐ Yes   ☒ No
    d. conflict of interest avoidance system?    ☐ Yes   ☒ No

6.  Does the firm:
    a. have more than one office location?    ☐ Yes   ☒ No
    b. share office space with any firm/lawyer **not** part of the Applicant firm?    ☐ Yes   ☒ No
    c. share letterhead with any firm/lawyer **not** part of the Applicant firm?    ☐ Yes   ☒ No

### *Provide details on the Detail Information Addendum for any YES response to Question 5 or 6.*

7.  In the past year, has the firm undergone a risk management audit performed by an independent auditing firm?    ☐ Yes   ☒ No
    If yes, date of audit: _____

|  | Yes | No |
|---|---|---|
| 8. Does any lawyer act as a director, officer or trustee for, or exercise any form of managerial or fiduciary control or hold any equity interest in any business enterprise other than the Applicant firm, which is a client to the firm? If yes, complete the Director's & Officer's/Outside Interests Supplemental Application. | ☐ | ☒ |
| 9. Has any lawyer proposed for this insurance ever been denied the right to practice, suspended from practice, disbarred, reprimanded or had other disciplinary action taken against them by any court or administrative agency? If yes, please provide full details on the Detail Information Addendum. | ☒ | ☐ |
| 10. During the current policy year, have any claims or suits been made against the Applicant, its predecessor firms or _any_ individual proposed for this insurance that have _not_ previously been reported to the firm's insurance carrier? If yes, please complete a Claim Information Supplement. | ☐ | ☒ |
| 11. Is the Applicant, its predecessor firms or _any_ individual proposed for this insurance aware of any circumstance, act, error, omission or personal injury which _might be expected_ to be the basis of a legal malpractice claim or suit that has _not_ previously been reported to the firm's insurance carrier? If yes, please complete a Claim Information Supplement. | ☐ | ☒ |
| 12. Within the past five years, have there been any claims or changes in the status of claims reported to other insurance companies? If yes, please complete a Claim Information Supplement or submit a copy of a claims information supplement with updated information. | ☒ | ☐ |

Not Applicable   ☐

**Attach a copy of your current letterhead. Any discrepancy between the names of the lawyers on the Lawyers Detail Addendum and the lawyers printed on the letterhead must be clarified on the Detail Information Addendum.**

Indicate additional coverage units you are applying for by checking the boxes. No checks will warrant no interest in the additional coverages.

     Employee Dishonesty ☐     Employment Practices Liability ☐     Non-Profit Director & Officer Liability ☐
     Public Officials Liability ☐     Title Insurance Agents Liability ☐

The undersigned represents that the statements set forth herein are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, to the best of his/her knowledge, and agrees that this application shall become the basis of any coverage and a part of any policy that may be issued by the Company.

The execution of this application does not bind the undersigned to purchase any coverage offered, nor does the receipt and/or review of this application bind the Company to offer coverage or issue a policy.

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Signature _____    Date __1-7-98__

        Partner, Officer and/or Owner

Copyright ©1996 Coregis Insurance Company. All rights reserved.

All rights reserved. The reproduction or utilization of this work in any form whether by any electronic, mechanical, or other means, now known or hereafter invented, including xerography, photocopying, and recording, and information storage and retrieval system is forbidden without the written permission of Coregis Insurance Company.

COR.CPC.1700 (5/96) PA.M                

**BROWN & JONES REPORTING, INC.**

IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------

CYNTHIA ANNE DIVEGLIA formerly CYNTHIA ANNE KAYLOR,

                    Plaintiff,

          -vs-                    Case No. 1-CV-00-1342

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

                    Defendant.

-----------------------------------------------------------


          Video Examination of DAVID GOSSE, taken

at the instance of the Plaintiff, under and pursuant to

the Federal Rules of Civil Procedure, pursuant to

Notice, before JANE M. JONES, a Certified Realtime

Reporter, Registered Merit Reporter and Notary Public in

and for the State of Wisconsin, at Brown & Jones

Reporting, Inc., 312 East Wisconsin Avenue, Milwaukee,

Wisconsin, on the 24th day of April, 2001, commencing at

2:02 p.m. and concluding at 2:55 p.m.

1    A    Again, I've answered your question by saying that

2         you can't ignore what's gone on before that.

3    Q    So you're admitting then that there is nothing in

4         the letter of April 14th, 2000, that sets forth

5         anything on lack of medical documentation?

6    A    I stand on my answer to the question.

7    Q    Would you answer my question?  Is there anything in

8         the letter of April 14th, 2000, that says that the

9         termination was for anything other than medical

10        documentation?

11   A    I'm sorry.  I have answered your question.

12   Q    The answer is no, is that correct?

13   A    The answer is that all of the information that has

14        gone on before, all of the requests are needed.

15             MR. HENEFER:  Can we go off the record

16        for a second?

17             VIDEOGRAPHER:  We're off the record at

18        2:45 p.m.

19             (Short recess.)

20             VIDEOGRAPHER:  We are back on the record

21        at 2:47 p.m.

22   BY MR. DIVEGLIA:

23   Q    Do you have something more to offer us?

24   A    Yes.  This particular letter does not cite the

25        other reasons why, as other letters do, as to

34

1    reason for termination.

2  Q   Sure.  Typically when you terminate, there is the

3      whole laundry list for termination, but here there

4      was only one, is that right?

5  A   This particular letter cites just one.

6  Q   And in fact, this whole file was rereviewed,

7      de novo, from the beginning, wasn't it, by Sharon

8      Hyde?

9  A   I was -- I left the company at that point.  I can't

10     testify to that.

11 Q   Okay.  Isn't it correct that you could have easily

12     sent this file to an outside consultant, an

13     oncologist, that was one of the things that you

14     folks could have done and said, look, here is what

15     Drs. Seidman and Borgen are saying, what do you

16     think, is this reasonable, does this make any sense

17     to you?  You could have done that, couldn't you?

18 A   I understand our medical consultants considered

19     that, and I would defer to them in that regard.

20 Q   Well, but you're -- you're overlooking this.

21     You're involved in the decision to terminate.  In

22     fact, I think your testimony today was, you're the

23     guy who terminated.  Are you the terminator?

24              MR. HENEFER:  Objection to the form of

25     the question.



# RISK MANAGEMENT INTERNATIONAL, INC.
## THE DISABILITY RESOURCE INC.

6632 Telegraph Road, #362
Bloomfield Hills, MI 48301
RISKMGINTL @ AOL.COM

Phone: 248-539-1080
Fax:   248-539-1081
DIRESOURC @ AOL.COM

Barbara K. Mueller

June 27, 2001

E. Thomas Henefer, Esq.
Stevens & Lee
P O. Box 679
Reading, PA 19603-0679

RE:  Cynthia Anne Diveglia v. Northwestern Mutual Life Insurance Company
     U.S. District Court for the Middle District of Pennsylvania
     Civil Action No.: 1-CV-00-1342

Dear Mr. Henefer:

At your request, I have reviewed the documents supplied to me by you regarding the captioned matter. The documents included the following materials:

- Pleadings through June 8, 2001 including the Complaint, Answer, interrogatory and production requests, discovery motions and motions for summary judgment (including the appendix in support of Defendant's motion for summary judgment which includes the claim file and replica policy) and Plaintiff's opposition to Defendant's Motion for Summary Judgment;
- Claim Payment history printouts;
- Records from the General Agency, GA 0001-GA0150;
- The deposition transcripts of Eileen Miller Carter, Suzanne Balistreri, Sharon Hyde, Patricia Sheehan, R.N., Dr. Randolph Powell, Minnie Armstrong, David Gosse, Richard Love and Bradley Newman;
- Defendant's document productions of February 13, 2001 and May 14, 2001; and
- The report of Eliott Leitner

Based on my review of the materials you furnished me and my education, training and experience, it is my opinion that it was reasonable and in accordance with the applicable disability insurance policy provisions and also in accordance with

17

do you anticipate your patient will continue to have work related restrictions as described in 5(b)? Indefinately (sic)..."

On her Request for Continuance of Disability Benefits dated April 6, 2000[64], Mrs. Diveglia reported, in part:

"...Number of hours worked per week: 40...
...Principal Duties Performed Since the Last Request for Benefit     % of Time at Duty
1. Administrative     25%
2. Non litigation attorney work     75%..."

NML followed up with Dr. Seidman's office on April 12, 2000 to obtain office notes from the March 27, 2000 visit and the doctor's office faxed to NML the follow-up note from the March 27, 2000 visit, which reported, in part:

"...Interval History:  Feels well...meds...Imaging Studies:  mammo 10/27/99  nl; Impression: ...NED...Doing well..."

On April 13, 2000, a medical referral of the file was made and Nurse Sheehan responded that same date[65], in part:

"I reviewed the most recent office note from Dr. Seidman (3/27/00) and discussed verbally with Dr. Powell. Specifically we reviewed to respond to the question – Does this medical document ongoing limitation?...Physical exam findings were negative including the examination of the breasts. Urine and blood tests were within normal limits. There is no indication of recurrent cancer at this time.
There is no current objective evidence to support continuing work limitations...Attempts to get a better understanding from Dr. Seidman of his usual work recommendations following cancer diagnosis and treatment as well as the medical basis for supporting permanent work restrictions in this patient have been unsuccessful...At this time, there is no objective medical documentation to support the Insured's claim of an inability to perform litigation duties and no medical documentation to support that permanently restricting the insured from the performance of litigation duties is reasonable and medically based."

Following that review, NML determined that the information submitted and gathered did not document or support the insured being restricted from trial law and that additional benefits would not be paid.

Ms. Balistreri wrote Mr. Diveglia advising of NML's determination on April 14, 2000[66], advising him, in part:

"...As you are aware, benefits have been paid as an accommodation without admission of liability while we waited for medical documentation to support ongoing disability...We have received a copy of the office notes from the March 27, 2000 examination and our medical consultants have reviewed the information. The documentation provided does not support ongoing disability due to medical restrictions or limitations. As a result, this disability claim has been terminated...

---

[64] 0056-0057
[65] 0053
[66] 0051

determined that the information submitted by Mrs. Diveglia as proof of her claim as well as the information it had gathered in its investigation of her claim did not support her continuing claim of Total Disability. Mrs. Diveglia had returned to work at an attorney in the practice and reported she was working 40 hours a week.

While she claimed that she was unable to make court appearances, the medical reviews indicated that she was feeling well following her recovery from her breast cancer surgery, reconstructive surgery and chemotherapy. She was being monitored on a 6 month basis by her oncologist, Andrew D. Seidman, M.D. of the Memorial Sloan-Kettering Hospital. Dr. Seidman's office notes following her chemotherapy indicated there was no current evidence of disease. Based on the proof of loss submitted, there was no need for NML to conduct an independent medical examination or outside medical review.

NML made its determinations after completing a reasonable claim investigation which included, among other things, reviewing all information provided over the course of the claim. Such information included the claimant's proof of loss submissions, medical records, information from her attending physicians, field investigation reports, telephone conversations with Mrs. Diveglia and her representative, Mr. Diveglia, and review of the claim and all documents submitted and gathered by NML's claim examiners and consulting nurse and physician.

In the course of handling this claim, NML accorded the interests of the insured the same consideration as its own interests. It considered all information developed in the course of the claim investigation. It promptly paid benefits it determined were due her based on the requests for benefits and proof of loss submitted, paid benefits on an accommodation basis while attempting to gather information it deemed necessary to the evaluation of her continuing claim, continued to review Mrs. Diveglia's claim on an ongoing basis and interpreted the language of the Policy to determine whether Mrs. Diveglia's loss was covered according to the terms of the Policy. There was no unreasonable or frivolous denial or delay of payment.

It is my opinion that it was and is reasonable and justified for NML, on review of all information, to conclude that there was insufficient proof of Mrs. Diveglia's ongoing Total Disability to warrant payment of continuing Total Disability benefits. It is reasonable and justified for NML to require, and to be permitted to independently verify, detailed information regarding Mrs. Diveglia's occupational duties prior to her onset of disability to determine her regular occupation for purposes of the claim. It is reasonable and justified for NML to require unfettered authorizations to obtain information, and proof of loss including medical, occupational, financial and other information on an ongoing basis while a continuing claim is made to determine the basis on which, if any, the insured qualifies for ongoing benefits according to the terms of the Policy.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CYNTHIA ANNE DIVEGLIA, FORMERLY          :
CYNTHIA ANNE KAYLOR,                     :
              PLAINTIFF                  :
                                         :
        VS                               :    NO. 1 CV-00-1342
                                         :
NORTHWESTERN MUTUAL LIFE                 :
INSURANCE COMPANY,                       :
              DEFENDANT                   :


DEPOSITION OF:   BRADLEY R. NEWMAN

TAKEN BY:        PLAINTIFF

BEFORE:          SHERRY BOWES, RMR, CRR
                 NOTARY PUBLIC

DATE:            APRIL 18, 2001, 10:16 A.M.

PLACE:           DIVEGLIA & KAYLOR
                 19 LOCUST STREET
                 HARRISBURG, PENNSYLVANIA


APPEARANCES:

     DIVEGLIA & KAYLOR
     BY: ARCHIE V. DIVEGLIA, ESQUIRE

          FOR - PLAINTIFF

     STEVENS & LEE
     BY: E. THOMAS HENEFER, ESQUIRE

          FOR - DEFENDANT


GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

11

17

1              (Five-page letter dated June 5, 1997 marked as

2      Newman Exhibit Number 1.)

3      BY MR. DIVEGLIA:

4          Q          Regardless as to whether you don't recall

5      whether you requested that this be provided to you or whether

6      she sent it to you on her own, do you have a recall as to

7      what you did with that document upon its receipt?

8          A          I believe I forwarded it to Northwestern

9      Mutual.

10         Q          Now, I want to go back to when you first met

11     with Cynthia about the policy.  Did you have discussions with

12     her in regard to how the policy would operate, what would be

13     done in case of disability in employment, general things like

14     that did you review with her, either at the initial visit or

15     subsequent visits?

16         A          I don't specifically recall.

17         Q          How about, let me ask some specific questions.

18     Did you ever discuss with her Northwestern's policy in regard

19     to financial audits for an occupation such as a trial lawyer,

20     how that was done and what was done?

21         A          I don't recall, but I don't believe so.

22         Q          Let me ask you this:  Did you discuss with her

23     what would occur if she was disabled as a trial lawyer, as to

24     whether or not she could earn income in another occupation,

25     even as a lawyer, did you have that kind of discussion with

18

1    her?

2        A        Most likely I did.  That was par with...

3        Q        What was your understanding, as a licensed

4    agent salesperson for Northwestern Mutual, and we're keeping

5    it to that, as to whether a trial lawyer who was disabled as

6    a trial lawyer was entitled to earn income in another

7    occupation, including just general practicing lawyer, and

8    still receive benefits?

9        A        It's been about two years since I've dealt

10    with it, but my understanding is or was that there were

11    really two fields.  If you were medically and dentally

12    certified in a board specialty or if you were a trial

13    attorney or litigator, those specific specialties would be

14    considered your occupation if you were engaged in them at the

15    time of a disability.

16            And if you were unable to do that specialty

17    but could do another occupation, you would be able to receive

18    your disability benefits in addition to income you were

19    earning from another occupation.

20        Q        What is your belief as to whether or not you

21    had explained that to Cynthia or whether she questioned you

22    and you explained that to Cynthia?

23        A        I don't really remember, but I'm relatively

24    certain I would have had that discussion with Cindy, based on

25    her occupation.

## CERTIFICATE OF SERVICE

I, ARCHIE V. DIVEGLIA, attorney for Plaintiff Cynthia A. Diveglia, on this 17th day of May, 2004, do hereby state that I have served a copy of Plaintiff's Appendix in Support of Motion in Limine upon counsel for Defendant by placing a copy of the same in the United States mail, first class, postage prepaid to:

E. Thomas Henefer, Esquire
Stevens & Lee located at
P.O. Box 679
Reading, PA 19603-0679

Respectfully submitted,

By: _____
Archie V. Diveglia. Esq.
PA. Attorney I.D. 17140
2 Lincoln Way West
New Oxford, PA 17350
Telephone: (717) 624-2500
Fax: (717) 624-3851

DIVEGLIA AND KAYLOR, P.C.                 ATTORNEY IN CHARGE FOR
                                          Plaintiff, Cynthia A. Diveglia