IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CYNTHIA ANNE DIVEGLIA, | : |
| Plaintiff, | : CIVIL ACTION NO. 1: CV-00-1342 |
| v. | : |
| NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, | : |
| Defendant. | : |

**JOINT STATEMENT OF UNDISPUTED FACTS**

1. This case involves a claim for breach of contract arising under a long-term disability policy issued by Northwestern.

2. Plaintiff purchased a disability income policy from defendant which was effective on July 28, 1994.

3. The policy provided for monthly benefits of $5,500.00 plus a consumer price index factor so her actual benefits were $5,949.00 per month.

4. Plaintiff applied for benefits on June 6, 1997 after being diagnosed with, and treated for, breast cancer.

5. In her application for benefits, plaintiff claimed to be engaged in the occupation of a trial lawyer and, on August 11, 1997, Northwestern approved the claim for disability benefits.

6. Benefits were paid continuously to March 17, 2000, following which Northwestern denied further benefits under the policy.

7. The Policy insures against either "total" or "proportionate disability" based on the insured's "regular occupation."

8. The policy defines total disability, in relevant part, as:

1

Until the end of the Initial Period, the Insured is totally disabled when unable to perform the <u>principal duties of the regular occupation</u>.

9. The Policy defines "proportionate disability" in terms of the insured's having the required loss of earned income due to an inability to perform one or more but not all of the "principal duties of the regular occupation" or "to spend as much time at the regular occupation as before the disability started."

10. Proportionate disability is based on the percentage loss of earned income following disability.

11. "Regular occupation" is defined as "[t]he words 'regular occupation' mean the occupation of the Insured at the time the Insured becomes disabled."

12. The Policy further notes that the regular occupation may be "the specialty of trial law" if the insured is "exclusively" engaged in that specialty.

13. The Policy contains, among other things, the following provision:

> For a claim to be payable, the Company must be provided with satisfactory written proof of loss. This is information that the Company deems necessary to determine whether benefits are payable, and if so, the amount of the benefits. The proof of loss will include information about the Insured's health, occupational duties, income both before and after the disability started (including income tax returns for the Insured and for businesses in which the Insured has or had an interest), overhead expenses and disability benefits, along with other information as may be required by the Company from time to time. The Company will also need to be provided information as described below under 'Other Requirements

14. On March 6, 1998 plaintiff wrote to an investigator retained by Northwestern and revoked all medical authorizations that she had previously signed.

15. Plaintiff's counsel refused to provide tax information that was requested and refused to sign the authorizations that Northwestern had requested.

2

16. Although Northwestern on more than one occasion requested tax information, billing information and other related financial and occupational information, plaintiff's counsel refused to provide the requested documents as not relevant to the claim.

17. While plaintiff received benefits, Northwestern continued to receive attending physician statement ("APS") forms from her treating physicians.

18. Plaintiff in fact did return to work in February 1998 and reported that her duties (a) did not include court appearances and (b) were limited to tasks such as legal research, interviewing new clients, preparing settlement documents, statements of demand and discovery.

19. The Policy contained, among other things, the following provision:

> **Authorizations.** From time to time, the Company will furnish the Insured with Authorizations to obtain information. These authorizations must be signed by the insured and returned to the Company.

20. Despite this requirement, plaintiff never again returned the authorizations Northwestern requested. Instead, she provided modified authorizations.

21. According to these statements, plaintiff was generally working 30-40 hour weeks.

22. The parties began to dispute Northwestern's need and right to obtain certain information Northwestern requested about the claim other than the periodic physicians' statements.

23. Plaintiff refused to comply with Northwestern's requests for tax returns and for the medical authorization in the form requested by Northwestern.

24. Thereafter, the parties engaged in correspondence regarding the impasse over records.

3

25. Dr. Randolph Powell, a board certified internist and one of Northwestern's medical directors, wrote to one of plaintiff's treating physicians to obtain additional information various issues including Dr. Seidman's opinion on "the current reasons your patient is unable to resume her pre-disability litigation duties?"

26. Dr. Seidman provided a letter supporting plaintiff's claim for disability benefits.

27. Nurse Sheehan reviewed Dr. Seidman's letter and discussed the claim further with Dr. Powell.

28. She noted that Dr. Powell was unaware of any objective medical basis for Dr. Seidman's opinion and recommended that a further medical review take place after records of further treatment (contemplated for March 1999 by Dr. Seidman's letter) were obtained.

29. In April 1999, plaintiff advised that she remained disabled and had not been back to see her physician.

30. Northwestern continued to pay benefits at this time but noted that the claim was under review and that, in Northwestern's view, the policy requirements may not be met.

31. Plaintiff's counsel responded on April 25, 1999 and disputed Northwestern's position.

32. On July 21, 1999, David Gosse, a senior claim administrator responded to plaintiff's counsel.

33. In the letter, Mr. Gosse addressed, among other things, plaintiff's claim that her counsel knew of at least three medical studies that supported her claim for benefits.

05/27/04/SL1 446006v1/05843.001

34. In his July 1999 letter, Mr. Gosse specifically asked plaintiff's counsel to provide copies of the alleged studies.

35. Although benefit payments continued, plaintiff's counsel had not responded to Mr. Gosse's letter as of November 18, 1999.

36. On November 30, 1999, plaintiff's counsel responded to Mr. Gosse's letter.

37. Plaintiff did not provide any of the requested financial or occupational information, and did not provide the alleged medical studies that purportedly linked stress to recurrence of cancer.

38. Northwestern later received updated treatment records which Dr. Powell and Nurse Sheehan reviewed.

39. Nurse Sheehan wrote a second letter to Dr. Seidman specifically requesting that he comment on whether his recommended work restrictions were supported by scientific studies.

40. This visit was initially scheduled for November 30, 1999 but did not occur until March 27, 2000.

41. Following the submission of Dr. Seidman's March 2000 APS, Dr. Powell and Nurse Sheehan conducted a further medical review.

42. Northwestern discontinued plaintiff's benefits on April 14, 2000.

43. At that time, Northwestern invited plaintiff to submit "any additional information or documentation she would like us to consider in support of her claim" within 30 days.

5

44. Plaintiff responded on April 25, 2000 by challenging the denial but did not include any additional information such as scientific studies that would support an alleged link between stress and recurrence of cancer.

45. Northwestern indicated that the termination of benefits would not be reversed on May 30, 2000.

46. Plaintiff was diagnosed as having invasive lobular carcinoma that had metastatically invaded 16 out of 16 lymph nodes with perineural and vascular invasion.

47. Plaintiff's entire treatment has been at the Sloan Kettering Cancer Center by a surgeon and an oncologist employed by Sloan Kettering.

48. The Defendant's adjusters relied on the opinion of Dr. Powell and Nurse Sheehan.

49. Defendant's Medical Director at the time of termination stated he was unaware of any studies in major medical journal that support stress reduction despite reading medical journals.

50. The Defendant could have sent the medical file of Plaintiff to an independent oncologist for review but did not do so.

51. Plaintiff on a monthly basis provided to Defendant her request for continuation of benefits in which she specifically set forth she was not performing trial work.

52. Defendant has not claimed or alleged that Plaintiff in any manner has engaged in fraudulent conduct requiring the submission of corporate records, tax returns, etc. (entire claim log of defendant).

53. Defendant has not ever disputed Plaintiff's earnings as of date of disability.

54. Plaintiff stopped working in April 1997 due to breast cancer.

55. Plaintiffs' income in 1996 was $110,500 and for purposes of this case was determined to be her base income.

56. Plaintiff continued to accept personal injury cases throughout her disability but asserts that she did not handle court appearances or attend any depositions in these cases until January 2003.

57. In 1998, plaintiff was paid $197,500 by her employer.

58. In 1999, plaintiff was paid $30,500 by her employer.

59. In 2000, plaintiff was paid $63,000 by her employer.

60. In 2001, plaintiff was paid $129,000 by her employer.

61. In 2002, plaintiff was paid $53,300 by her employer.

62. In 2003, plaintiff was paid $136,800 by her employer.

05/27/04/SL1 446006v1/05843.001