1

2                UNITED  STATES  DISTRICT  COURT

3              MIDDLE  DISTRICT  OF  PENNSYLVANIA

4       --------------------------------x

        CYNTHIA  ANNE  DIVEGLIA

                                              ORIGINAL
5       formerly  CYNTHIA  ANNE  KAYLOR,

6                     Plaintiff,

7                     vs.                No.  1-CV-00-1342

8       NORTHWESTERN  MUTUAL  LIFE

        INSURANCE  COMPANY,

9

                      Defendant.

10      --------------------------------x

11

12

13

14

15        VIDEOTAPED  DEPOSITION  OF  DR.  PATRICK  I.  BORGEN

16                   New  York,  New  York

17                  Friday,  May  21,  2004

18

19

20

21

22

23      Reported  by:

        THERESA  TRAMONDO

24      JOB  NO.  160707B

25

```
 1

 2

 3

 4                    May, 2004

 5                    10:55 a.m.

 6

 7          Videotaped Deposition of DR. PATRICK I.

 8     BORGEN, held at the offices of Dr. Borgen,

 9     Memorial Sloan-Kettering Cancer Center, 1275

10     York Avenue, New York, New York, pursuant to

11     Court Order, before Theresa Tramondo, a Notary

12     Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2  A P P E A R A N C E S:

3

4      DIVEGLIA AND KAYLOR, P.C.

5      Attorneys for Plaintiff

6              Two Lincoln Way West

7              New Oxford, Pennsylvania 17350

8      BY:   ARCHIE DIVEGLIA, ESQ.

9

10     STEVENS & LEE

11     Attorneys for Defendant

12             25 North Queen Street, Suite 602

13             Lancaster, Pennsylvania 17608-1592

14     BY:   KIRK WOLGEMUTH, ESQ.

15

16  ALSO PRESENT:

17     CYNTHIA DIVEGLIA

18     KRISTIN ZARNETSKE, Videographer

19

20

21

22

23

24

25

4

1

2          IT IS HEREBY STIPULATED AND AGREED, by

3      and between the attorneys for the respective

4      parties herein, that filing and sealing be and

5      the same are hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED that

7      all objections, except as to the form of the

8      question, shall be reserved to the time of the

9      trial.

10          IT IS FURTHER STIPULATED AND AGREED that

11      the within deposition may be sworn to and

12      signed before any officer authorized to

13      administer an oath, with the same force and

14      effect as if signed and sworn to before the

15      Court.

16

17

18

19

20

21

22

23

24

25

1

2          (Borgen Exhibit 12, Attending

3    Physician's Statement dated 10/27/99, marked

4    for identification, as of this date.)

5          (Borgen Exhibit 16, Attending

6    Physician's Statement dated 2/3/98, marked for

7    identification, as of this date.)

8          (Borgen Exhibit 18, Attending

9    Physician's Statement dated 8/14/98, marked

10   for identification, as of this date.)

11         (Borgen Exhibit 20, Attending

12   Physician's Statement dated 10/27/99, marked

13   for identification, as of this date.)

14         (Borgen Exhibit 46, Curriculum Vitae,

15   marked for identification, as of this date.)

16         (Borgen Exhibit 64, Attending

17   Physician's Statement dated 6/3/97, marked for

18   identification, as of this date.)

19         THE VIDEOGRAPHER:  This is tape number

20   one of the videotaped deposition of

21   Mr. Patrick I. Borgen, M.D., taken by

22   Plaintiff in the matter of Cynthia Anne

23   Diveglia, and formerly Cynthia Anne Kaylor,

24   versus Northwestern Mutual Life Insurance

25   Company, Defendant, in the United States

1

2        District Court of the Middle District of

3        Pennsylvania, case number 1-CV-00-1342.  This

4        deposition is being held on May 21, 2004, at

5        approximately 10:55 a.m.

6              My name is Kristin Zarnetske.  I'm the

7        legal videographer representing Esquire

8        Deposition Services.  The court reporter, also

9        in association with Esquire, is Theresa

10       Tramondo.

11             This deposition is being held at the

12       office of Dr. Borgen at 424 East 68th Street,

13       New York, New York.

14             Would counsel present please introduce

15       themselves for the record.

16             MR. WOLGEMUTH:  Kirk Wolgemuth.  I

17       represent Northwestern.

18             MR. DIVEGLIA:  Archie Diveglia.  I

19       represent Cynthia Diveglia.

20             THE VIDEOGRAPHER:  Would the court

21       reporter please swear in the witness.

22   D R.   P A T R I C K   I.   B O R G E N , called as

23      a witness, having been duly sworn by a Notary

24      Public, was examined and testified as

25      follows:

Borgen

EXAMINATION BY

MR. DIVEGLIA:

    Q.    Doctor, I am Archie Diveglia for Cynthia Diveglia.

        Would you state your name and office address, please?

    A.    Patrick Ivan Borgen, B-O-R-G-E-N.  My office address is 1275 York Avenue, New York, New York.

    Q.    What is your employer, sir?

    A.    My employer is Memorial Sloan-Kettering Cancer Center.

    Q.    Would you tell us a little bit about what Memorial Sloan-Kettering Cancer Center is?

    A.    Briefly, Memorial Sloan-Kettering is the oldest and largest medical facility in the United States dedicated entirely to the prevention, diagnosis and treatment of cancer.  It's one of the largest in the world.  Our institution is over a hundred and twenty years old.

    Q.    Would you tell us, sir, what positions you hold at Memorial Sloan-Kettering Cancer Center?

    A.    I have several positions at Memorial. I'm chief of the surgical breast cancer service in

Borgen

the Department of Surgery.  That makes me the chief

breast surgeon here.  I also codirect all breast

cancer-related clinical activities.  I'm chairman

of what is called the Breast Cancer Disease

Management Team.  I also direct the activities of

the William F. Keck Breast Research Laboratory.  I

also hold the position of associate professor of

surgery at Cornell University Medical College.

     Q.    When did you first come to

Sloan-Kettering?

     A.    I came to Sloan-Kettering in 1989 as a

clinical fellow.

     Q.    And have you continued, has your

employment been continuous since that time?

     A.    It has been.

     Q.    Could you tell us what percentage of

your practice is related to breast cancer

treatment?

     A.    100 percent of my clinical practice and

academic practice is breast cancer.

     Q.    Can you give us an estimate as to the

number of breast surgeries you perform in a year?

     A.    I treat between 275 and 325 patients --

new patients' surgery each year.

Borgen

Q.     And do these surgeries involve invasive cancer?

A.     They certainly involve all types of breast cancer.  The most common type is invasive cancer.

Q.     Would you just -- would you explain to us what invasive cancer is?

A.     There are many, many different types of breast cancer, and there are two large families, ductal and lobular, and within those two families we have some breast cancers that are good guys, that don't metastasize.  Those are called "in situ."  And we have cancers that are capable of escaping the breast.  Those are called "invasive."

Q.     Just to connect this with Cynthia's case, what type did Cynthia have?

A.     Cynthia had an uncommon type of breast cancer that was in the lobular family.  The lobular in the breast is the organ that produces milk when a woman is lactating.  It is an uncommon site for breast cancers to develop.  Fewer than 10 percent of cancers are lobular, and fewer than 5 percent are Cynthia's type.  So she had an invasive lobular carcinoma.

Borgen

1

2      Q.    Getting back to the invasive cancers

3  that you perform surgeries on, can you give us an

4  estimate over the years how many surgeries that

5  involved invasive cancers have you performed?

6      A.    I would estimate that I've treated

7  between three and four thousand patients with

8  invasive cancer myself, and because not everyone I

9  see comes here, I do some second-opinion work, I've

10 probably seen eight to nine thousand patients with

11 invasive cancer over the years.

12     Q.    Some another physician may have referred

13 somebody here for a consultation, so you have not

14 only your patients but those patients, so we are

15 talking 10 to 12 thousand invasive cases?

16     A.    I would think that eight to ten thousand

17 would be a reasonable estimate.

18     Q.    Do you have any idea or any sense as to

19 how the number of invasive surgeries that you

20 performed compare to other surgeons, what they

21 typically get to see?

22     A.    I know the numbers in New York State

23 where this has been audited.  75 percent of general

24 surgeons in New York State treat fewer than ten

25 breast cancers per year.  Because of the unique

Borgen

nature of this institution, where we are treating

in my case nothing but breast cancer, the numbers

are extraordinarily higher than the average general

surgeon.

    Q.    Besides your hands-on treatment of

breast cancer patients, have you also written

articles and textbook chapters on the subject?

    A.    I have.

    Q.    You have in front of you a copy of your

curriculum vitae; is that correct?

    A.    Yes.

    Q.    Now, I don't want to get into it in

detail, but could you confirm that you have either

written or cowritten over 133 articles relating to

breast cancer that have been published?

    A.    That's correct.

    Q.    And is it also correct that you've

written or cowritten 15 different textbook chapters

on breast cancer?

    A.    That's correct.

    Q.    And am I correct that you now have

approximately ten articles that have been either

submitted or in the process of being submitted?

    A.    At least ten.

Borgen

1

2      Q.      Now your CV indicates that you also have

3   cowritten over 124 abstracts; is that correct?

4      A.      That's correct.

5      Q.      Would you briefly tell us what an

6   abstract is?

7      A.      An abstract is a research finding.  It

8   is a brief paper that brings a finding to the

9   general public's attention quicker, and so

10  abstracts are presented at national meetings.

11     Q.      And your CV indicates that you are on

12  the editorial board of, I think, 11 different

13  journals; is that right, approximately?

14     A.      That sounds approximately right.

15     Q.      What is your role there, what do you in

16  an editorial capacity?

17     A.      I help to review articles for

18  consideration of publication.  In this country we

19  have a very healthy system of peer review, where

20  before something is published a lot of outside eyes

21  look at it and render their opinion about it.

22  Since papers can impact practice, this is an

23  important checks and balance on the system.

24     Q.      So you're reviewing what other

25  physicians have submitted for publication?

                         Borgen

1

2      A.    Right.

3      Q.    We've referenced your curriculum vitae,

4   Exhibit 46; is that a true and correct copy of your

5   curriculum vitae?

6      A.    I believe so.

7            MR. DIVEGLIA:  Cross examination is

8      halt.  I pass the witness to counsel.

9            MR. WOLGEMUTH:  Just a few, Dr. Borgen.

10  EXAMINATION BY

11  MR. WOLGEMUTH:

12     Q.    The published articles that you've

13  identified, I believe there are approximately 133

14  of them?

15     A.    I believe that's right.

16     Q.    Do you agree with me, Doctor, that none

17  of those articles discusses any conclusions

18  regarding the effects of stress and risk of

19  recurrence of breath cancer?

20     A.    That is correct.

21     Q.    So you never actually engaged in any

22  type of specific research with respect to that

23  issue?

24     A.    I have not published on that.  We have

25  an ongoing audit study looking at a large number of

                        Borgen

1

2    factors in our large number of breast cancer

3    patients.  And certainly stress, psychological

4    issues, social issues, are part of an ongoing work

5    in progress.

6         Q.    But as to this date, you never had any

7    articles published regarding that issue?

8         A.    That's correct.

9              MR. WOLGEMUTH:  That's all I have.

10   FURTHER EXAMINATION

11   BY MR. DIVEGLIA:

12        Q.    Doctor, when did Cynthia Kaylor first

13   become your patient?

14        A.    I believe that it was in April of 1997.

15        Q.    When you first saw her, what were your

16   findings, and what did you decide needed to be

17   done?

18        A.    Well, I was concerned about what

19   appeared to be a large tumor in the central part of

20   the breast, and I made recommendations concerning

21   the diagnosis and treatment of that condition.

22        Q.    What were your recommendations?

23        A.    I wanted to do a biopsy, and if that

24   biopsy confirmed my suspicions, I recommended a

25   mastectomy, totally removal of the breast, and

                            Borgen

1    removal of the lymph gland under the left arm.

2        Q.    Did Cynthia Kaylor follow your

3    recommendations?

4        A.    She did.

5        Q.    And when the lymph nodes were removed

6    from under her arm, what were the findings?

7        A.    Unfortunately, every lymph node that I

8    removed contained metastatic invasive lobular

9    breast cancer.

10       Q.    What is a significance of a hundred

11   percent finding of metastatic cancer in a woman's

12   lymph nodes?

13       A.    The lymph nodes under the arm are the

14   most important predictor of the future, and by

15   having every node involved with breast cancer, it

16   made the likelihood of systemic spread quite high.

17       Q.    By "systemic spread" you mean what, sir?

18       A.    What really threatens a woman's health

19   with breast cancer is when it leaves the breast and

20   the lymph nodes and travels in the body.  The most

21   common sites are the bone, the lungs and the liver.

22   When breast cancer travels to those organs and

23   establishes itself and becomes a clinical tumor, a

24   tumor we can identify, it is extremely difficult to

Borgen

cure.

Q.    In regard to the -- over the years, the
women that you've seen and consulted and performed
surgery upon, can you give us an estimate as to the
number of women that you know had a hundred percent
lymph node involvement?

A.    It is thankfully uncommon, and my best
estimate would be about one patient a year.

Q.    Back in 1997, before you performed the
surgery upon her, with the findings that you had
upon examination, review of the mammogram films and
the like, what was the probability that she was
going to have systemic recurrence?

A.    Based upon the visit in the clinic or
based upon the lymph nodes that we found?

Q.    Okay.  Just the visit in the clinic
without any surgery.

A.    Well, the average U.S. woman's risk of
being cured of breast cancer, if we took everybody
coming through the door, the cure rate is very
high, 90, 95 percent.  With Cynthia's larger tumor,
I might have given her a 70 or 80 percent chance of
cure.

Q.    Now, once you did learn that there was a

Borgen

2    hundred percent lymph node, what was your estimate

3    there as far as recurrence?

4        A.    Yeah.    Considerably worse.    With maybe

5    an 80 or 90 percent chance of systemic recurrence.

6        Q.    Now, after you performed your radical

7    mastectomy, am I correct, that she then had a

8    regimen -- you recommended a regimen of

9    chemotherapy?

10        A.    I did recommend a regimen of

11    chemotherapy, and I referred her to a colleague of

12    mine in Medical Oncology, who further made

13    recommendations about that treatment.

14        Q.    Can you tell us what is your

15    understanding as to what chemotherapy she incurred?

16        A.    Because of the nature of this breast

17    cancer, Ms. Kaylor was offered a chance to

18    participate in a clinical trial of a more

19    aggressive regimen of chemotherapy, stronger drugs,

20    higher doses and a shorter interval between the

21    doses.

22        Q.    Did she follow the recommendation to

23    have that?

24        A.    She did.

25        Q.    Approximately how long was she

1                          Borgen

2     undergoing that program?

3          A.      Approximately six months.

4          Q.      Now, I've heard the term "high-dose

5     intensive"; is that a description of what she had?

6          A.      The treatment that she offered in 1997

7     is today the standard of care, and we refer to it

8     as "dose-dense," high dose with a short interval

9     between the doses.

10         Q.      What were the side effects of this high

11    dose that she could have incurred and, in fact,

12    that you observed that she did incur?

13         A.      Well, the obvious and striking one is a

14    complete loss of all hair on the body, often a

15    pallor, a lack of color, patients complain of a

16    lack of taste, that food doesn't taste the same,

17    nausea, vomiting, a higher chance of infection.

18    The Taxol can cause numbness and paresthesia in the

19    hands and feet.  Adriamycin can weaken the heart

20    muscle.  These are the most striking side effects

21    of the chemo.

22              The other one that is increasingly

23    talked about is an impact on mental functioning.

24    We call it "cognitive functioning," meaning the

25    patient doesn't think as quickly, may not retrieve

Borgen

1

2  a word as quickly, may see a person they know and

3  not pull their name out of the back of their mind.

4  This has been referred to as "chemo brain."  It's a

5  terrible name, but that's what it has been called.

6      Q.    Do you have an understanding as to

7  whether Cynthia has incurred these symptoms?

8      A.    I think she incurred almost all of these

9  symptoms.  I can't comment on the cardiac toxicity,

10 but certainly in terms of the outward

11 manifestations that I saw, she certainly did.

12     Q.    Is another side effect of chemotherapy

13 extreme fatigue?

14     A.    Yes.

15     Q.    Did she indicate she incurred that?

16     A.    Yes.

17           And it would have been extremely

18 uncommon given this regimen.  We know that

19 virtually a hundred percent of patients on this

20 regimen have extreme fatigue.

21     Q.    After you did your surgery, you referred

22 her for chemotherapy.  Did you continue to have

23 follow-up visits with Cynthia?

24     A.    I did.

25     Q.    How often would you see her?

Borgen

1

2      A.      Typically it's every six months.

3  Cynthia had a number of doctors looking in on her.

4  My standard approach, and I think this was true

5  with Ms. Kaylor, was every six months.

6      Q.      Do you continue to see her?

7      A.      I do.

8      Q.      After she had completed her dense

9  chemotherapy, do you have any knowledge as to

10  subsequent, whether she was placed on any kind of

11  oral chemotherapies?

12      A.      I do.

13              Her tumor was responsive to estrogen.

14  Circulating estrogens in her body would promote the

15  growth or regrowth of a cancer, so she was placed

16  on a pill called Tamoxifen citrate, which blocks

17  the effects of estrogen on tumor cells, and I

18  believe she took that for approximately five years.

19      Q.      Do you have any knowledge as to --

20  subsequent to the Tamoxifen treatment, is she

21  currently on ongoing treatment?

22      A.      While she was on Tamoxifen a study was

23  unblinded that suggested that a follow-up drug may

24  continue to provide some measure of protection.

25  That is a drug in a class of drugs called aromatase

                              Borgen

1

2   inhibitors.  I believe she's on one called Femara.

3        Q.    In the course of your care for her, that

4   she would come to you and ask you to complete

5   disability forms from Northwestern or did

6   Northwestern send you forms for completion; do you

7   recall that?

8        A.    I do.

9        Q.    I have premarked some exhibits.  Would

10  you tell us the first one, Exhibit No. 64 -- I

11  think it's dated 6/3/97 on page 2, sir -- is that a

12  form you completed?

13       A.    Yes, it is.

14       Q.    Would you look at item 7-A and note what

15  column comment you made?

16       A.    7-A is under -- on at the top of the

17  second page, and I indicated "No trial work."

18       Q.    Now, the next exhibit I think I have

19  premarked as Exhibit 16.  It's the Attending

20  Physician's Statement that you were asked to

21  complete, dated 2/3/98.

22            The dates on these are always on the

23  second page, by your name.

24       A.    Yes.  I have that in front of me.

25       Q.    And under the section "Extent of

1                          Borgen

2    disability," Section F, could you tell us what you

3    wrote and what you then wrote under "Remarks"?

4          A.     Under 6-F the question is "What are the

5    patient's current limitations?"  And I wrote "Left

6    arm, no heavy lifting, 10 pound max.  See under

7    remarks."

8          Q.     And then what did you say under

9    "Remarks"?

10          A.     Under number 9 under "Remarks," I wrote

11    "A major stress reduction will enhance the

12    likelihood of getting this disease into long-term

13    remission.  This may mean a sabbatical from trial

14    work."

15          Q.     The next exhibit I have for you is

16    premarked Exhibit 18.  I believe that has a date of

17    8/14/98; am I correct?

18          A.     The next -- the next one I have is dated

19    '99.

20          Q.     Let's see if I have this.

21                MR. DIVEGLIA:  Would you pass this to

22          the Doctor, please.

23                MR. WOLGEMUTH:  What is the exhibit

24          number?

25                MR. DIVEGLIA:  18.

Borgen

Q.    Do you have that exhibit in front of you, sir?

A.    I do.

Q.    Would you tell us what you wrote in 6-F, please?

A.    Number 1, "Left arm, no heavy lifting, ten pound max.  See remarks."

Q.    What did your remarks indicate, sir?

A.    Under number 9, "Remarks," I wrote "I continue to recommend major stress reduction.  This will enhance the likelihood of a long-term remission."

Q.    I think the next exhibit now is Exhibit 12; is that what you have, sir?

A.    Yes, it is.

Q.    Is that dated 10/27/99?

A.    It is.

Q.    Would you tell us what is marked under 6-F?

A.    "Nonlitigation/nontrial work, stress reduction."

Q.    And the last exhibit is Exhibit 20.  I think it's dated the same date, but it's a different type of form.

1                          Borgen

2        A.      That's correct.

3        Q.      Would you tell us, sir, what is listed

4    under 5-B?

5        A.      5-B I wrote --

6        Q.      I am sorry.  Yes, 5-B, yes, sir.

7        A.      "Major stress reduction, nonlitigation,

8    no trial work."

9        Q.      And would you look at item 6-A, please.

10       A.      Yes.

11       Q.      And tell us what you wrote there.

12       A.      The question on the form "Is how long do

13   you anticipate your patient will continue to have

14   work-related restrictions as described in 5-B?"  I

15   wrote "Indefinitely."

16       Q.      After that form, did you receive any

17   other forms from Northwestern requesting your

18   opinion regarding the disability?

19       A.      I'm not aware of any.

20       Q.      Now, tell us --

21               First of all, what, is your knowledge of

22   Cynthia as a trial lawyer, and your knowledge as to

23   what trial lawyers do?

24       A.      Well, within our initial consultation I

25   learned a fair amount about Cynthia and found out

Borgen

1

2    what she did for a living, which was, I believe,

3    medical malpractice-related trial work, litigation.

4    In talking to her I developed an opinion about the

5    type of stresses that were involved in that work.

6    I am married to a trial lawyer, so I had some

7    appreciation of that, what she said resonated with

8    me.

9        Q.    As her physician and surgeon, throughout

10   these years, with the consistent opinion she should

11   not go back to trial work, could you explain to us

12   why you recommended that she not return to trial

13   work?

14       A.    This unfolded as an extremely dangerous,

15   bad type of breast cancer, and I knew that we were

16   going to recommend a variety of treatments.  Those

17   treatments are not 100 percent effective, and so we

18   look for other ways to improve the chances of a

19   cure, and one of my own biases, has been stress

20   reduction, and certainly not in every patient, but

21   every patient doesn't have this type of breast

22   cancer.  So here from very early on in the

23   management, I felt that we needed to maximize this

24   in every way that we could, and so that's why

25   stress reduction in Cynthia Kaylor.

Borgen

1

2        Q.      And in regard to the stress reduction

3   issue, who raised that issue?

4        A.      I did.

5        Q.      And do you make similar recommendations

6   to other patients in high-stress fields?

7               MR. WOLGEMUTH:  Objection.

8        Q.      Was this solely --

9               MR. WOLGEMUTH:  Let's go off the record.

10              THE VIDEOGRAPHER:  The time is 11:20

11   a.m.  We're going off the record.

12              (Discussion off the record.)

13              THE VIDEOGRAPHER:  The time is 11:21

14   a.m.  We are back on the record.

15   BY MR. DIVEGLIA:

16       Q.      Doctor, in your clinical practice and in

17   your recommendations that you made to Cynthia, did

18   you have a basis as to whether or not that

19   recommendation would have an effect on her ability

20   to not have a recurrence?

21       A.      Yes, I did.  My overwhelming experience

22   over the last 15 years has been that when things

23   look bad, you do everything you can to try to

24   reverse that, and stress reduction has been in my

25   experience a significantly positive thing in terms

Borgen

1

2      of outcome, and conversely, increased stress or

3      lack of stress reduction has -- I very often have

4      seen a negative impact on outcome, and so I said

5      earlier I certainly don't recommend that every

6      patient take off from work and that wouldn't be

7      reasonable, but there are cases like this where I

8      think it's extremely valuable.

9           Q.     Are you aware of whether or not -- other

10     cancer treatment centers have similar programs

11     relating to stress reduction?

12          A.     Certainly all major medical institutions

13     that have cancer programs and certainly cancer

14     centers have a variety of programs to enhance the

15     outcome, one of which is stress management, stress

16     reduction. That's a very, very common thing. Not

17     only in the U.S. but around the world.

18          Q.     You earlier alluded to this about if the

19     cancer reoccurred. Could you just explain to us,

20     if her cancer had reoccurred in, let's say, the

21     five years after her chemotherapy ending, what

22     prognosis would you believe that she would have

23     had?

24          A.     Put bluntly, which is frankly not so

25     easy, we do not have a treatment for breast cancer

Borgen

that has metastasized and established itself in

other organs. We simply don't have tools at our

disposal to treat that once it has occurred. It is

almost uniformly fatal.

Q.    Was there any stage where Cynthia could

be determined to be cancer-free or would she always

have some cancer in her?

A.    Well, I think that the uncertainty of

whether there is cancer in her will remain for a

long time. She has not had a period during which

she's not been treated, since 1998 when the chemo

and the Tamoxifen and everything else was done. So

she has been under constant treatment since then.

With today's technology, it's impossible to

determine whether she's actually cancer-free as we

sit here today. Time will bear that out.

Q.    What is your prognosis for Cynthia at

this point?

A.    My estimate of Cynthia's prognosis has

continued to improve a little bit each year. I am

far more optimistic about her prognosis today than

I was in 1997, and that will continue to get

better.

Q.    Earlier you discussed how rare a hundred

1                      Borgen

2  percent lymph node involvement is.  Do you have an

3  idea as with regard to how many of those women have

4  survived?

5       A.    It's a minority of those women that have

6  survived.

7       Q.    As her physician, who has provided

8  treatment throughout these six or seven years, do

9  you have an opinion whether her following your

10 recommendation to avoid distress of trial work has

11 contributed in any manner as to her lack of

12 reoccurrence?

13      A.    I certainly believe that the combination

14 of everything that was done, thorough surgery,

15 aggressive chemotherapy, aggressive hormonal

16 treatments, stress reduction, have all combined to

17 get her to where she is today.

18           MR. DIVEGLIA:  No further questions.

19 EXAMINATION BY

20 MR. WOLGEMUTH:

21      Q.    Good morning, Dr. Borgen.

22      A.    Good morning.

23      Q.    I just have a few questions for you.

24           Doctor, you had mentioned that your wife

25 was a trial lawyer, I believe?

Borgen

A.    Up until a couple of -- up until baby number four was born.

Q.    And Doctor, do you agree with me that the duties of a trial lawyer may be stressful to one attorney and not stressful to another attorney?

A.    Sure.

Q.    Do you recall whether Mrs. Diveglia had indicated to you when you had first met with her, even over the course of your treatment of her, what particular duties she did that were stressful to her?

A.    I don't recall that.  My recollection is more a global impression that the practice of law and in particular the practice of litigation was a stressful event for her.  I don't remember specific compartmentalizations of the various aspects of her job.

Q.    Did you have any discussions with Mrs. Diveglia about the fact that she has cancer and just the stress that that caused her?

A.    She told me how much stress or let me know how much stress was involved.  I didn't need to ask her that question.

When you sit across the table from

Borgen

patients who have just been told this news, the

stress is palpable.  Certainly this stress is then

additive to all of life's other stresses.

Q.    When you had first met Mrs. Diveglia,

did she give you any indication or do you recall

any indication of how many times she was in court,

how many trials she had a year prior to your

diagnosis?

A.    We may have had a discussion about that.

I simply don't recall.

Q.    Doctor, when you counsel your patients

who come to see you for treatment of breast cancer,

do you direct them to any type of programs or

anything like that in terms of stress reduction?

A.    Sometimes.  Every option -- there are so

many different ways to reduce stress, whether it's

with a support group, whether it's with a trained

healthcare professional, like a psychologist,

psychiatrist or psychologist, whether it's with

taking a sabbatical from work.  Different

approaches work in different people, and there are,

obviously, risks and benefits to each of those

different strategies, including support groups, and

so in getting to know the patient, I try to look at

Borgen

where the most -- if you'll pardon the

expression -- bang for the buck is, where can I get

the most reduction in stress.  For some patients it

could be medications, it could be a psychiatrist,

it could be support groups.  In some people it's

stepping away from the stress in their life,

whether that's at work or at home.

     Q.    Would you agree with me, Doctor, that

some people that are stressing over the very fact

that they have breast cancer, that returning to

work could be a positive thing for them in terms of

stress reduction?

     A.    Everyone is different, and I've had

patients who I felt should step away from their

work for a period of time who didn't, who said,

"I'm going to keep working," and certainly all I

can do is make recommendations to those people, but

clearly in those patients' minds, for whatever

reason, they decided to keep working.  It certainly

happens.

     Q.    Now, Doctor, on the one Attending

Physician's Statement that Mr. Diveglia reviewed

with you, I believe you indicated that

Mrs. Diveglia should take a sabbatical from trial

Borgen

2  work?

3      A.    Uh-hmm.

4      Q.    Do you agree with me that the term

5  "sabbatical" connotes a limited period away from

6  that duty?

7      A.    More than limited.  I think it leaves

8  the door open to a return.  "Sabbatical" can be two

9  weeks or five years, but it -- I -- my impression

10 was she had a tough hill to climb, and that she, if

11 she successfully climbed that hill and got to the

12 point that she was well down the road, whether it

13 was four years or six years or eight years, my

14 impression, from getting to know her, is that she

15 would return to work, so "sabbatical" to me just

16 left that door open.

17     Q.    Doctor, on your direct examination, I

18 believe you testified about the percent chance of

19 recurrence in somebody that had the level of cancer

20 that Mrs. Diveglia had?

21     A.    Right, I think I was asked that.

22     Q.    What percent was that?

23     A.    Well, I think we talked about it in

24 terms of the chances of the disease metastasizing,

25 and I thought it was 80 to 90 percent.

Borgen

Q.    And would you agree that that risk of 80 to 90 percent would include women that aren't employed?

A.    I'm sorry.  I'm not sure what you're asking.

Q.    I believe you said that the risk of a recurrence in somebody who had the level of cancer that Mrs. Diveglia had is about 80 to 90 percent, and would you agree that that risk would apply to women who have high-stress jobs, low-stress jobs, and no job?

A.    Well, no.  We're talking about untreated.  We're talking about what would happen if I took the cancer out alone and stopped, and so we're talking about taking no action.  So that's the -- what we would call the "crude survival rate."  That's almost the natural history of breast cancer.  If you look at the natural history, yes, it won't -- it won't make a huge difference whether you're working or not.  When you begin crossing the line to treating the breast cancer, where you're talking about intervening, taking nodes, giving chemo, giving Tamoxifen, giving Femara, you start looking at incremental benefits in outcome,

Borgen

incremental benefits in survival.  That's what we
are talking about here with working versus not
working as a stress reduction here.  We're talking
about the incremental benefit to that, which I
think is meaningful.

    Q.    Now, maybe I misunderstood you,
Dr. Borgen.  What you're saying is that if you had
just done surgery alone, the risk of recurrence
would have been 80 to 90 percent?

    A.    That's right.

    Q.    So with the chemotherapy that
Mrs. Diveglia received, your other patients
received, and the other treatment, that reduces the
risk of recurrence?

    A.    That's exactly right.

    Q.    In somebody like Mrs. Diveglia, that
received the chemotherapy that I would understand
that you probably prescribed or at least assisted
in the prescription of, and the elimination of any
sites where you could see invasive cancer, what
risk would she have of recurrence after receiving
the chemotherapy?

    A.    The number we typically quote is a
40-to-50 percent reduction in the rate of

Borgen

metastasis. So if she had a 90 percent rate of

metastasis, it would be about 45 percent. Put

differently, her survival would go from 10 to about

60 percent.

Q.    And somebody that has gone six, seven

years since they've had the chemotherapy, and have

showed no signs of recurrence, what type of percent

would you estimate that she would have a risk of

recurrence as of this time?

A.    That's a really good question, and a

tough question. I think a patient uses up the

lion's share of their risk in those first five or

six years. With Cynthia I think that there may be

still a 10 to 15 percent chance that something

could come back. So we've gone from a 90 percent

chance to a 10 percent chance. I think that's

terrific.

Q.    And does that type of prognosis apply to

all your patients who remain not cancer-free, but

they have no signs of any active metastases after

five or six or seven years?

A.    Well, you'd have to ask the question

does this apply to every patient with 16 nodes

positive and that's a really rare subset of

Borgen

patients, but I think the answer is yes, if we had

other patients like Cynthia, who had 16 nodes, who

had taken the same steps that she had taken, I

think that would be -- that number would be

applicable.

Q.    Doctor, do you agree with me that after

these five or six years had gone by where there has

been no evidence that the cancer metastasized, that

your belief that she ought to engage in a stress

reduction is less important to you?

A.    I certainly think that stress reduction

is the most beneficial, the higher your risk of

recurrence is.  Remember, I certainly don't

recommend that all of my patients take off of work

because most of the time the prognosis is so

incredibly good.  So yes, as time goes by and as

the prognosis begins to brighten, then I do think

that the value of stress reduction takes a back

seat.

Q.    So as of sometime in 1992 or 1993 you

wouldn't have had restricted --

A.    Two thousand and --

Q.    Yes.  Sorry.

Sometime during 2002, 2003 you wouldn't

Borgen

have restricted or placed that restriction upon

Mrs. Diveglia?

    A.    I may not have.  I felt that at some

point, having gotten to know her over seven years,

I felt that at some point she would have come to me

and say I think I'm going to return to work.  And I

certainly would support that.  Again, it gets back

to the "sabbatical" word.  I never envisioned this

as long-term disability or long-term being out of

work.  We just wanted her to have a long-term.

    Q.    Are you aware, Doctor, that, in fact,

Mrs. Diveglia returned to trial work back in

December of 2003?

    A.    I learned that recently.

    Q.    Doctor, I believe you had testified that

maybe there is a 10 percent chance of recurrence of

the cancer with somebody like Mrs. Diveglia, that

had the level of cancer she had and the fact that

she had no evidence of cancer after six or seven

years.  That 10 percent, in your experience, do you

see women that have been working in high-stress

jobs over that six- or seven-year period that don't

have a recurrence?

    A.    Well, again, if we go back to the

Borgen

1
2   specific patient that matches Ms. Kaylor, that is
3   the bad breast cancer with high lymph nodes, I am
4   sure there are exceptions to every rule in
5   medicine, but certainly in the aggregate I've seen
6   an improvement in outcome where we could control
7   the stress, absolutely.
8       Q.    And do you agree with me, Doctor, that
9   in some of your patients who had the same level of
10  cancer that Mrs. Diveglia had don't engage in
11  stressful activities and yet, unfortunately, still
12  have a recurrence?
13      A.    Well, certainly, yeah.  We -- again, we
14  are looking at all of these steps as incremental
15  benefit, but none of it is perfect, and certainly
16  even with the steps that we took, and even with the
17  stress reduction, we remained worried that the
18  cancer could come back, certainly.
19      Q.    And, Doctor, as of 1998 there has been
20  no evidence that the cancer has recurred in her
21  body?
22      A.    The -- that's correct.  The tests we
23  have are incapable of showing whether there is
24  actually cancer cells in her body, but in terms of
25  setting up a metastatic -- we call it a "metastatic

1                          Borgen

2    deposit."   It means that breast cancer has not only

3    traveled but has begun to grow and proliferate.

4    That's how we describe "metastasis."   And that

5    event, thankfully, has not been identified in

6    Ms. Kaylor.

7         Q.     So the bone scans and the CAT scans and

8    blood tests that have been performed show no

9    evidence of metastasis at this point?

10        A.     Right, as we've described, that's right.

11        Q.     Doctor, do you agree with me that your

12   opinion that the reduction of stress could increase

13   the outcome of Mrs. Diveglia, that there is no

14   scientific proof of that opinion?

15        A.     I think it would be extremely difficult

16   to prove measuring stress, quantifying stress,

17   quantifying stress reduction; quantifying the

18   immune system has proven to be very difficult for

19   the medical community, and so in terms of hard core

20   trial, clinical trial, not legal trial, evidence,

21   it has been difficult to do, so I agree with you

22   that that has been difficult.   The clinical

23   observation that stress reduction has a good effect

24   is reflected in the fact that every cancer center I

25   know of has a stress reduction program.   So you're

1                          Borgen

2    correct that the evidence is debatable and soft,

3    and it's necessarily soft.  Until we get concrete

4    ways to measure these things, it's going to be

5    tough.  But certainly I'm far from alone in the

6    clinical observation that in aggressive bad breast

7    cancers with a guarded prognosis, everything should

8    be done and one of those things should be stress

9    reduction.

10        Q.    Do you agree with me, Doctor, that would

11   be very difficult to quantify or separate the

12   stress from having cancer in the first place versus

13   work-related stress?

14        A.    I think stress is stress.  I think it's

15   additive, and certainly there is stress associated,

16   as we discussed earlier.  There is certainly a lot

17   of stress with the cancer event itself, absolutely.

18        Q.    And, Doctor, do you agree with me that

19   you've treated patients who have had high-stress

20   positions, were treated for breast cancer and

21   returned to work in their high-stress positions?

22        A.    That has happened, yes.

23        Q.    Would you also agree with me that some

24   of the treating physicians don't restrict their

25   patients from high-stress type of positions after

Borgen

being treated successfully for breast cancer?

     A.     Sure.   Treatment of this disease is
extremely individualized.  If we just look at the
mainstream options, and I am talking about
clinically trial proven options for stage one and
two breast cancer, there are 200 treatments we
could recommend, all of them sanctioned by the
results of the clinical trial.  So there is
incredible variability in what doctors do.  And
that's part of the art of breast cancer.  So, yes,
you would certainly find some doctors who would
disagree with this, who would say go about your
life, I don't believe in the stress reduction
theory, and that certainly is out there.

     Q.     Doctor, would it be fair to say that
having appropriate surgery is by far more important
in terms of the long-term prognosis of the patient
than stress reduction?

     A.     Well, I'm a surgeon, so you're asking a
loaded question.  I think that in the lion's share
of breast cancer surgery is the most important
option, in situ carcinomas, stage one cancers,
node-negative stage two cancers.  I certainly think
surgery provides the most positive impact on

Borgen

survival.  By the time you reach 16 positive lymph

nodes, I think that it's the magic of surgery, plus

the medicine, plus everything else that is done.

Q.    Do you agree with me, Doctor, that the

proper prescription of chemotherapy is also

significantly more important in the long-term

prognosis of a patient than stress reduction?

A.    I think it's the same answer.  I think

that for early-stage breast cancer, yes,

absolutely, the medicines are extremely important,

but again as you cross that line to the 16-node

positive person, again I think it's the

conglomerate of all of the things together.

Q.    Doctor, do you know what the National

Cancer Institute is?

A.    Yes, I do.

Q.    Could you explain for the jury what that

organization, is?

A.    Sure.  The National Cancer Institute is

a federally established, federally sanctioned

organization that is part of a larger body called

the National Institutes of Health, or NIH, and the

NCI is charged with studying the cancer component

of our national healthcare problem.  The NIH and

1                          Borgen

2    NCI are trying to keep Americans healthier, and

3    it's our tax dollars that pay for this.  The NCI

4    does its own research, it funds people like us to

5    do research, and occasionally it produces

6    guidelines or what are called "consensus

7    recommendations," where people in the field have

8    gotten together, put their heads together and

9    issued a statement.  So that's sort of the role of

10   the NCI.

11       Q.     And do you agree, Doctor, that I believe

12   the NCI has even funded some research of yours in

13   the past and I believe is currently funding some of

14   your research?

15       A.     It's a very important source of funding

16   for us.

17       Q.     And, Doctor, are you aware of the

18   position of the National Cancer Institute on

19   whether stress reduction would increase the

20   likelihood of no recurrence of cancer?

21       A.     I know that it's a topic that they look

22   at frequently, and I know that it's been the source

23   of attempted studies.  Because of what we talked

24   about earlier, that the metrics or the tools are

25   difficult to ascertain, the NCI has concluded that

Borgen

there is not enough evidence one way or the other

to recommend it.   They are aiming at the larger

body of breast cancer patients.   You can imagine

the disaster if all the women with breast cancer in

America took off of work, for example.   There are

probably ten million breast cancer survivors in

this country right now.   There are a quarter of a

million new ones each year added to the list.

So the NCI concluded that based on

studies that they had, they couldn't recommend it,

and I think in the aggregate I certainly would

agree with that.   Like all government regulations,

you have the aggregate and then you have the

individuals, and we can't use those federal

statements to apply to every single patient, and

certainly they were not thinking of someone with 16

positive lymph nodes and a young person with an

invasive lobular cancer, with those particular

guidelines.

Q.    Are you aware of any published

recommendations by the National Cancer Institute

regarding stress reduction and the risks of

recurrence?

A.    I'm aware of research that they're

Borgen

1

2  funding, even stress reduction programs that

3  they're funding.  So while their statement is "we

4  just can't prove it," they certainly have supported

5  it financially.

6      Q.    Finally, Doctor, do you know who

7  Dr. Barbara Weber is?

8      A.    I do.

9      Q.    What is your professional knowledge of

10  her?

11      A.    Barbara Weber is a researcher who has

12  spent much of her professional life studying the

13  genetics of breast cancer, and most notably two

14  genes, BRCA 1 and BRCA 2.

15      Q.    And in your professional knowledge of

16  her, Doctor, is she respected in the medical

17  community?

18      A.    I think as far as genetics goes, as far

19  as BRCA 1 and 2 go, I think she's absolutely a

20  recognized expert in that field.

21      Q.    Doctor, at this point you're very

22  optimistic about the prognosis for Mrs. Diveglia?

23      A.    It's probably the first time I've said

24  it, but yeah, I am optimistic about it.

25          MR. WOLGEMUTH:  That's all the questions

```
 1                      Borgen

 2        I have.  Thank you, Doctor.

 3             MR. DIVEGLIA:  No redirect.  We're now

 4        complete.

 5             THE VIDEOGRAPHER:  The time is 11:50

 6        a.m. on May 21, 2004.  This is the end of tape

 7        number 1, and this completes the videotaped

 8        deposition of Mr. Patrick I. Borgen, M.D.

 9             (Time noted:  11:50 a.m.)

10                    _____

11             DR. PATRICK I. BORGEN

12

13   Subscribed and sworn to before me

14   this ___ day of _____, 200_.

15

16   _____

17

18

19

20

21

22

23

24

25
```

48

1

2                    C E R T I F I C A T E

3   STATE OF NEW YORK      )

4                          :  ss.

5   COUNTY OF NEW YORK     )

6

7         I, THERESA TRAMONDO, a Notary Public

8   within and for the State of New York, do

9   hereby certify:

10        That DR. PATRICK I. BORGEN, the witness

11  whose deposition is hereinbefore set forth,

12  was duly sworn by me and that such deposition

13  is a true record of the testimony given by the

14  witness.

15        I further certify that I am not related

16  to any of the parties to this action by blood

17  or marriage, and that I am in no way

18  interested in the outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set

20  my hand this 27th day of May, 2004.

21

22        _____

23           THERESA TRAMONDO

24

25

1

2    ------------------ I N D E X ------------------

3    WITNESS                    EXAMINATION BY      PAGE

4    DR. PATRICK I. BORGEN    MR. DIVEGLIA      7, 14

5                             MR. WOLGEMUTH    13, 29

6

7    ------------------ EXHIBITS ------------------

8    BORGEN                              FOR ID.

9

10    Borgen Exhibit 12, Attending              5

11    Physician's Statement dated 10/27/99

12    Borgen Exhibit 16, Attending              5

13    Physician's Statement dated 2/3/98

14    Borgen Exhibit 18, Attending              5

15    Physician's Statement dated 8/14/98

16    Borgen Exhibit 20, Attending              5

17    Physician's Statement dated 10/27/99

18    Borgen Exhibit 46, Curriculum Vitae       5

19    Borgen Exhibit 64, Attending              5

20    Physician's Statement dated 6/3/97

21

22

23

24

25