# EXHIBIT C

16

1 the time I was diagnosed and probably a few years
2 before that, it was all personal injury work, and it --
3 and even though I pretty much just wanted to do
4 personal injury, it really developed into mostly
5 medical malpractice.
6     Q    Did your -- did the domestic relations
7 work that you did briefly involve courtroom
8 appearances?
9     A    Yes.
10    Q    Again, not to be scientific about it, but
11 could you put an estimate on how often, you know,
12 percentage-wise in terms of your cases you would have
13 to make court appearances for the domestic relations
14 cases?
15    A    Very frequently because -- now, around the
16 time that I was getting out of the domestic, they
17 started having a lot more with conciliators, you know,
18 having divorce conciliators to take the burdens off of
19 the courts.
20         But when I actually started to do the
21 work, especially even in some counties, they didn't
22 have the conciliators immediately.  So you did
23 everything in court, and that was very frequent.  I
24 would say very frequent.
25    Q    When did you -- setting aside the domestic

17

1 relations work, let's just focus on the medical
2 malpractice and the personal injury.  When did you
3 start trying cases on your own?
4     A    Wow, I don't know the answer to that.  I
5 don't know the date of that.  I mean --
6     Q    Okay.
7     A    I -- I just can't say that.  That's a good
8 question.  I am sorry.
9     Q    Let me -- let's work through it a little
10 bit.
11         When you were with your first firm, was
12 there -- you know, were you trained by more seasoned
13 lawyers, so that if you had a courtroom appearance, you
14 would go with another attorney from the firm?
15    A    No.
16    Q    Did you have personal injury or medical
17 malpractice cases at the old firm?
18    A    Yes.
19    Q    That you handled on your own without
20 supervision?
21    A    We didn't have a supervisor per se, but
22 you had someone -- like if I had a question and if I
23 didn't know how to handle something, I could go to
24 Lee Swartz, but nobody -- or maybe one of the other
25 partners if I was working for him.

18

1         But they did not have like a mentorship
2 program.  You were expected to know what you were
3 doing.  You were a lawyer, and that is what you were
4 supposed to do.
5     Q    Did you actually try any cases when you
6 were with the old firm, any personal injury or med mal
7 cases?
8     A    No.  I don't think so, no.
9     Q    When you started to work with
10 Mr. Diveglia -- let me back up.  Scratch that.
11         Have you and Mr. Diveglia tried cases
12 together?
13    A    Yes.
14    Q    While you have been at Diveglia and
15 Kaylor, have you personally tried cases without
16 Mr. Diveglia?
17    A    Yes.
18    Q    Okay.
19    A    Let me just -- let me modify that.  What
20 we did was -- maybe this will make it more clear.  He
21 has his cases, and I have my cases.  But when we go to
22 court, we are only a two-person firm, we both go.
23         In other words, if it's a case where it
24 was predominantly his case, I will go to -- you know,
25 to provide support for him, to console the client.

19

1         I mean, there is so much going on when you
2 are in trial and especially with medical malpractice
3 cases or some of the larger cases.
4         When you say alone, I don't think I ever
5 went, and I don't think he ever went, strictly alone
6 with nobody else in the room with just us.  I mean,
7 just to carry the stuff in alone, you know, and to sit
8 and talk to the -- listen to the client, because they
9 have a tendency to interject when you have to listen.
10        And so in that regard, we always try to
11 provide support to each other, if that helps you out.
12    Q    I think it does.
13        If you had a case that was primarily your
14 case, again, before April of 1997 --
15    A    Uh-huh.
16    Q    -- and it was going to go to trial, would
17 you be the lead attorney for that trial and Archie --
18 or, I'm sorry -- Mr. Diveglia would be providing you
19 with backup and support at the trial?
20    A    Yes.
21    Q    How many cases -- just a ballpark, if you
22 can, how many cases did you try in that capacity with
23 you being lead attorney?
24    A    Oh, wow, I can't really remember
25 precisely, but I can -- I know there was one -- one

20

1  slip and fall case. That was sometime before that,
2  early on, I know.
3         Well, 1996 I did a medical malpractice
4  case, and that was about -- I would guess that went on
5  for about seven days. It was more than one week of
6  trial, and I was the lead attorney in that case.
7         And in 1997, in February, I was lead
8  counsel in another case. That was a -- had to do with
9  an obstetrical issue.
10        And actually, in April of 1997, I had
11 another case that was -- I believe -- wait a minute.
12 Wait a minute. I think that was a medical malpractice
13 case. I can't remember if it was listed originally in
14 April or August, but I think it was -- the Court had
15 set a date specifically then in August of '97, which I
16 couldn't try, and -- and that was postponed until
17 sometime in '98.
18        And so, as I said, the -- from the time I
19 started the cases -- it takes several years to get a
20 medical malpractice case ready for trial, and they were
21 sort of all coming ripe, if you would, to try right
22 about the time of my illness.
23        And so I had numerous cases ongoing, and
24 some I -- I had to refer out.
25    Q     Who handled the one that was originally

21

1  scheduled for 1997 and it was pushed back to 1998?
2     A     Ultimately, that case was tried by Archie
3  then, my law partner.
4     Q     Okay. So there was -- while you were at
5  Diveglia and Kaylor, you tried two cases where you were
6  the lead attorney, one was a slip and fall case and one
7  was a --
8     A     No. No.
9     Q     -- like a seven-day or two-week jury
10 trial?
11    A     No, and then there is another one. That
12 was --
13    Q     February of '97?
14    A     February of '97, and I just -- I think I
15 remember now. There was another case scheduled in
16 April, and that we were all ready to go to trial, I was
17 lead counsel on that one, and it literally settled on
18 the courtroom steps.
19    Q     Okay.
20    A     And so -- but we did all the prep work to
21 get that to trial.
22        And that also frequently happens. You
23 know, like you get a case all ready, and you are ready
24 to settle it because you litigated it, because, you
25 know, you did all the trial work for it, and at the

22

1  very last minute the case will settle.
2     Q     So did you have a number of cases that
3  settled?
4     A     Oh, yes.
5     Q     Okay.
6     A     More settle than go to court by far, but
7  that -- but you still have to litigate them rather
8  ferociously or they don't settle, as you know.
9         And they all -- like you take the
10 depositions and all that sort of thing and do all --
11 all the court appearances, the -- the oral arguments,
12 the -- file all the motions and do all that sort of
13 stuff, and all that involves court appearances before
14 it actually goes to trial.
15    Q     Uh-huh.
16    A     It's part of the litigation process.
17    Q     Yes, no doubt about that.
18        How many cases did you try that you can
19 remember with Archie as the -- with Mr. Diveglia as the
20 lead counsel?
21    A     I couldn't put a number on that. I -- I
22 can recall several cases, but I couldn't -- I couldn't
23 put a number on it.
24    Q     Sure. Was it more or less than the ones
25 that you tried on your own as lead counsel -- not on

23

1  your own, with Mr. Diveglia but as lead counsel?
2     A     I don't know.
3     Q     Okay.
4     A     I would have to think about that. I don't
5  know.
6     Q     Did you ever keep a list of the cases that
7  you tried?
8     A     No.
9     Q     Did you ever write down a list for your
10 own recordkeeping?
11    A     No.
12    Q     No?
13    A     No.
14    Q     I want to go through a number of different
15 work activities with you, and --
16        MR. HENEFER: We can mark this as an
17 exhibit.
18        MR. ASHWAY: Off the record at 10:27.
19        (Discussion off the record.)
20        (Deposition Exhibit No. 1, the Requests
21        for Continuance, were produced and
           marked for identification.)
22        MR. ASHWAY: Back on the record at 10:27.
23 BY MR. HENEFER:
24    Q     Ms. Diveglia, I have -- excuse me -- I've
25 handed you a series of documents which we have just

24

1  compiled -- compiled from Northwestern's claim file.
2  There is no particular order to them, other than I
3  tried to put them in chronological order, and they are
4  all Requests for Continuance of Total Disability
5  Benefit forms that you filled out at one point or
6  another. Okay?
7           And I am going to ask you some questions
8  about this in a minute. But I wanted to ask you about
9  some of the job duties and so forth that you have
10 listed on these forms that you were doing at points in
11 time after April of 1997, and I want to see what of
12 those responsibilities you performed before April of
13 1997.
14      A    Okay.
15      Q    Does that make sense?
16      A    Well, it seems to.
17      Q    Okay.
18      A    Let's see where we go with it.
19      Q    Well, I was going to go through this list,
20 and I just wanted you to know that there was some
21 rationale to the list in terms of why I was asking the
22 questions.
23      A    Okay.
24      Q    It's things that you identified on these
25 forms.

25

1           Did you -- so let me just go through the
2  list, and you can elaborate.
3           Before you were diagnosed with cancer, did
4  you work on Discovery Requests and Responses?
5       A    Before?
6       Q    Uh-huh.
7       A    Yes.
8       Q    Okay. Is that something that you
9  typically did with most cases?
10      A    All cases in litigation.
11      Q    How about payroll responsibilities, taking
12 care of checks for payroll and things like that, did
13 you do any of that?
14      A    Yes.
15      Q    How about reading transcripts to highlight
16 objections, is that something that you did before being
17 diagnosed with cancer?
18      A    Well, I don't remember really doing that.
19 That was more like a -- at this point I was assisting
20 Archie with that, where before I would have -- if I
21 would have done it, I would have done it perhaps
22 differently because I would have been doing it for
23 myself.
24      Q    So, in other words, after -- at some
25 point, I think it was after February of 1998, when you

26

1  started to return to work in some capacity, you were
2  doing that to help out Mr. Diveglia with his cases?
3       A    In that particular one that I mentioned,
4  on that, that is what he -- he asked me if I would help
5  him go through transcripts and highlight the objections
6  so that he could find them more easily.
7           Now, you know, if I were to try my own
8  case, I might have done that differently. That was
9  just something he specifically asked me to do for him.
10 So --
11      Q    Okay. Legal research?
12      A    Well, it was something I have done before
13 but not nearly -- you have to understand, in all these
14 questions you are asking me, as far as like the
15 discovery, what I did before was different than what I
16 have done since.
17      Q    Okay.
18      A    Okay. But I guess the simple answer to
19 your question -- would you repeat that one again?
20      Q    Let me try.
21           Did you do -- before you were diagnosed
22 with cancer, did you do legal research?
23      A    Yes.
24      Q    Okay. And did you -- let me go through
25 them, and maybe we can come back given your comment --

27

1       A    Okay.
2       Q    -- and I can ask about how it differed.
3            But how about interviewing new clients?
4       A    Yes. You are asking before?
5       Q    Yes.
6       A    Yes.
7       Q    Again, before you were diagnosed with
8  cancer, preparing settlement documents?
9       A    Yes.
10      Q    Statements of Demand?
11      A    Yes.
12      Q    Preparing correspondence?
13      A    Sure.
14      Q    Okay. Attending seminars?
15      A    Yes, that is a requirement.
16      Q    Preparing Briefs?
17      A    You're -- all talking before now? Yes.
18      Q    Yes.
19      A    Yes.
20      Q    Reviewing new cases?
21      A    Yes.
22      Q    And, obviously, settlement negotiations?
23      A    Yes.
24      Q    Okay. Now, I will tell you what, I will
25 give you my list just to make it easier, and why don't

28

1  you just -- if you could, just kind of elaborate on how
2  the work that you did in these various categories
3  changed from before you were diagnosed with cancer
4  until the time when you started resuming some of these
5  responsibilities after February of '98.
6       A    Okay.  The first one that you gave me that
7  you asked me if I did before had to do with Discovery
8  Requests and Responses.  Before -- discovery is sort of
9  a broad thing here.  It could include like what you are
10 doing here today, this deposition.
11      Q    Uh-huh.
12      A    And before I would have done depositions,
13 and there would be discovery disputes that there would
14 be litigation over, courtroom appearance for, those
15 sorts of things.
16           Since my cancer, I avoid the high stress
17 of conducting any oral discovery like depositions such
18 as this.  But I would do things that are not stressful,
19 like hand writing interrogatories or sitting down with
20 a client if someone serves interrogatories, which are
21 just written questions and answers, and they just ask
22 general background information like about the client,
23 and there is -- it's really a no-pressure situation.
24           Even with the written discoveries though,
25 often there are written objections, and that involved a

29

1  volley of motions in the court.  I don't do that
2  anymore.  I don't make any court appearances.  I don't
3  advocate for my clients in court.  I do things that are
4  not -- not stressful.
5            Before, for instance, like I would
6  have -- would have done extensive research to prepare
7  to like cross examine a medical malpractice expert that
8  the Defense was -- was putting forth, including doing
9  the -- the medical research for that and flying
10 someplace like to Milwaukee and/or Chicago or Virginia.
11 We would just fly around, and I would conduct these
12 different depositions at these different places.  I
13 don't do any of that anymore.  Don't do that.
14           Now, pay -- the next one is payroll.  I
15 did that both before and after, you know.
16      Q    Okay.
17      A    Like I say, that is generally a
18 nonstressful thing, no pressure really.
19           The next thing, read transcripts to
20 highlight objections, I think I pretty will explained
21 that for you.  Is that all right?
22      Q    Yep.
23      A    Legal research, I really don't do as much
24 of that as I did before, and the reason is, before, if
25 I did the legal research and wrote the Brief, I argued

30

1  the Brief.  You know what I mean?
2            When you do the legal research, you might
3  do it -- there might be some that I would do now.  Like
4  if I was going to investigate a new -- a new case, I
5  would want to check the law, or I might want to check
6  the medicine.
7            You know, if it's a medical malpractice
8  case, I might do a little medical research to see if --
9  if there was a legitimate case, something like that.
10           But I don't like write the extensive
11 Briefs nor prepare to go to oral argument on appeal or
12 otherwise.  I don't do the court appearances.
13      Q    Okay.
14      A    So it's -- it's much, much less than it
15 had been previously.
16           Interviewing new clients, I did that
17 before, and I have phased into doing more of that now.
18 So during -- when you say before and after, there was a
19 period of time, of course, when I didn't interview new
20 clients at all.
21      Q    Right.
22      A    And so I have phased into doing
23 interviewing of new clients and screening them out.  I
24 would say there are fewer of them now because I feel I
25 lost a lot of my client base and a lot of the momentum,

31

1  I think, for my cases.  But I still do that.
2            Preparing settlement documents, again, I
3  don't have the quantity that I used to have.  But I do
4  prepare like -- a settlement document, I am not sure
5  what you mean by that.  Maybe I should ask you that.
6  What do you mean by a settlement document?
7       Q    Well, I think -- I think I probably lifted
8  it right out of your form.
9       A    Oh.
10      Q    And I just assumed you meant like a
11 settlement agreement or a release or something along
12 those lines.
13      A    Okay.  Yes.  If you are using my
14 interpretation of it, that would be like, yeah, just
15 looking over a release or finalizing the cost of the
16 case and things like that.  It's like, again, very low
17 key, not a high pressure kind of thing.
18           I don't make court appearances.  I don't
19 testify in court.  Like on minor settlement for
20 children, you have to go to court, and you have to put
21 people on the stand to make sure they understand.  I
22 don't -- I don't make that court appearance anymore.
23           Next one is preparing Statements of
24 Demand.  I did that before, and I do it now.  I do less
25 of it than I used to do.  But I still do prepare

32

1  Statements of Demand per se.
2           That is -- we do that more in auto cases,
3  I would say, than in medical malpractice cases, because
4  auto cases are more likely to settle, and they're
5  not -- they don't -- most auto cases do settle. They
6  don't get into the litigation, and so that would be a
7  prelitigation type of thing.
8           Now, sometimes they -- during the course
9  of litigation, they want to settle, and so then you
10 would submit a demand also. But that is just a limited
11 area of it.
12    Q     Uh-huh.
13    A     Prepare correspondence, sure, I did that
14 before and to a lesser extent, certainly to a much
15 lesser extent during the actual chemotherapy and
16 things, and doing some preparing -- preparing of
17 correspondence now.
18    Q     Okay.
19    A     Attend seminars, I did that before, during
20 chemotherapy, and for a period of time afterward I got
21 a special dispensation to not have to go to get my
22 credits, the CL -- the continuing education, legal
23 education requirements.
24          And then I -- what they did, I think, was
25 they made a provision that I could take videotapes

33

1  home, and they gave me an extension of time, because at
2  that time I was too weak to go and attend a seminar.
3           Prepare Briefs, I think -- I did one
4  Brief, I think, since I have had chemotherapy. I think
5  I did one.
6     Q     Okay.
7     A     And, of course, prior to that, you know,
8  you prepare Briefs all the time. So I don't do as much
9  of that, and I think the main reason is that I don't
10 argue them. So the person that wants to actually go
11 there and argue has to know the stuff, and it's --
12    Q     Uh-huh.
13    A     I would want to do my own Brief if I were
14 going to argue the case. So I just don't really get
15 into much preparation of Briefs.
16          Review new cases, yes, I do that still,
17 and I did it before. I do it to a much lesser extent
18 though.
19          Settlement negotiations, I do this to a
20 much lesser extent.
21    Q     Okay. Now, with the settlement
22 negotiations and the reviewing new cases, and a couple
23 of these you mentioned that you do to a lesser extent,
24 is part of the reason why you are doing it to a lesser
25 extent because you have -- your practice suffered as a

34

1  result of being sick?
2     A     Are you saying is that part of the reason?
3     Q     Uh-huh. In other words, is part of the
4  reason that you don't have as many clients now because
5  you had this interruption in your career?
6     A     I would say that that is part of the
7  reason. But the other part of the reason is that even
8  in settlement negotiations, if you are just talking
9  about an auto case where there is not a big issue as to
10 how much it is going to settle for, a smaller case,
11 there -- it's not a very stressful thing.
12          Once it gets into more of a heated debate
13 that it's getting feisty, if you would, I don't do
14 them.
15    Q     Okay. You did return to work sometime
16 around -- or in February of 1998; is that right?
17    A     Yeah, that was right after -- just a few
18 months after my chemotherapy stopped.
19    Q     And you -- you worked a progression of
20 hours. In other words, you didn't come back working 40
21 hours a week, right?
22    A     No.
23    Q     Okay. How much did you work when you
24 first came back?
25    A     I think -- I only worked about half a day

35

1  roughly, you know, and --
2     Q     Okay.
3     A     -- tried to pick things up. It was kind
4  of really depressing.
5     Q     It looked like -- excuse me. It looked
6  like from the last of these Requests for Continuation
7  of Benefits that you were working about 40 hours a week
8  by April of 2000?
9     A     Probably so.
10    Q     And have you continued with that work
11 regimen?
12    A     I wouldn't say that I work 40 hours every
13 single week.
14    Q     Uh-huh.
15    A     No, I wouldn't say that. I don't -- no, I
16 wouldn't be able to say that, that that is true.
17    Q     Okay. Do you not work 40 hours a week
18 because of physical ailments, or do you not work 40
19 hours a week because of not having enough work, or what
20 is the reason?
21    A     I get too tired still.
22    Q     Okay. So there are some weeks where you
23 work 40 hours, and there is other weeks where you are
24 too tired; so you don't?
25    A     I don't -- I don't think there is very